# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| CITY OF TRAVERSE CITY, MICHIGAN, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| PURDUE PHARMA L.P., CEPHALON, INC., TEVA PHARMACEUTICAL INDUSTRIES LTD., TEVA PHARMACEUTICALS USA, INC., ENDO INTERNATIONAL PLC, ENDO HEALTH SOLUTIONS, INC., ENDO PHARMACEUTICALS, INC., JANSSEN PHARMACEUTICALS, INC., INSYS THERAPEUTICS, INC., MALLINCKRODT PLC, MALLINCKRODT LLC , ALLERGAN PLC f/k/a ACTAVIS PLC, ALLERGAN FINANCE LLC f/k/a ACTAVIS, INC. f/k/a WATSON PHARMACEUTICALS, INC., WATSON LABORATORIES, INC., ACTAVIS LLC, ACTAVIS PHARMA, INC. f/k/a WATSON PHARMA, INC., AMERISOURCEBERGEN DRUG CORPORATION, CARDINAL HEALTH, INC., McKESSON CORPORATION, OMNICARE DISTRIBUTION CENTER LLC, MASTERS PHARMACEUTICAL, INC., CVS HEALTH CORPORATION, CVS PHARMACY, INC., OMNICARE, INC., WALGREENS BOOTS ALLIANCE, INC., WALGREEN COMPANY, RITE AID CORPORATION, RITE AID OF | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No.:<br><br>COMPLAINT FOR (1) PUBLIC NUISANCE; (2) NEGLIGENCE PER SE; (3) NEGLIGENCE; and (4) VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ACT |

MICHIGAN, INC., and COSTCO                )
WHOLESALE CORPORATION,                    )
                                          )
                    Defendants.           )
                                          )
                                          )
                                          )
_____  )

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................. 1

II.    PARTIES ............................................................................................................... 5

    A.  City of Traverse City ................................................................................... 5

    B.  Manufacturers .............................................................................................. 6

    C.  Wholesale Distributors .............................................................................. 11

    D.  Retail Pharmacies ..................................................................................... 12

III.   JURISDICTION AND VENUE ......................................................................... 14

IV.   THE INAPPLICABILITY OF MICHIGAN'S REGULATORY IMMUNITY
     STATUTE ............................................................................................................ 20

V.    GENERAL FACTUAL ALLEGATIONS .......................................................... 20

    A.  Manufacturer Defendants' Misinformation Campaign Regarding Opioids .............. 23

          i.  Manufacturer Defendants' General Campaign To Normalize Widespread
             Opioid Use ...................................................................................... 23

    B.  Manufacturer Defendants' Misrepresentations Regarding Their Specific Products .. 30

          i.  FDA Approval Process .................................................................. 31

          ii.  Each Manufacturer Defendant Flouted This Process For its Particular
             Product(s) ....................................................................................... 34

                a.  Purdue .................................................................... 34

                b.  Cephalon, Inc. ........................................................ 42

                c.  Janssen Pharmaceuticals, Inc. ............................... 45

                d.  Endo International PLC .......................................... 49

                e.  Actavis .................................................................... 51

      f.    Mallinckrodt .................................................................................... 53

C. Defendants' Failures to Maintain Effective Controls Against Diversion and Failures Report Suspicious Orders ........................................................... 53

    i.    Failure of the Manufacturer Defendants ....................................... 60

    ii.   Failure of the Distributor Defendants ........................................... 61

        a.   The Distributor Defendants Failed to Track and Report Suspicious Sales as Required by Michigan and Federal Law ............................... 64

            1)  McKesson ........................................................................ 64

            2)  Cardinal Health ............................................................... 68

            3)  AmerisourceBergen ........................................................ 70

            4)  Mallinckrodt PLC ........................................................... 70

            5)  Omnicare ......................................................................... 71

            6)  Masters ............................................................................ 72

    iii.  Failure of the Retailer Defendants ............................................... 72

        a.   Duties of Pharmacies ....................................................... 73

        b.   Retailer Defendants' Policy of Speed over Accuracy Was Negligent 76

        c.   Retailer Defendants and/or their Subsidiaries or Franchisees Failed to Track and Report Suspicious Sales as Required by Michigan and Federal Law ................................................................. 82

            1)  CVS .................................................................................. 82

            2)  Rite Aid ............................................................................ 84

            3)  Costco .............................................................................. 86

            4)  Walgreens ........................................................................ 88

D.   Examples of Unreported Suspicious Prescribing Habits in Michigan ....................... 91

E.   Examples of Unreported Suspicious Orders from Pharmacies in Michigan ............. 95

F.   The Opioid Epidemic's Devastating Effects............................................................ 97

G.   Deaths from Prescription Opioid Overdoses ......................................................... 98

H.   Social, Economic, and Health Consequences of Prescription Opioid Abuse .......... 100

I.    The Rising Tide of the Heroin Epidemic ............................................................... 102

VI.    SPECIFIC FACTUAL ALLEGATIONS ..................................................................... 106

VII.   TOLLING OF STATUTE OF LIMITATIONS AS TO THE CLAIMS AGAINST THE
       MANUFACTURER DEFENDANTS AND THE DISTRIBUTOR DEFENDANTS ... 108

VIII.  CAUSES OF ACTION .................................................................................................. 113

       COUNT I ...................................................................................................................... 113

       COUNT II ..................................................................................................................... 115

       COUNT III.................................................................................................................... 118

       COUNT IV.................................................................................................................... 121

EXEMPLARY DAMAGES ................................................................................................ 148

PRAYER FOR RELIEF ..................................................................................................... 149

## COMPLAINT AND DEMAND FOR JURY TRIAL

### I.    INTRODUCTION

1.    The use of highly addictive narcotic drugs such as oxycodone, hydrocodone, methadone, fentanyl, codeine and others (hereinafter, "opioids") has become a national epidemic of chemical addiction in the United States.[1]  Across the country, Americans are addicted to prescription drugs, synthetic opioids, and heroin at levels unprecedented in U.S. history.  The opioid epidemic has led to carnage and devastation—including the loss of over 33,000 lives annually, the destruction of countless families and homes, and the incarceration of hundreds of thousands of addicts who have turned to crime in order to support their chemical addictions.  The United States comprises less than 5% of the world's population, but consumes over 80% of the world's opioid products.

2.    Drug overdoses are one of the leading causes of injury and death in the United States and are currently at their highest level ever recorded.  Every year since 2011, fatal drug overdoses have outnumbered deaths by firearms and motor vehicle crashes.  In 2015, approximately 140 people died every day from drug poisoning associated with opioids.

3.    The opioid epidemic has been unsparing, and undiscriminating, in the victims it has claimed.  Opioids—profligately sold to treat virtually any ailment—have destroyed the lives of countless men and women who had the misfortune of suffering from back pain, arthritis, workplace

---

[1]Traditionally, the term "opiate" is used in pharmacology to refer drugs derived from the opium.  Opiates are alkaloid compounds naturally found in the opium poppy plant, Papaver somniferum.  These opiate alkaloid compounds include heroin, morphine, codeine, and thebaine; each has a high potential for addiction.

"Opioid" is a more modern term used to refer to all substances, both natural and synthetic, that bind to opioid receptors in the human brain.  Opioid is, therefore, a broader term than opiate, and it also encompasses synthetic opiates (e.g., fentanyl, meperidine, and methadone) and semi-synthetic opiates (e.g., hydrocodone, hydromorphone, oxycodone, and oxymorphone).

injuries and a countless array of other relatively minor and term-limited painful conditions. Opioids have devastated families whose teenaged sons and daughters were killed by accidental overdoses.  America's raging opioid epidemic has turbocharged the heroin trade, as people addicted to prescription opioids often end up turning to highly potent street drugs.

4.     These diverse manifestations of the opioid epidemic are all rooted in a common cause: corporate malfeasance.  As patients throughout the country became addicted to opioids, manufacturers, distributors and retailers of opioids similarly became addicted to the immense profits associated with the widespread consumption of opioids.  Motivated by their own bottom lines, these corporate actors looked the other way—or worse—as the epidemic unfolded.

5.     Beginning in the mid-1990s, drug manufacturers aggressively over-promoted highly addictive, dangerous opioid products—falsely telling both the federal government, and the medical community, that the risk of opioid addiction and dependence was rare.  In violation of federal law, Manufacturer Defendants, as defined below, also misled the government and the public about various facets of the drugs, promoting opioids as miracle pills that could relieve pain without any real risk of addiction.  Building upon those falsehoods, the Manufacturer Defendants launched and funded aggressive campaigns to convince doctors, and the general public, that opioids could safely be used as a daily treatment for chronic pain.

6.     The misinformation campaign worked.  Across the country, doctors began prescribing highly addictive opioids for ailments ranging from neck pain to headaches.  At the same time, in response to the aggressive marketing campaigns, public demand for opioids soared.  That demand, in turn, created a cottage industry of "pill mills," where unscrupulous doctors handed out opioid prescriptions for even the most minor (claimed) ailments, without any consideration of the drugs' highly addictive properties.

7.     With stunning speed, and as a direct result of drug manufacturers' deceit, America quickly became awash in prescription opioids.  Neither the State of Michigan nor the City of Traverse City was spared from the tsunami of highly addictive opioids.  Indeed, by 2012, there were more opioid prescriptions written in the State of Michigan than the State has residents.[2]

8.     Predictably, many of these highly addictive opioids ultimately found their way into the black market.  There, they were sold to recreational users, to former pain patients suffering from addiction, and to children and teenagers, who in turn became addicted.  When addicted people became unable to afford prescription drugs—or when they reached a point where prescription opioids no longer satiated their withdrawal symptoms—many of them turned to an even deadlier opioid: heroin.

9.     If corporate actors had only followed federal law, however, the torrential flow of prescription opioids into American homes, schools, towns and cities might have been slowed to a trickle.  Cognizant that opioids can have devastating effects if diverted to the black market, the U.S. Congress created a system requiring any drug manufacturer, distributor, or retailer to: (1) report suspicious orders of prescription opioids to the Drug Enforcement Administration ("DEA"); and (2) perform required due diligence prior to filling any suspicious orders. *See* 21 U.S.C. § 823(b)(1); 21 C.F.R. § 1301.74(b).  Had those requirements been followed, manufacturers, distributors and retailers of opioids could have dramatically reduced opioid use.

10.    Instead, manufacturers, distributors, and retailers opted not to follow federal law.  When presented with absurdly large opioid orders—orders which, in Michigan, *exceeded the population of the state*, on aggregate—manufacturers, distributors, and retailers simply looked the other way.

---

[2] Ctr. for Disease Control & Prevention *Opioid Painkiller Prescribing Infographic*, CDC.GOV (July 1, 2014), https://www.cdc.gov/vitalsigns/opioid-prescribing/infographic.html#map.

11.     In prioritizing profit over legal duty, the prescription drug industry wreaked havoc on the lives of countless Americans.  Along the way, the industry drained the coffers of local governmental entities across the country, including the City of Traverse City, forcing those entities to shoulder increased costs associated with the opioid epidemic.

12.     Plaintiff, the City of Traverse City, has been uniquely and disproportionately impacted by the scourge of opioid addiction.  The State of Michigan was, per capita, the tenth-leading state in the country for opioid usage in 2016.[3]  As a direct result of Defendants', as defined below, corporate malfeasance, the City of Traverse City's first responders and medical professional employees must now prioritize combatting drug overdoses, including opioid overdoses.  The City of Traverse City's law-enforcement officers are engaged in a pitched battle against the heroin trade, and against criminal enterprises illegally trading in prescription opioids.  The City of Traverse City's medical professional employees must now spend their time and resources combatting the multifaceted harms that drug addiction imposes on families, children, and infants.

13.     As in communities across the country, the adverse effects of opioid addiction radiate across the City of Traverse City.  When workers in the City of Traverse City become addicted, it decreases their productivity and their earning power, and ultimately harms the local economy. When heads of households fall victim to the opioid epidemic, the children that rely on them fall victim as well—increasing the strain on City social-service providers.  The opioid epidemic has, perhaps, its most pernicious effects in neighborhoods where drugs are sold.  The illegal drug trade often invites violence and decimates the quality of life for innocent families living nearby.  Many choose to leave.  The opioid epidemic has contributed to the destabilization of communities and

---

[3] *See* CENTERS FOR DISEASE CONTROL AND PREVENTION, ANNUAL SURVEILLANCE REPORT OF DRUG RELATED RISKS AND OUTCOMES: UNITED STATES, 2017, at 41-42 (2017), https://www.cdc.gov/drugoverdose/pdf/pubs/2017-cdc-drug-surveillance-report.pdf.

4

neighborhoods in the City of Traverse City and elsewhere, and, in turn, has deprived the City of Traverse City of tax revenue and increased the costs of delivering public services.

14.     Plaintiff, the City of Traverse City, accordingly brings this civil action to eliminate or, at a minimum, reduce the imminent threat to public health and safety in the City of Traverse City caused by the opioid epidemic, to abate the nuisance caused thereby, and to recoup monies spent to address the harm that resulted from: (1) the false, deceptive and unfair marketing of prescription opioids by Defendants, and from (2) Defendants' failure to stop plainly suspicious orders of opioids, as defined below.  The economic damages suffered by Plaintiff were caused by the use of opioid products that were foreseeable to Defendants and were sustained through Defendants' patterns of activity directly resulting from their reckless, intentional and unlawful acts and omissions.

## II.     PARTIES

### A.  City of Traverse City

15.     Plaintiff, the City of Traverse City ("Plaintiff", "Traverse City", or "City of Traverse City"), is governed by the Traverse City City Commission and the City Manager.  Plaintiff's offices are located at 400 Boardman Avenue, Traverse City, MI 49684.

16.     The City of Traverse City is located in Northern Michigan, and according to the United States Census Bureau, as of 2010 the City of Traverse City had a population of 14,674.

17.     Under the Home Rule City Act of Michigan, "[e]ach organized city shall be a body corporate." See MCL § 117.1.  Under MCL § 600.2051, corporate bodies can sue in their corporate name.

18.     In pertinent part, the services provided to residents of the City of Traverse City by the Plaintiff include, *inter alia*:

a)  law enforcement patrols;

b)  administration of public health and mental health services regulation; and

c)  participation with the State in providing other social services.

19.    Plaintiff has standing to bring the instant claims including, *inter alia*, claims for violations under the Racketeer Influenced and Corrupt Organizations Act ("RICO Act"), because Plaintiff qualifies as a "person" within the meaning of the RICO Act. *See* 18 U.S.C. § 1961(3); 18 U.S.C. § 1964(c).

20.    Plaintiff has suffered, and continues to suffer, damages as a direct and foreseeable result of Defendants' reckless, intentional and unlawful conduct, as well as Defendants' conduct that was, at times, fraudulent.

21.    Plaintiff additionally seeks the means to abate the ongoing opioid epidemic—an epidemic that was created by Defendants' reckless, intentional and/or unlawful conduct.

### B.  Manufacturers

22.    Defendant Purdue Pharma L.P. is a Delaware limited partnership with its headquarters and principal place of business located in Stamford, Connecticut.  The company maintains four operational branches: Purdue Pharma L.P., the Purdue Frederick Company, Purdue Pharmaceutical Products L.P., and Purdue Products L.P. (collectively referred to herein as "Purdue").

23.    Purdue manufactures, promotes, distributes and sells prescription opioids such as OxyContin, MS Contin, Dilaudid/Dilaudid HP, Butrans, Hysingla ER, and Targiniq ER.  These opioids are manufactured in the United States and promoted, distributed, and sold across the U.S.—including in the State of Michigan and the City of Traverse City.  OxyContin is Purdue's best-selling opioid.  Since 2009, Purdue's annual sales of OxyContin have fluctuated between

$2.47 billion and $2.99 billion, up four-fold from its 2006 sales of $800 million. OxyContin constitutes roughly 30% of the entire market for analgesic drugs, otherwise known as painkillers.

24. Defendant Cephalon, Inc. ("Cephalon, Inc.") is a Delaware corporation with its headquarters and principal place of business located in Frazer, Pennsylvania. In October 2011, Cephalon, Inc. was acquired by Defendant Teva Pharmaceutical Industries Ltd.

25. Defendant Teva Pharmaceutical Industries Ltd. ("Teva Ltd.") is incorporated under the laws of the State of Israel with its headquarters and principal place of business in Petah Tikva, Israel. Since Teva Ltd. acquired Cephalon, Inc., its U.S. sales and marketing activities have been conducted by Defendant Teva Pharmaceuticals USA, Inc.

26. Defendant Teva Pharmaceuticals USA, Inc. ("Teva USA") is a wholly-owned operating subsidiary of Teva Ltd. Teva USA's headquarters and principal place of business are in North Wales, Pennsylvania. Teva Pharmaceutical Industries Ltd. and Teva Pharmaceuticals USA, Inc. are collectively referred to herein as "Teva." Cephalon, Inc., Teva Ltd. and Teva USA are collectively referred to herein as "Cephalon."

27. Cephalon manufactures, promotes, distributes and sells prescription opioids such as Actiq and Fentora. These opioids are manufactured in the United States and promoted, distributed, and sold across the U.S.—including in the State of Michigan and the City of Traverse City. Actiq and Fentora have been approved by the United States Food and Drug Administration ("FDA") only for the "management of breakthrough cancer pain in patients 16 years of age and older who are already receiving and who are tolerant to opioid therapy for their underlying persistent cancer pain."

28.     Defendant Endo International PLC ("Endo PLC") is a public limited company organized under the laws of the State of Ireland with its headquarters and principal place of business in Dublin, Ireland.

29.     Defendant Endo Health Solutions, Inc. ("Endo Health") is a Delaware corporation with its headquarters and principal place of business in Malvern, Pennsylvania.  Endo Health Solutions, Inc. is a wholly-owned subsidiary of Endo International PLC.

30.     Defendant Endo Pharmaceuticals Inc. ("Endo Inc.") (Endo International PLC, Endo Health Solutions, Inc. and Endo Inc. are collectively referred to herein as "Endo") is a Delaware corporation with its headquarters and principal place of business in Malvern, Pennsylvania.  Endo Pharmaceuticals Inc. is a wholly-owned subsidiary of Endo Health and an indirectly wholly-owned subsidiary of Endo International PLC.

31.     Endo manufactures, promotes, distributes and sells prescription opioids such as Opana/Opana ER, Percodan, Percocet, and Zydone.  These opioids are manufactured in the United States and promoted, distributed, and sold across the U.S.—including in the State of Michigan and the City of Traverse City.  In 2012, opioids made up roughly $403 million of Endo's $3 billion total revenues.  Opana ER yielded $1.15 billion in revenue from 2010 and 2013, and the drug accounted for 10% of Endo's total revenue in 2012.  Additionally, Endo manufactures, promotes, distributes and sells generic opioids such as oxycodone, oxymorphone, hydromorphone, and hydrocodone products.  These opioids are manufactured in the United States and promoted, distributed, and sold across the U.S.—including in the State of Michigan and the City of Traverse City—by and through Endo and its subsidiary, Qualitest Pharmaceuticals, Inc.

32.     Defendant Janssen Pharmaceuticals, Inc. ("Janssen"), formerly known as Ortho-McNeil-Janssen Pharmaceuticals, Inc. and Janssen Pharmaceutica, is a New Jersey corporation

with its headquarters and principal place of business in Titusville, New Jersey and Raritan, New Jersey.  Janssen is a wholly-owned subsidiary of Johnson & Johnson, a New Jersey corporation with its principal place of business in New Brunswick, New Jersey.

33.     Janssen manufactures, promotes, distributes and sells prescription opioids such as Duragesic, Nucynta and Nucynta ER.  These opioids are manufactured in the United States and promoted, distributed, and sold across the U.S.—including in the State of Michigan and the City of Traverse City.  Prior to 2009, Duragesic accounted for, at least, $1 billion in annual sales.  Prior to January 2015, Janssen manufactured, promoted, distributed and sold the prescription opioids Nucynta and Nucynta ER.  In 2014, Nucynta and Nucynta ER collectively accounted for $172 million in sales.

34.     Defendant Insys Therapeutics, Inc. ("Insys") is a Delaware corporation with its headquarters and principal place of business in Chandler, Arizona.  Insys manufactures, promotes, distributes and sells prescription opioids such as Subsys.  These opioids are manufactured in the United States and promoted, distributed, and sold across the U.S.—including in the State of Michigan and the City of Traverse City.

35.     Defendant Mallinckrodt PLC ("Mallinckrodt PLC") is a public limited company organized under the law of the State of Ireland with its headquarters and principal place of business in Staines-Upon-Thames, Surrey, United Kingdom.

36.     Defendant Mallinckrodt LLC ("Mallinckrodt LLC") (Mallinckrodt PLC and Mallinckrodt LLC are collectively referred to herein as "Mallinckrodt") is a Delaware corporation with its headquarters and principal place of business in Hazelwood, Missouri.

37.     Mallinckrodt manufactures, promotes, distributes and sells prescription opioids such as Exalgo, Roxicodone, Xartemis XR, Methadone, Morphine sulfate extended release, and fentanyl,

among other generic opioids.  These opioids are manufactured in the United States and promoted, distributed, and sold across the U.S.—including in the State of Michigan and the City of Traverse City.  Mallinckrodt is the largest U.S. supplier of prescription opioid pain medications and is among the top ten generic pharmaceutical manufacturers of prescription opioid pain medications in the United States, based on prescriptions.

38.     Defendant Allergan PLC, formerly known as Actavis PLC, is a public limited company incorporated under the laws of the State of Ireland with its headquarters and principal place of business in Dublin, Ireland.

39.     Defendant Allergan Finance LLC, formerly known as Actavis, Inc., formerly known as Watson Pharmaceuticals, Inc., is a Delaware limited liability company with its headquarters and principal place of business in Parsippany, New Jersey.

40.     Defendant Watson Laboratories, Inc. is a Nevada corporation with its headquarters and principal place of business in Corona, California, and is a wholly-owned subsidiary of Allergan PLC.

41.     Defendant Actavis LLC is a Delaware limited liability company with its headquarters and principal place of business in Parsippany, New Jersey.

42.     Defendant Actavis Pharma, Inc., formerly known as Watson Pharma, Inc., is a Delaware corporation with its headquarters and principal place of business in New Jersey.

43.     Allergan Finance LLC, Watson Laboratories, Inc., Actavis LLC, and Actavis Pharma, Inc. are owned by Allergan PLC, which operates subsidiary companies to market and sell pharmaceutical drugs in the U.S.  Upon information and belief, Allergan PLC exercises control over each subsidiary company, including marketing and sales efforts.  Upon information and belief, profits from the sale of Allergan PLC products ultimately inure to Allergan PLC's benefit.

10

44.     Allergan PLC, Actavis PLC, Allergan Finance LLC, Actavis, Inc., Watson Laboratories, Inc., Actavis LLC, Actavis Pharma, Inc., and Watson Pharma, Inc. are collectively referred to herein as "Actavis."

45.     Actavis manufactures, promotes, distributes and sells prescription opioids such as the brand-name drugs Kadian and Norco, a generic version of Kadian, and generic versions of Duragesic and Opana.  These opioids are manufactured in the United States and promoted, distributed, and sold across the U.S.—including in the State of Michigan and the City of Traverse City.  On December 30, 2008, Actavis acquired the rights to Kadian from King Pharmaceuticals, Inc. and, subsequently, began marketing Kadian in 2009.

46.     The failure of all Manufacturer Defendants to effectively monitor and report suspicious orders of prescription opioids, their aggressive misinformation campaign aimed at increasing public consumption of highly addictive opioids, their failure to forthrightly provide accurate information to FDA, their failure to adhere to FDA regulations regarding misbranding, their failure to implement measures to prevent the filling of suspicious orders, and their perverse utilization of so-called "patient advocacy" groups to evade FDA regulations concerning consumer drug-marketing greatly contributed to a vast increase in opioid overuse and addiction. Manufacturer Defendants' conduct thus directly caused a public-health and law-enforcement crisis across this country, including in the City of Traverse City, Michigan.

47.     The manufacturer defendants listed above are all engaged in the manufacturing of opioids.  The manufacturer defendants listed above are collectively referred to herein as the "Manufacturer Defendants."

### C. Wholesale Distributors

48.     Defendant AmerisourceBergen Drug Corporation ("AmerisourceBergen") is a Delaware corporation with its headquarters and principal place of business located in Chesterbrook, Pennsylvania.

49.     Defendant Cardinal Health, Inc. ("Cardinal Health") is a Delaware corporation with its headquarters and principal place of business located in Dublin, Ohio.

50.     Defendant McKesson Corporation ("McKesson") is a Delaware corporation with its headquarters and principal place of business located in San Francisco, California.

51.     Defendant Omnicare Distribution Center LLC, ("Omnicare") is a Delaware limited liability company with its headquarters and principal place of business in Cincinnati, Ohio.

52.     Defendant, Masters Pharmaceutical, Inc., ("Masters") is an Ohio limited liability company with its headquarters principal place of business in Cincinnati, Ohio.

53.     The failure of all Distributor Defendants to effectively monitor and report suspicious orders of prescription opioids and to implement measures to prevent the filling of improper prescriptions greatly contributed to the vast increase in opioid overuse and addiction.  Distributor Defendants' conduct thus directly caused a public-health and law-enforcement crisis across this country, including in the City of Traverse City, Michigan.

54.     The distributor defendants listed above are all engaged in the wholesale distribution of opioids.  The distributor defendants listed above are collectively referred to herein as the "Distributor Defendants."

### D. Retail Pharmacies

55.     Defendant CVS Health Corporation ("CVS Health") is a Delaware corporation with its headquarters and principal place of business in Woonsocket, Rhode Island.

56.     Defendant CVS Pharmacy, Inc. ("CVS Pharmacy") is a wholly-owned operating subsidiary of CVS Health, incorporated in the State of Rhode Island with its headquarters and principal place of business in Woonsocket, Rhode Island.

57.     Defendant Omnicare, Inc. ("Omnicare, Inc.") is a wholly-owned operating subsidiary of CVS Health, incorporated in the State of Delaware with its headquarters and principal place of business in Woonsocket, Rhode Island.

58.     Defendant CVS Health, Defendant CVS Pharmacy and Defendant Omnicare, Inc. are collectively referred to as "CVS".

59.     Defendant Walgreens Boots Alliance, Inc. ("Walgreens Boots Alliance") is a Delaware corporation with its headquarters and principal place of business located in Deerfield, Illinois.

60.     Defendant Walgreen Company ("Walgreen Co.") is a wholly-owned operating subsidiary of Walgreens Boots Alliance, incorporated in the State of Illinois with its headquarters and principal place of business in Deerfield, Illinois.

61.     Defendant Walgreens Boots Alliance and Defendant Walgreen Co. are collectively referred to as "Walgreens".

62.     Defendant Rite Aid Corporation ("Rite Aid Corp.") is a Delaware corporation with its headquarters and principal place of business located in Camp Hill, Pennsylvania.

63.     Defendant Rite Aid of Michigan, Inc. ("Rite Aid of Michigan") is a Michigan corporation with its headquarters and principal place of business located in Camp Hill, Pennsylvania.  Rite Aid of Michigan is a citizen of Pennsylvania for purposes of diversity of citizenship.

64.     Defendant Rite Aid Corp. and Defendant Rite Aid of Michigan are collectively referred to as "Rite Aid".

65.     Defendant Costco Wholesale Corporation ("Costco") is a Washington corporation with its headquarters and principal place of business located in Issaqua, Washington.

66.     The failure of all Retailer Defendants to effectively monitor and report suspicious orders of prescription opioids and to implement measures to prevent filling of improper prescriptions greatly contributed to the vast increase in opioid overuse and addiction.

67.     Additionally, Retailer Defendants foisted a perverse incentive system on their employees that prevented their pharmacists from meeting their obligations under federal and Michigan law.  In so doing, Retailer Defendants greatly contributed to the vast increase in opioid overuse and addiction.

68.     Retailer Defendants' conduct thus directly caused a public-health and law-enforcement crisis across this country, including in the City of Traverse City, Michigan.

69.     The retailer defendants listed above are all engaged in the business of retail selling of opioids.  The retailer defendants are collectively referred to herein as the "Retailer Defendants."

70.     Each of the Manufacturer Defendants, Distributor Defendants and Retailer Defendants are collectively referred to herein as the "Defendants."

## III.     JURISDICTION AND VENUE

71.     This Court has subject matter jurisdiction over this action in accordance with 28 U.S.C. § 1332(a).  Complete diversity exists between Plaintiff (a citizen of the State of Michigan) and Defendants (citizens of states other than Michigan).  The amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

72.     This Court also has subject matter jurisdiction under 28 U.S.C. § 1331 based upon the federal claims asserted under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.* ("RICO Act").  This Court has supplemental jurisdiction over Plaintiff's state law

claims pursuant to 28 U.S.C. § 1367, as the state law claims are so related to Plaintiff's federal law claims that the claims form part of the same case or controversy.

73.     Venue is proper within this District pursuant to Case Management Order No. 1 regarding direct filing of actions in *In re: National Prescription Opiate Litigation*, MDL No. 2804 ("MDL 2804"), for purposes of coordinated and consolidated pretrial proceedings (Hon. Dan A. Polster).

74.     Venue is proper within the Western District of Michigan pursuant to 28 U.S.C. § 1391, as the Western District of Michigan is a judicial district where Defendants are subject to personal jurisdiction in accordance with 28 U.S.C. §§ 1391(a) and (c), as well as Mich. Comp. Laws § 600.705, the Michigan Long-Arm statute.

75.     This Court has personal jurisdiction over Defendants as they conduct business in Ohio and Michigan, purposefully direct or directed their actions toward Ohio and Michigan, consented to be sued in Ohio and Michigan by registering an agent for service of process, consensually submitted to the jurisdiction of Ohio and Michigan when obtaining a manufacturer or distributor license, and have the requisite minimum contacts with Ohio and Michigan necessary to constitutionally permit this Court to exercise jurisdiction.

76.     Defendants regularly engage in business within the States of Ohio and Michigan. Defendants have committed tortious acts outside and within the States of Ohio and Michigan that have caused injury within Michigan to the City of Traverse City. Defendants expect or should reasonably have expected those acts to have consequences in the States of Ohio and Michigan. Defendants, moreover, solicited business within the States of Ohio and Michigan, engaged in persistent courses of conduct in the States of Ohio and Michigan, and derived substantial revenue

from goods used and services rendered in the States of Ohio and Michigan through interstate commerce.

77.     Defendants are regularly engaged in the business of manufacturing, distributing and dispensing prescription opioids, either directly or indirectly through third-party related entities, in the States of Ohio and Michigan and, specifically, in the City of Traverse City.  Defendants' activities in the City of Traverse City in connection with the manufacture, distribution and dispensation of prescription opioids was, and is, continuous and systematic, and gave rise to the causes of action alleged herein.

78.     At all relevant times, Defendants expected or should have expected that their acts would have consequences within the United States of America and, specifically, the States of Ohio and Michigan.

79.     Defendant CVS Health, Defendant CVS Pharmacy, and Defendant Omnicare, Inc. were, and are, the agents, representatives, joint venturers, alter egos, co-conspirators, consultants, predecessors, successors, servants, and/or employees of each other.

80.     In doing the acts alleged herein, Defendant CVS Health, Defendant CVS Pharmacy, and Defendant Omnicare, Inc. were, and are, acting in the course and scope of such agency, representation, joint venture, conspiracy, consultancy, predecessor agreement, successor agreement, service and employment, with knowledge, acquiescence and ratification of each other.

81.     Defendant CVS Health sells opioids for profit in the State of Michigan, through its wholly owned subsidiary sales agents and retail distributor agents, Defendant CVS Pharmacy and Defendant Omnicare, Inc.

82.     Defendant CVS Pharmacy and Defendant Omnicare, Inc., as the sales agents, retail distributor agents and alter-egos of Defendant CVS Health, transacts business by retail sale and

distribution of opioids in the United States of America and, specifically, the States of Ohio and Michigan at the direction of Defendant CVS Health and/or which is ratified by Defendant CVS Health.

83.     Defendant CVS Health has purposefully availed itself of the privilege of retail sale and distribution of opioids in the United States of America and, specifically, the States of Ohio and Michigan by directing its wholly owned subsidiaries, Defendant CVS Pharmacy and Defendant Omnicare, Inc. to sell opioids in the States of Ohio and Michigan.

84.     Defendant CVS Health sells opioids through Defendant CVS Pharmacy and Defendant Omnicare, Inc., who serves as Defendant CVS Health's sales agents and retail distributor agents in the state of Michigan for purposes of this Court's exercise of personal jurisdiction over Defendant CVS Health.

85.     The activities of Defendant CVS Pharmacy and Defendant Omnicare, Inc. are imputed to Defendant CVS Health for purposes of minimum contacts necessary for this Court to exercise personal jurisdiction over Defendant CVS Health under the Michigan Long-Arm statute.

86.     As a result of this imputed activity in the states of Ohio and Michigan, it is reasonable for Defendant CVS Health to anticipate being subject to litigation in Ohio and Michigan, and for this Court to exercise personal jurisdiction over Defendant CVS Health as comporting with fair play and substantial justice.

87.     Defendant Walgreens Boots Alliance and Defendant Walgreen Co. were, and are, the agents, representatives, joint venturers, alter egos, co-conspirators, consultants, predecessors, successors, servants, and/or employees of each other.

88.     In doing the acts alleged herein, Defendant Walgreens Boots Alliance and Defendant Walgreen Co. were, and are, acting in the course and scope of such agency, representation, joint

venture, conspiracy, consultancy, predecessor agreement, successor agreement, service and employment, with knowledge, acquiescence and ratification of each other.

89.     Defendant Walgreens Boots Alliance sells opioids for profit in the States of Ohio and Michigan, through its wholly owned subsidiary sales agent and retail distributor agent, Defendant Walgreen Co.

90.     Defendant Walgreen Co., as the sales agent, retail distributor agent and alter-ego of Defendant Walgreens Boots Alliance, transacts business by retail sale and distribution of opioids in the United States of America and, specifically, the States of Ohio and Michigan at the direction of Defendant Walgreens Boots Alliance and/or which is ratified by Defendant Walgreens Boots Alliance.

91.     Defendant Walgreens Boots Alliance has purposefully availed itself of the privilege of retail sale and distribution of opioids in the United States of America and, specifically, the States of Ohio and Michigan by directing its wholly owned subsidiary, Defendant Walgreen Co., to sell opioids in the States of Ohio and Michigan.

92.     Defendant Walgreens Boots Alliance sells opioids through Defendant Walgreen Co., who serves as Defendant Walgreens Boots Alliance's sales agent and retail distributor agent in the States of Ohio and Michigan for purposes of this Court's exercise of personal jurisdiction over Defendant Walgreens Boots Alliance.

93.     The activities of Defendant Walgreen Co. are imputed to Defendant Walgreens Boots Alliance for purposes of minimum contacts necessary for this Court to exercise personal jurisdiction over Defendant Walgreens Boots Alliance under the Michigan Long-Arm statute.

94.     As a result of this imputed activity in the States of Ohio and Michigan, it is reasonable for Defendant Walgreens Boots Alliance to anticipate being subject to litigation in Ohio and

18

Michigan, and for this Court to exercise personal jurisdiction over it as comporting with fair play and substantial justice.

95.     Defendant Rite Aid Corp. and Defendant Rite Aid of Michigan, Inc. were, and are, the agents, representatives, joint venturers, alter egos, co-conspirators, consultants, predecessors, successors, servants, and/or employees of each other.

96.     In doing the acts alleged herein, Defendant Rite Aid Corp. and Defendant Rite Aid of Michigan, Inc. were, and are, acting in the course and scope of such agency, representation, joint venture, conspiracy, consultancy, predecessor agreement, successor agreement, service and employment, with knowledge, acquiescence and ratification of each other.

97.     Defendant Rite Aid Corp. sells opioids for profit in the State of Michigan, through its wholly owned subsidiary sales agent and retail distributor agent, Defendant Rite Aid of Michigan, Inc.

98.     Defendant Rite Aid of Michigan, Inc., as the sales agent, retail distributor agent and alter-ego of Defendant Rite Aid Corp., transacts business by retail sale and distribution of opioids in the United States of America and, specifically, the States of Ohio and Michigan at the direction of Defendant Rite Aid Corp. and/or which is ratified by Defendant Rite Aid Corp.

99.     Defendant Rite Aid Corp. has purposefully availed itself of the privilege of retail sale and distribution of opioids in the United States of America and, specifically, the States of Ohio and Michigan by directing its wholly owned subsidiary, Defendant Rite Aid of Michigan, Inc., to sell opioids in the States of Ohio and Michigan.

100.     Defendant Rite Aid Corp. sells opioids through Defendant Rite Aid of Michigan, Inc. who serves as Defendant Rite Aid Corp.'s sales agent and retail distributor agent in the state of

Michigan for purposes of this Court's exercise of personal jurisdiction over Defendant Rite Aid Corp.

101.    The activities of Defendant Rite Aid of Michigan, Inc., are imputed to Defendant Rite Aid Corp. for purposes of minimum contacts necessary for this Court to exercise personal jurisdiction over Defendant Rite Aid Corp. under the Michigan Long-Arm statute.

102.    As a result of this imputed activity in the States of Ohio and Michigan, it is reasonable for Defendant Rite Aid Corp. to anticipate being subject to litigation in Ohio and Michigan, and for this Court to exercise personal jurisdiction over it as comporting with fair play and substantial justice.

## IV.    THE INAPPLICABILITY OF MICHIGAN'S REGULATORY IMMUNITY STATUTE

103.    Michigan law includes a provision enacted as a portion of Public Act 249 of 1995 which provides immunity from liability for certain "product liability actions" as the term is defined in the statute. *See* Mich. Comp. Laws § 600.2946(5).  This limited immunity provision is inapplicable to the claims in the instant case because, *inter alia*, the claims brought in this lawsuit do not fall within the definition of a "product liability action," because the claims brought in this lawsuit are subject to one of more statutory exceptions to Public Act 249, and because the immunity conferred in Public Act 249 does not extend to illegal drug diversionary conduct.

## V.    GENERAL FACTUAL ALLEGATIONS

104.    Substance-abuse addiction is generally understood as a primary, chronic disease of brain reward, motivation, memory, and related circuitry.  It develops over time, has no known cure, and requires continuous monitoring and treatment if serious disability and/or death are to be avoided.

105.    Rather than resulting from a moral failing or lack of willpower, substance-abuse addiction is caused by the effects of repeated substance use on neurotransmission, and on interactions within reward structures of the human brain.  In turn, these effects alter motivational hierarchies and cause addictive behaviors which supplant healthy, self-care related behaviors.

106.    Opioids are a class of drugs which contain molecules that bind to naturally occurring opioid receptors in the human brain.  When those molecules are in place, they block the brain's pain signaling mechanism.  In addition, by blocking the brain's dopamine-regulation mechanism, opioids cause a massive release of dopamine (in turn causing euphoria, drowsiness, and slowed breathing).  Over time, a patient's dose must be increased to produce the same pain-relieving effects, and the patient will experience worsening withdrawal symptoms when the drug is not present in the body.

107.    Opioids have been known to be lethally poisonous and intensely habit forming since the dawn of human civilization.  Indeed, opium has been derived from the poppy plant cultivated since neolithic times and was likely mankind's first drug.  Since that time, humans have derived from the poppy plant various opioids including morphine, laudanum, codeine, thebaine, hydrocodone, oxymorphone, and heroin.

108.    The common denominator in most opioids is the highly addictive morphine molecule, found in the poppy plant. The lone exceptions are synthetic opioids like fentanyl.  Otherwise, the opioids at issue in this case are all produced from the morphine-containing opium poppy plant.

109.    For over a century, pharmaceutical companies have attempted to change the chemical composition of naturally occurring opioids to create a drug that targets pain without creating addiction. These efforts, however, have consistently resulted in unequivocal failure.

110.    Heroin, for example, was invented in the nineteenth century and was derived from opium for the purpose of finding a non-addictive form of morphine.  Now widely known as a highly addictive street drug, heroin was initially marketed as an addiction-proof pain medication. Indeed, the word "heroin" is in fact a brand name invented by the pharmaceutical company Bayer.

111.    The similarities between the marketing of heroin and the marketing of prescription opioids are strikingly similar.  Much like the opioids at issue in this complaint, a perverse parade of salesman and traveling promoters once claimed that heroin was non-addictive and safe in virtually every clinical context. Of course, those claims turned out to be false.  And the pharmaceutical industry, having fattened its wallets with proceeds from heroin, left a generation of addicts in its wake.

112.    For much of the twentieth century (and partially as a result of the catastrophic failure of purportedly "addiction-proof" heroin) long-term opioid use was primarily reserved for palliative care for cancer patients in severe pain, or for the terminally ill.  Doctors and medical professionals understood the serious risks associated with any opioid use exceeding mere days.  Those risks, including addiction, overdose, and death, significantly outweighed the benefits of the drug's pain relieving effects.

113.    Accordingly, prior to the 1990's, doctors used opioid pain relievers sparingly, and only in the short term, for cases of severe injury or illness, or during surgery. Meldrum ML, *Progress in Pain Research and Management*, Vol. 25 Seattle, WA: IASP Press; 2003.  Doctors' reluctance to use opioids for an extended period of time, despite their short-term effectiveness for pain, sprang from the legitimate fear of causing addiction. *Id*.

114.    In addition, Congress enacted laws which strictly regulated the marketplace for medical opioids.  Pursuant to the Controlled Substances Act of 1970 ("CSA"), the federal Drug

Enforcement Agency ("DEA") annually caps the aggregate number of opioids that could be produced in the United States. 21 U.S.C. § 826(a); 28 C.F.R. § 0.100. Under the CSA, moreover, can be sold only through a controlled, highly regulated distribution network that requires manufacturers, wholesale distributors, and retailers to act as substance-abuse watchdogs, and report any suspicious orders of opioids to the DEA. 21 C.F.R. § 1301.74(b).

115.     But beginning in the late 20th century, and continuing through today, the pharmaceutical industry acted to dramatically expand the marketplace for opioids. As set forth below, pharmaceutical actors facilitated this expansion in two ways. *First,* pharmaceutical manufacturers engaged in a misinformation campaign which altered public perception of opioids, and deceived doctors, federal regulators, and the general public about their addictive qualities. *Second,* opioid manufacturers, wholesalers, and retailers flouted their federally imposed requirements to report suspicious opioid orders to the DEA. That, in turn, facilitated an explosion in the illegitimate marketplace for prescription opioids.

### A. Manufacturer Defendants' Misinformation Campaign Regarding Opioids

#### i.     Manufacturer Defendants' General Campaign To Normalize Widespread Opioid Use

116.     The story of the present-day opioid crisis begins with opioid manufacturers, specifically, with Manufacturer Defendants. Each of the Manufacturer Defendants produces one or more prescription opioid product. Manufacturer Defendants, however, envisioned a bigger market for their product than mere short term treatment for the terminally ill or severely injured.

117.     In furtherance of their quest for market expansion, Manufacturer Defendants undertook a concerted campaign to misrepresent the addictive qualities of their product, and to push opioids as a safe, effective drug which could treat a variety of non-cancer, non-terminally ill patients. In

so doing, Manufacturer Defendants successfully rebranded what is essentially morphine and convinced doctors to prescribe it for bad backs, arthritis, and headaches.

118.    The Manufacturer Defendants were able to influence doctor prescribing habits by supporting "academic" physicians, funding and/or creating professional medical societies, and donating large sums to regulatory agencies.  Individually, and as a group, the Manufacturer Defendants manipulated and misrepresented medical science to sell as many opioids as possible.

119.    The Manufacturer Defendants, individually and as a group, encouraged doctors to prescribe opioids more liberally and reassured them, based on false evidence, that the risk of becoming addicted to prescription opioids was less than one percent.  That figure was tragically wrong.  Recent studies reveal that as many as 56% of patients receiving long term opioid painkillers progress to addictive opioid use—including patients with no prior history of addiction.

120.    Despite knowledge that their opioid products were as dangerous as heroin, opium, or morphine, Manufacturer Defendants misrepresented these risks and, in essence, fostered addiction as a central component of their business models with a total disregard for preventing addiction. The Manufacturer Defendants' goal was never to create non-addictive analgesics; if that were the case, Manufacturer Defendants would not have used one of the most addictive substances known to man, the morphine molecule, as the primary active ingredient.

121.    What the Manufacturer Defendants realized is opioids are a perfect inelastic manufactured good.  Patients treated with opioids, once they become addicted, do not have the free will to choose not to purchase the product.  Given enough time on opioids, a patient will need higher and higher doses just to stave off the ever-looming and life-threatening effects of opioid withdrawal—for which the only short term remedy is more of opioids.

122.     During the 1980s and 1990s, Manufacturer Defendants introduced new opioid drugs and sought to maximize the market for them.  They did so by taking advantage of, and massively taking out of context, a single letter to the editor in the *New England Journal of Medicine*.  They then funded purportedly neutral foundations and organizations to convince doctors and the general public that, contrary to what doctors and the general public had previously been taught, opioids were safe and could be addiction-proof.

123.     Manufacturer Defendants' campaign of deception regarding the addictive nature of opioids was rooted in two pieces of purportedly "scientific" evidence. The first piece of evidence was a five-paragraph letter to the editor published in 1980 in the *New England Journal of Medicine*. The letter was drafted by Hershel Jick, a doctor at Boston University Medical Center, with the help of a graduate student, Jane Porter.  It noted, anecdotally, that a review of "current files" did not indicate high levels of addiction among hospitalized medical patients who received narcotic preparation treatment. *In full*, the letter reads:

> Recently, we examined our current files to determine the incidence of narcotic addiction in 39,946 hospitalized medical patients who were monitored consecutively. Although there were 11,882 patients who received at least one narcotic preparation, there were only four cases of reasonably well-documented addiction in patients who had no history of addiction. The addiction was considered major in only one instance. The drugs implicated were meperidine in two patients, Percodan in one, and hydromorphone in one. We conclude that despite widespread use of narcotic drugs in hospitals, the development of addiction is rare in medical patients with no history of addiction.

*Addiction rate in patients treated with narcotics*, 302(2) New Eng. J. Med. 123 (Jan. 10, 1980).

124.     The second major piece of "evidence" used by Manufacturer Defendants was a 1986 study by Russell Portenoy ("Portenoy"), who was then 31 years old, in the medical journal *Pain*. The study, which had a patient cohort of merely 38 patients, claimed that opioids could be used

25

for long periods of time to treat non cancer related chronic pain without any risk of addiction. The rationale behind the study was that patients in pain would not become addicted to opioids because their pain drowned out the euphoria associated with opioids. As such, the study concluded that opioids should be freely administered to patients with fibromyalgia, headaches, finicky backs, and a host of other issues. According to Portenoy and his co-author, Dr. Kathleen Foley, "opioid maintenance therapy can be a safe, salutary and more humane alternative … in those patients with intractable non-malignant pain and no history of drug abuse." Portenoy RK, Foley KM, *Chronic use of opioid analgesics in non-malignant pain: report of 38 cases*, 25 Pain 171 (1986). Portenoy's study also cited Hershel Jick's one-paragraph letter to the *New England Journal of Medicine*.

125.    Portenoy went on to serve as one of the pharmaceutical industry's most vocal advocates, regularly appearing at conferences and gatherings of medical professionals to promote the use of opioids for chronic, long-term pain.

126.    In the years that have followed, both the *New England Journal of Medicine* letter and Portenoy's 1986 study have been expressly disavowed. Neither actually demonstrates that opioids can be safely prescribed for long-term, chronic pain.

127.    In a taped interview in 2011, Portenoy admitted:

> I gave so many lectures to primary care audiences in which the Porter and Jick article was just one piece of data that I would then cite. I would cite 6 to 7 maybe 10 different avenues of thought or evidence, ***none of which represents real evidence***. And yet what I was trying to do was to create a narrative so that the primary care audience would look at this information in toto and feel more comfortable about opioids in a way they hadn't before … Because the primary goal was to de-stigmatize, ***we often left evidence behind***."

> ***It was clearly the wrong thing to do*** and to the extent that some of the adverse outcomes now are as bad as they have become in terms of endemic occurrences of addiction and unintentional overdose death, it's quite scary to think about how the growth in that prescribing driven by people like me led, in part, to that occurring.

26

Live interview with Dr. Russell Portenoy. Physicians Responsible for Opioid Prescribing. https://www.youtube.com/watch?v=DgyuBWN9D4w. Accessed December 3, 2017 (emphases added).

128.    As to the *New England Journal of Medicine* letter, Dr. Jick, in an interview with Sam Quinones decades after the letter was published, stated: "[t]hat particular letter, for me, is very near the bottom of a long list of studies that I've done. It's useful as it stands because there's nothing else like it on hospitalized patients. But if you read it carefully, it does not speak to the level of addiction in outpatients who take these drugs for chronic pain."

129.    *The New England Journal of Medicine* itself has since disavowed the letter, stating "[the letter] was heavily and uncritically cited as evidence that addiction was rare with long-term opioid therapy." 376 *New Eng. J. Med*. 2194, 2194–95 (2017).  "We believe," the journal provided, "that this citation pattern contributed to the North American opioid crisis by helping to shape a narrative that allayed prescribers' concerns about the risk of addiction associated with long-term opioid therapy." *Id.*

130.    Indeed, the letter—because it was just a letter—did not describe how the data was gathered, the duration of the patients' treatment, or the purpose behind their treatment in the first place.  But the *New England Journal of Medicine* is one of the premier medical journals in the country.   And, given the journal's prestige, the five-sentence letter, combined with Portenoy's later study, was exactly what opioid manufacturers needed to push their products.

131.    In the years following the publication of the *New England Journal of Medicine* letter, and the publication of Russell Portenoy's 1986 study, the Manufacturer Defendants introduced multiple new highly addictive opioid products onto the market.  Those new drugs included: Purdue's MS Contin (introduced 1987) and OxyContin (1995), Janssen's Duagesic (1990),

Nucynta (2008), and Nucynta ER (2011), Cephalon's Actiq (1998) and Fentora (2006), Endo's Opana and Opana ER (2006), and Insys' Subsys (2012).

132.    To expand the markets for those new products, Manufacturer Defendants engaged in a concerted push to convince doctors and the general public that opioids were safe and effective for long-term pain relief.  In large part, Manufacturer Defendants turned to Russell Portenoy, the author of the 1986 *Pain* study. Because Portenoy's study dovetailed perfectly with Manufacturer Defendants' marketing strategy, within a decade, Portenoy was financed by "at least a dozen companies, most of which produced prescription opioids." Meier B., *Pain Killer: A Wonder Drug's Trail of Addiction and Death*, New York, NY: St. Martin's Press; 2003.

133.    By enlisting concept peddlers like Russell Portenoy to promote opioid analgesics, Manufacturer Defendants successfully promoted the myth that opioids could be liberally prescribed for non-cancer related chronic pain, without any risk of addiction.

134.    Manufacturer Defendants funded these concept peddlers.  In turn, these concept peddlers would speak at academic conferences to primary care physicians in an effort to de-stigmatize opioids and encouraged liberal prescription of narcotics for the treatment non-cancer related chronic pain.  Invariably, the key piece of "data" cited in support of the proposition that opioids could be safely used to treat chronic pain was the *New England Journal of Medicine* article.

135.    In addition to funding and supporting concept peddlers, like Portenoy, Manufacturer Defendants funded multiple innocuously named, purportedly front groups to convince doctors and medical professionals that opioids could safely be used as a long-term treatment for chronic pain. Such organizations included the American Pain Foundation (which received nearly 90% of its funding from the drug and medical device industry, including Manufacturer Defendants); the

American Academy of Pain Management (which received funding from Manufacturer Defendants Endo, Janssens, and Purdue); and the American Pain Society.

136.     All of these purportedly neutral, industry-funded organizations took aggressive stances to convince doctors and medical professionals that America was suffering from an epidemic of untreated pain—and that opioids were the solution.  For example, the American Pain Foundation, of which Dr. Portenoy was a director, urged tracking of what they called an epidemic of untreated pain.  The American Pain Society, of which he was president, campaigned to make pain what it called the "fifth vital sign" that doctors should monitor, alongside blood pressure, temperature, heartbeat and breathing.[4]

137.     In 1996, the American Pain Society and the American Academy of Pain Management, both funded almost entirely by the Manufacturer Defendants, issued a "landmark consensus," written in part by Portenoy, saying that there is little risk of addiction or overdose in pain patients. The consensus cited the "less than 1 percent" addiction figure and the Jick letter.

138.     In actuality, the risk of addiction is as high as 56%. Martell BA, O'Connor PG, Kerns RD, Al E., *Systematic review: opioid treatment for chronic back pain: prevalence, efficacy, and association with addiction*, 146 Ann. Intern. Med. 116 (2007).

139.     Concept peddlers including Portenoy, funded by Manufacturer Defendants, also claimed that opioid analgesics have no "ceiling dosage" in that prescribing physicians should increase dosages for patients as high as necessary to treat non-cancer related chronic pain.  Through their concept peddlers and neutral front groups, Manufacturer Defendants also invented a term for drug seeking behavior: "pseudoaddiction."  The term describes drug seeking behavior which is not

---

[4] On June 16, 2016, at its annual meeting in Chicago, the American Medical Association ("AMA")—a legitimate medical organization—urged physicians to eliminate pain as the fifth vital sign.

the result of addiction but the result of under-prescribing.  The solution for pseudoaddiction is, of course, to increase the dosage.

140.    Manufacturer Defendants' misinformation campaign worked as intended.  Across the country, demand for prescription opioids exploded.  Doctors and medical professionals, swayed by Manufacturer Defendants' sophisticated propaganda machine, began prescribing prescription opioids for ailment ranging from headaches to neck pain to fibromyalgia.  That unleashed a wave of addiction—increasing the demand for opioids yet further.  Manufacturer Defendants' profits soared.

141.    A key player in Manufacturer Defendants' misinformation campaign, Russell Portenoy, has since admitted that the information Manufacturer Defendants were pushing was false. "I gave innumerable lectures in the late 1980s and '90s about addiction that weren't true," Dr. Portenoy told a fellow doctor in 2010.  "It was the wrong thing to do." [5]

142.    Yet, despite the fact that 80 percent of the global opioid supply is consumed in the United States, concept peddlers, front groups, and the Manufacturer Defendants continue to maintain that pain is undertreated.

### B. Manufacturer Defendants' Misrepresentations Regarding Their Specific Products

143.    In addition to funding massive propaganda campaigns as to the safety of opioids, generally, each of the Manufacturer Defendants actively engaged in deceptive conduct with respect to their opioids, in particular.  This deception, importantly, included deceiving the FDA about key qualities of their drugs.

---

[5] Thomas Catan and Evan Perez, *A Pain-Drug Champion Has Second Thoughts*, Wall Street Journal (Dec. 17, 2012).

### i.    FDA Approval Process

144.    Pursuant to the Federal Food, Drug and Cosmetic Act ("FDCA"), new pharmaceutical drugs may not be marketed in the United States until the FDA determines that the drug is "safe for use" and effective for all "conditions prescribed, recommended, or suggested" on a drug's label. *See* 21 C.F.R. § 99.103; *see also* 21 C.F.R. § 201.5.

145.    A company seeking to bring a new pharmaceutical drug to market in the United States must first go through a three-step FDA approval process:

a)    *First*, the sponsoring company must conduct laboratory testing in animals to determine whether the drug will be relatively safe and, to some extent, effective. If animal testing indicates that the drug or compound is relatively safe, the company then submits an investigational new drug ("IND") application to the FDA to gain approval to test the product with human subjects;

b)    *Second,* the sponsoring company must conduct "clinical trials" on human subjects.  Clinical trials are carried out sequentially in three phases—Phase I, II, and III studies. Each phase increases the number of subjects, and is designed to test for safety and efficacy of the drug for specific uses and patient populations; and

c)    *Third,* after the clinical trials are completed, the company compiles the data and analysis into a new drug application ("NDA"). FDA then reviews the NDA, focusing on three major potential concerns: (1) safety and effectiveness in the drug's proposed use; (2) appropriateness of the proposed labeling; and (3) adequacy of manufacturing methods to assure the drug's strength, quality, and identity. After evaluating the NDA, the FDA will make the decision whether to approve or reject the drug.

146.    When a drug is approved by the FDA, it means the drug manufacturer has satisfied the regulatory requirements set forth in the Food Drug and Cosmetic Act ("FDCA").  It does not mean that the drug meets all state law requirements, or that it can be promoted for all uses in all populations.

147.    Though the FDA plays an important role in approving drugs for use, its role is limited by the fact that it does not conduct its own clinical trials.  The FDA must therefore rely heavily on the representations and reports made by the sponsoring company.  For example, in the context of efficacy, the FDA can deny an application only if it finds the *application* lacks "substantial evidence that the drug will have the effect it purports or is represented to have[.]" *See* 21 U.S.C. § 355(d)(5).

148.    The FDA's role is similarly circumscribed with respect to drug labeling.  The FDA does not draft drug labels. Instead, the drug manufacturer submits proposed labeling and, unless the FDA finds, under FDCA standards, that the label is misleading, it must approve it. 21 U.S.C. § 355(d).

149.    Much of the FDA approval process, then, hinges on the good-faith, honest representations of the sponsoring company.  And the duties of a drug company to act in good faith do not end with the approval process.  To the contrary, even after the FDA approves a drug, the company manufacturing the drug continues to bear the responsibility of ensuring that the drug is manufactured, promoted, and labeled correctly.

150.    Towards that end, sections 502(a) and 201(n) of the FDCA (21 U.S.C. §§ 352(a), 321(n)) impose on drug manufacturers an ongoing duty to fully and accurately disclose information in their possession relating to the efficacy of a drug—as well as information relating to adverse events associated with that drug's use. These disclosures must appear in the drug's package insert, other labeling, and promotional materials.

151.    Sections 502(a) and 201(n) of the FDCA (21 U.S.C. §§ 352(a) and 321(n)) further prohibit drug manufacturers from making misleading statements about the efficacy of a drug, from

minimizing the risks of adverse events associated with that drug's use, or from making misleading claims that a drug is safer or more effective than other available medications.

152.     The indications and dosages approved by the FDA are set forth in the drug's labeling, the content of which is also approved by the FDA.

153.     The Food, Drug and Cosmetic Act defines "label" as "a display of written, printed, or graphic matter upon the immediate container of any article ..." *See* 21 U.S.C. § 321(k).

154.     Furthermore, 21 C.F.R. 202.1(l)(2) states:

> Brochures, booklets, mailing pieces, detailing pieces, file cards, bulletins, calendars, price lists, catalogs, house organs, letters, motion picture films, film strips, lantern slides, sound recordings, exhibits, literature, and reprints and similar pieces of printed, audio, or visual matter descriptive of a drug and references published (for example, the 'Physicians' Desk Reference') for use by medical practitioners, pharmacists, or nurses, containing drug information supplied by the manufacturer, packer, or distributor of the drug and which are disseminated by or on behalf of its manufacturer, packer, or distributor are hereby determined to be labeling as defined in section 201(m) of the act.

155.     A manufacturer's statement that a drug is "effective" or "works" or "has been proven to …" is understood to mean that well-controlled clinical studies support the use.  Such a statement without clinical trial proof is misleading and a violation of a manufacturer's obligation to disclose the necessary information. *See* 21 C.F.R. § 99.205.

156.     FDA also regulates the advertising and promotion of prescription drugs under the FDCA. FDA carries out this responsibility by ensuring that prescription drug advertising and promotion is truthful, balanced, and accurately communicated. FDA regulations require that promotional labeling and advertisements be submitted to the FDA at the time of initial dissemination (for labeling) and initial publication (for advertisements). The FDCA defines labeling to include all labels and other written, printed, or graphic matter accompanying an article.

For example, promotional materials commonly shown or given to physicians, such as sales aids and branded promotional items, are regulated as promotional labeling.

ii.   **Each Manufacturer Defendant Flouted This Process For its Particular Product(s)**

157.   Every Manufacturer Defendant flouted its duties under the FDCA for its particular product. Once Manufacturer Defendants were found to be in violation of the FDCA, the Manufacturer Defendants indirectly marketed through third parties to alter the way doctors viewed and prescribed opioids.  They disseminated through these third parties the unproven and deceptive messages that opioids were safe for the treatment of non-cancer related chronic pain, that opioids were virtually non-addictive and that opioids were woefully under-prescribed to the detriment of patients who were needlessly suffering to avoid FDA regulation and oversight.

158.   Manufacturer Defendants did so by sponsoring pro-opioid front groups who published misleading prescription guidelines, articles and Continuing Medical Education sessions ("CMEs"), and paid physicians thousands of dollars every year to publicly opine on the safety, efficacy, and non-addictive nature of opioids for a wide variety of uses.

a.  **Purdue**

159.   Purdue manufactures, among other opioids, OxyContin.  OxyContin is a so-called "delayed release" pill, in which doses of opioids are released into the bloodstream in specified amounts over a specified period of time.

160.   Purdue believed that OxyContin's "delayed release" mechanism was a game-changer, because (according to Purdue) one pill could provide the user with complete pain relief for 12 hours.  That claim was front-and-center in Purdue's marketing materials. When Purdue launched

OxyContin in the mid-1990s, it did so with the express claim that "One dose relieves pain for 12 hours, more than twice as long as generic medications."[6]

161.    Purdue also claimed, repeatedly, that OxyContin's controlled release mechanism rendered the pill both effective and non-addictive.

162.    Those claims were wrong.  Indeed, when evaluating the efficacy of OxyContin in Purdue's 1995 NDA, the FDA's medical review officer concluded that OxyContin had not been shown to have a significant advantage over conventional, immediate-release oxycodone taken 4 times daily other than a reduction in frequency of dosing.

163.    Despite this, Purdue continued to claim that OxyContin's delayed release mechanism rendered it less addictive, less subject to abuse and to diversion into illegal channels, and less likely to build opioid tolerance and cause withdrawal symptoms than predecessor drugs.

164.    Initially, OxyContin was available in 10 mg, 20 mg, 40mg, and 60 mg tablets. 80 mg and 160 mg tablets were introduced in 1997 and 2001, respectively.

165.    Any dose of OxyContin above 40mg can be deadly for a non-opioid tolerant individual.

166.    Purdue spread misinformation to doctors about physical addiction, asserting that opioid seeking patients were not physically addicted, but suffered from pseudoaddiction caused by the under-treatment of pain.

167.    Upon information and belief, Purdue introduced different dosage levels with the specific intent that patients would become addicted and subsequently graduate to a higher dosage level, into perpetuity. One key promotional message for OxyContin was that it was the drug "to start and to stay with."

---

[6] Harriet Ryan, *et al., "You Want A Description of Hell?" OxyContin's 12-Hour Problem,* The Los Angeles Times (May 5, 2016).

168.    Purdue claimed that OxyContin's delayed release formula would make it less susceptible to abuse, because the delayed release formula foreclosed a rapid release of oxycodone. At the same time, Purdue included directions, in the form of a safety warning on OxyContin, on how crushing OxyContin would result in a rapid release of oxycodone, thereby circumventing the delayed release formula.

169.    Purdue intentionally, fraudulently, and maliciously misrepresented to consumers and doctors alike that OxyContin was an opioid that provided 12 hours of pain relief, despite explicit knowledge to the contrary.

170.    Upon information and belief, even before OxyContin was approved by the FDA in 1996 for marketing and sales in the United States, Purdue had significant information indicating that OxyContin does not treat a patient's pain for 12 hours.  Information in Purdue's possession included a clinical study at hospitals in Puerto Rico in 1989 during which more than a third of the study's subjects began complaining about pain in the first 8 hours, and about half required more medication before the 12-hour mark.

171.    Upon information and belief, Purdue was incentivized to cling to its 12-hour claim of pain relief in order to protect its revenue stream because many available generic competitors successfully treated pain for less than 12-hour intervals.  Without the 12-hour of pain relief claim, OxyContin did not stand out from its competitors, which obviated the need for doctors to continue prescribing OxyContin over available less-expensive alternatives.

172.    Upon information and belief, when Purdue began receiving reports from physicians, sales representatives, and independent researchers that OxyContin did not last 12 hours, it nevertheless clung to its 12-hour of pain relief claim.  Instead of reconsidering its claims, Purdue instead recommended that doctors prescribe higher doses of OxyContin rather than more frequent

doses. Upon information and belief, Purdue deployed a team of hundreds of sales representatives to refocus physicians on 12-hour dosing, with company executives noting in internal documents that any consideration of more frequent dosing "needs to be nipped in the bud. NOW!"

173. As a result, patients taking OxyContin experienced higher highs, but also suffered much lower lows. Patients on whom OxyContin did not last the full 12 hours experienced agonizing pangs of acute withdrawal symptoms, and eventually became physically dependent of opioids and addicted. That, in turn, increased patients' propensity to use opioids other than as prescribed,

174. By claiming that OxyContin offered 12 hours of relief, Purdue was able to include more oxycodone than any prescription opioids at that time. In fact, OxyContin is twice as potent as morphine.

175. From 1996 to 2001, Purdue conducted more than 40 national pain-management and speaker training conferences at lavish resorts in Florida, Arizona, and California. More than 5000 physicians, pharmacists, and nurses attended these all-expenses-paid symposia, where they were recruited and trained for Purdue's national speaker bureau with the intent of influencing prescribing patterns towards prescribing opioids more liberally for non-cancer related chronic pain.

176. During that time, Purdue funded more than 20,000 pain-related educational programs through direct sponsorship or financial grants. In so doing, Purdue exerted enormous influence on physicians' prescribing practices throughout the country.

177. One of the cornerstones of Purdue's marketing plan was the use of sophisticated marketing data to influence physicians' prescribing patterns towards prescribing opioids more liberally for non-cancer related chronic pain.

178.    Purdue (in an innovation that, on information and belief, was copied by other Manufacturer Defendants) compiled prescriber profiles on individual physicians detailing their prescribing patterns, in an effort to influence doctors' prescribing patterns towards prescribing opioids more liberally for non-cancer related chronic pain.

179.    Through these profiles, Purdue (and, on information and belief, other Manufacturer Defendants) could, and can, identify the highest and lowest prescribers of particular drugs in a single zip code, county, state, or the entire country.

180.    One of the critical foundations of Purdue's marketing plan for OxyContin was to target the physicians who were the highest prescribers for opioids across the country.

181.    Purdue's prescriber database also helped identify physicians with large numbers of chronic-pain patients, and helped identify which physicians were simply the most frequent prescribers of opioids and, in some cases, the least discriminate prescribers.

182.    A lucrative bonus system encouraged Purdue's sales representatives to increase sales of OxyContin in their territories, resulting in a large number of visits by said sales representatives to physicians with high rates of opioid prescriptions, as well as a multifaceted "information" campaign aimed at high volume opioid prescribers.  In 2001, in addition to the average sales representative's annual salary of $55,000, annual bonuses averaged $71,500, with a range of $15,000 to nearly $240,000.

183.    Purdue paid $40 million in sales incentive bonuses to its sales representatives in 2001.

184.    From 1996 to 2000, Purdue increased its internal sales force from 318 sales representatives to 671, and its total physician call list from approximately 33,400 to 44,500 to approximately 70,500 to 94,000 physicians.  Through its sales representatives, Purdue used a patient starter coupon program for OxyContin, providing patients with a free limited-time

prescription for a 7-day to 30-day supply. When the program was discontinued, approximately 34,000 coupons had been redeemed nationally.

185.     Purdue also distributed to health care professionals branded promotional items such as OxyContin fishing hats, stuffed plush toys, and music compact discs (''Get in the Swing With OxyContin''). That "swag" strategy was, according to the DEA, unprecedented for an opioid regulated under Schedule II of the CSA.

186.     By getting more "non-pain" specialist physicians to prescribe opioids, and by equating the prescription of opioids to compassion for those in pain, Purdue pulled off a remarkably brilliant marketing campaign that was successful in removing the dangerous stigma surrounding its opioid drugs.

187.     In much of its promotional campaign—in literature and audiotapes for physicians, brochures and videotapes for patients, and its ''Partners Against Pain'' website—Purdue claimed that the risk of addiction from OxyContin was extremely small.

188.     In addition, Purdue provided two promotional videos to physicians that, according to FDA, appear to have made unsubstantiated claims and minimized the risks of OxyContin. The first video was available for about 3 years without being submitted to FDA for review.

189.     In 2003, the FDA issued a warning letter to Purdue for spreading inaccurate information in OxyContin advertisements, and for failing to inform the public of important safety information about the drug.  The letter found Purdue was in violation of the Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 331(a) and (b), 352 (n).

190.     While Purdue did withdraw the offensive promotional materials, rather than distributing a "Dear Healthcare Professional" ("DHP") letter correcting the misinformation or altering the labeling for OxyContin, Purdue doubled down and instructed their sales force to

"refocus" physicians if and when they learn that physician was misinformed regarding the addictive qualities of their products.

191.    The misinformation Purdue pushed out violated federal criminal law. On May 9, 2007, Defendant Purdue pleaded guilty, in federal court, to violations of 21 U.S.C. 331(a) and 331 (a)(2) for marketing and promoting OxyContin as less addictive, less subject to abuse and diversion, and less likely to cause tolerance and withdrawal than other pain medications.

192.    Purdue thus knowingly misbranded OxyContin, and knowingly introduced misbranded OxyContin into interstate commerce, with the intent to defraud or mislead the medical community and consumers into believing OxyContin was less addictive, less subject to abuse and diversion, and less likely to cause tolerance and withdrawal than other pain medications.

193.    Following its guilty plea, Purdue pivoted its promotion of OxyContin.  De-emphasizing direct promotion, Purdue began to work primarily through patient advocacy organizations—or "Front Groups"—posing as neutral and credible professional organizations. In so doing, Purdue was able to deliberately mislead the medical community and the general public while avoiding FDA violations that would have been issued if it had conducted the same promotional campaigns directly.

194.    The American Pain Foundation ("APF"), upon information and belief, received more than $10 million in funding from opioid manufacturers from 2007 through 2012.  The primary opioid manufacturer contributors were Purdue and Endo.  The APF, founded in 1997 described itself as the nation's largest advocacy group for pain patients.

195.    APF published numerous guides and brochures for patients, doctors, and policymakers that minimized the risks of addiction and exaggerated the benefits associated with prescription

opioids, including but not limited to the "Policymaker's Guide," sponsored by Purdue, which sought to dispel the "myth" that opioid pain medication leads to addiction.

196.     At the heart of APF's messaging was that the risk of opioid addiction was overblown and opioids were underused as a treatment for pain.  In December 2011, a ProPublica investigation found that in 2010, nearly 90% of APF's funding came from the drug and medical device community, including Manufacturer Defendants.  On May 8, 2012 the U.S. Senate Finance Committee sent a letter APF inquiring about its ties to drug manufactures.  That very same day, APF announced it was ceasing operations, effective immediately.

197.     Purdue also funded "Responsible Opioid Prescribing," a guide sponsored by the Federation of State Medical Boards ("FSMB") and authored by Dr. Scott Fishman, and former chairman and president of the now defunct APF in 2007.  The guide was ultimately disseminated to 700,000 practicing doctors, with doctors in Michigan alone receiving 42,366 copies.  A June 8, 2012 letter submitted by FSMB to the Senate Finance Committee disclosed that Purdue paid $40,000 to fund the production of the guide.  Purdue also paid the FSMB at least $822,400 from 1997-2012.

198.     The "Responsible Opioid Prescribing" guide promoted the use of opioid pain relievers for both acute and chronic pain and severely minimized the risk of addiction, even claiming that opioids could be used safely (just with additional care) in patient assessed to have a risk of substance abuse.  The guide promoted the widespread use of opioids, stating that "[p]atients should not be denied opioid medications except in light of clear evidence that such medications are harmful to the patient."

199.     Additionally, the guide presented symptoms of genuine addiction as "pseudoaddiction" and taught doctors that the symptoms of addiction—such as demanding or manipulative behavior

and obtaining opioid prescriptions from more than one physician—are actually pseudoaddiction, rather than addictive behavior that would necessitate the withdrawal of opioid treatment.

200.    Upon information and belief, Purdue contributed funding to The American Academy of Pain Management ("AAPM"), a medical specialty society.  AAPM issued a statement in 1997 that endorsed opioids and claimed that the risk of opioid addiction in people taking prescription opioids was low.  The chairman of AAPM at that time was Dr. David Haddox.  Dr. Haddox was, at the time of the statement, a paid speaker for Purdue.  He later went on to become Purdue's vice president for health policy.

201.    In 2009 the American Pain Society ("APS") and AAPM jointly issued guidelines ("APS/AAPM Guidelines") recommending the use of opioids to treat chronic pain.  The APS/AAPM guidelines promoted the use of opioids for the treatment of chronic pain and concluded that the risk of opioid addiction was manageable in patients regardless of previous histories of abuse.  At least fourteen of the twenty-one panel members who drafted the APS/AAPM Guidelines received funding from Manufacturer Defendants, including Purdue.

202.    The APS/AAPM Guidelines have been relied upon by doctors to inform their treatment of pain. They were cited repeatedly in academic literature and were even reprinted in the monthly medical journal, *Pain*.  Upon information and belief, pharmaceutical sales representatives employed by Purdue discussed the APS/AAPM Guidelines with doctors during sales calls.

### b.  Cephalon, Inc.

203.    In 2008, the FDA found that Cephalon had promoted its fentanyl-containing lollipop, Actiq, for non-approved uses.  Actiq had been "indicated" by the FDA for a specific use: to treat breakthrough pain in opioid-tolerant cancer patients who are already receiving around-the-clock opioid therapy.  Cephalon, however, had been marketing Actiq for uses such as migraine

headaches and other non-cancer pain, such as sickle-cell pain crises, and in anticipation of changing dressings or radiation therapy.

204.     Cephalon also:

   a) had sales representatives call on doctors who would not normally prescribe such drugs in the course of their practice;

   b) trained sales representatives on techniques to prompt doctors into off-label conversations;

   c) structured its employees' compensation and bonuses in a manner that encouraged off-label marketing;

   d) had sales representatives instruct doctors how to get their patients' insurance to cover off-label uses;

   e) use grants for continuing medical education to promote off-label uses; and

   f) sent doctors to "consultant" meetings at lavish resorts to hear the company's off-label message.

205.     As a result, Cephalon entered a plea agreement with the United States in which it admitted guilt to numerous violations of the FDCA and agreed to pay a record $425 million in penalties as part of a collective settlement related to the off-label market of multiple drugs, one including Actiq.

206.     Cephalon was also required to:

   a) send letters to doctors about the settlement agreement to enable doctors to report questionable sales representative conduct; and

   b) post information about payments the manufacturer made to doctors on its website.

207.     On March 26, 2009, Cephalon received a warning letter regarding its sponsored links on internet search engines (e.g. Google.com) for the opioid pain reliever Fentora, which made representations and/or suggestions about the efficacy of the said drug but failed to communicate any risk information.

208.    The FDA found that the sponsored links omitted the most serious and frequently occurring risks associated with the Fentora, misleadingly suggesting Fentora is safer than demonstrated.

209.    The FDA also found that the sponsored link for Fentora made incomplete and misleading statements about what the drug is indicated for, suggesting that Fentora is useful in a broader range of conditions or patients than had been demonstrated.

210.    The FDA noted that the marketing material provided only a brief statement about what Fentora is indicated for, which was incomplete and misleading.  Specifically, the marketing material suggested that Fentora is useful in a broader range of conditions or patients than is supported was by substantial evidence in clinical experience.  The advertisement implied that Fentora was indicated for breakthrough pain in any patient with cancer, rather than only those who are already receiving, and already tolerant to, around-the-clock opioid therapy.

211.    Additionally, the FDA found that the sponsored links did not present the full established name of said drug being promoted. Accordingly, the FDA found that the Cephalon's sponsored links misbranded Fentora in violation of the Federal Food, Drug, and Cosmetic Act and FDA implementing regulations. *See* 21 U.S.C. §§ 352(a) & (n), 321(n); 21 C.F.R. §§ 201.10(g)(1), 202.1(b)(1), (e)(3)(i), (ii) & (e)(6)(i).

212.    On September 29, 2008 Cephalon pleaded guilty to 21 U.S.C. § 331(a), 331 (a)(1), and 352(f)(1) for marketing and promoting the opioids Actiq, for medical indications that were not approved by the FDA.

213.    Between January 1, 2001 and December 31, 2006 Cephalon thus knowingly and willfully promoted the sale and use of Actiq for certain uses which the FDA had not approved (i.e. "unapproved uses").

44

214. The FDA approved Actiq, a fentanyl product manufactured as a lollipop, for use only in opioid-tolerant cancer patients (meaning those patients for whom morphine-based painkillers are no longer effective).

215. The drug is a strong and highly addictive narcotic, with significant potential for abuse. From 2001 through at least 2006, Cephalon was allegedly promoting the drug for non-cancer patients to use for such maladies as migraines, sickle-cell pain crises, injuries, and in anticipation of changing wound dressings or radiation therapy.

216. Cephalon promoted Actiq for use in patients who were not yet opioid-tolerant, and for whom it could have life-threatening complications and results.

217. Following its guilty plea, Cephalon pivoted to promoting Actiq through patient advocacy organizations or "Front Groups" posing as neutral and credible professional organizations in order to deliberately mislead the medical community and the general public while avoiding FDA violations. One such Front Group is APF.

218. At least fourteen of the twenty-one panel members who drafted the APS and AAPM Guidelines received funding from Manufacturer Defendants, including Cephalon. The guidelines recommended the use of opioids to treat chronic pain and concluded that the risk of opioid addiction was manageable in patients regardless of previous histories of abuse.

219. Cephalon provided considerable funding to FSMB, including $180,000 from 1997 through 2012. It also funded APF before withdrawing its support due to a Senate investigation.

### c. Janssen Pharmaceuticals, Inc.

220. On December 9, 1999, the FDA sent Janssen a letter indicating that it had reviewed a number of "homemade" marketing pieces that had been used by Janssen sales representatives for its fentanyl-based synthetic opioid, Duagesic. The FDA found those marketing pieces to be false

or misleading because they contained misrepresentations regarding safety information, broadened Duragesic's indication for use, contained unsubstantiated claims, and lacked fair balance.

221.   FDA's warning letter provided the following examples of statements in the homemade marketing material that misrepresented safety information:

a)   "Significantly LESS constipation!", which suggested Duragesic had been demonstrated to be associated with less constipation than other available opioids, thus, minimizing the risk of constipation; and

b)   "Low abuse potential!", which suggested that Duragesic had less potential for abuse than other available opioids, and minimized and contradicted fentanyl's status as a Schedule II controlled substance.

222.   FDA's warning letter provided the following example of a statement in the homemade marketing material that broadened Duragesic's indication for use: "It's not just for end stage cancer anymore!"  That suggested that Duragesic can be used for any type of pain management, and ignored the fact that Duragesic was indicated only for the management of chronic pain in patients who require continuous opioid analgesia for pain that cannot be managed by less powerful means. It also ignored the fact that use in persons other than those for whom Duragesic was indicated by FDA poses a high risk of death.

223.   FDA's warning letter provided the following examples of unsubstantiated claims made in the homemade marketing material:

a)   "Preferred regimen:  2 x per week versus 2 x per day!";

b)   "Easy for Patient compliance."; and

c)   "And the #1 reason to convert your patients to the Duragesic patch:  QUALITY OF LIFE," and "… without pain, patient's [sic] sleep better, increase daily."

224.   Janssen received further warning by way of a September 2, 2004 warning letter.  That letter was in relation to Janssen's Duragesic patch. FDA found that a file card used by Janssen in connection with that patch contained false and misleading claims about the abuse potential of

Duragesic, as well as unsubstantiated claims of the effectiveness of Duragesic. The FDA noted Janssen's representations could encourage the unsafe use of the drug, potentially resulting in serious or life-threatening hypoventilation, or even death.

225. The FDA requested a letter response (1) describing Janssen's intent to comply with FDA's requests, and (2) listing all promotional materials for Duragesic that were the same as or similar to the offending promotional materials. The FDA also requested that Janssen submit a plan for discontinuing use of the promotional marketing materials in question.

226. Janssen's promotional materials in question included:

a) "low reported rate of mentions in DAWN data" along with Drug Abuse Warning Network ("DAWN") data comparing fentanyl/combination mentions to other listed opioid products, which suggested that Duragesic is less abused than other opioid drugs;

b) "minimizes the potential for local GI side effects by avoiding GI absorption," which suggested that Duragesic is associated with less constipation, nausea, and vomiting than oral opioids;

c) "demonstrated effectiveness in chronic back pain with additional patient benefits" which was based on an open-label, single arm trial with no control group which is clearly inadequate to support such a claim;

d) "86% of patients experienced overall benefit in a clinical study based on: pain control, disability in ADLs, quality of sleep", "all patients who experienced overall benefit from Duragesic would recommend it to others with chronic low back pain", "significantly reduced nighttime awakenings" and "significant improvement in disability scores as measured by the Oswestry Disability Questionnaire and Pain Disability Index" which were again based on an open-label, single arm trial with no control group—which is inadequate to support such claims;

e) "Improved patient outcomes: Open-label, crossover comparison study", "Significant improvement in physical functioning summary score", and

47

"Significant improvement in social functioning", which are based on an open label study lacking sufficient support for the cited claims; and

f) "1,360 loaves … and counting", "Work, uninterrupted", "Life, uninterrupted", "Game, uninterrupted", "Chronic pain relief that supports functionality", "Helps patients think less about their pain", and "Improvements in physical and social functioning" which imply that patients will experience improved social or physical functioning, a claim that Janssen lacks support for.

227. The FDA stated they were not aware of any substantial evidence or clinical experience to support these comparative claims.

228. On September 2, 2004 the FDA determined that Duragesic was misbranded and in violation of Section 502(a) of the Food, Drug, and Cosmetic Act. *See* 21 U.S.C. § 352(a).

229. Janssen thus made misleading safety claims and unsubstantiated effectiveness claims for Duragesic.

230. The FDA would not have approved Duragesic's label had Janssen disclosed misleading safety claims and unsubstantiated effectiveness claims for Duragesic at the time of the FDA approval process

231. On August 26, 2011, Janssen received a warning letter regarding its opioid drug, Nucynta. The letter informed Janssen that the FDA had become aware of oral statements made by a Janssen representative that promoted an unapproved use for its opioid Nucynta, made unsubstantiated superiority claims about the drug, and minimized the serious risks associated with Nucynta.

232. The statements were made on December 8, 2010 at the 2010 American Society of Health-System Pharmacists ("ASHP") Midyear Clinical Meeting and Exhibition in Anaheim, CA.

233. The FDA requested a letter response that (1) described Janssen's intent to comply with the request, (2) listed all promotional materials for Nucynta that contained a violation resulting

48

from that actions within the warning letter or similar to the actions in the warning letter, and (3) Janssen's plan for discontinuing use of such materials.

234.    The Janssen representative promoted an unapproved use of Nucynta when the representative indicated that Nucynta is useful in the treatment of Diabetic Peripheral Neuropathic Pain ("DPNP"). Nucynta is not approved by the FDA for treatment of DPNP.

235.    Janssen also made the following unsubstantiated superiority claims and statements that minimized the risk of Nucynta:

    a)  "DPNP patients stay on Nucynta for longer, and Nucynta provides 10 mg of opioid/oxycodone pain control, similar to Tramadol, but with less GI, constipation, nausea, and vomiting," which is misleading and implied that Nucynta is clinically superior compared to oxycodone and Tramadol for DPNP patients; and

    b)  When physicians prescribe Nucynta they "won't have to put patients on docusate or senna, patients get out of the hospital a day earlier which saves thousands of dollars because they are going to be able to have a bowel movement," which is misleading and implied that treatment with Nucynta has been shown to reduce the length of a hospital stay in comparison to oxycodone and Tramadol.

236.    Following its FDA warnings, Janssen pivoted to promoting Duragesic and Nucynta through patient advocacy organizations or "Front Groups" posing as neutral and credible professional organizations in order to deliberately mislead the medical community and the general public while avoiding FDA violations.  Such Front Groups included the APF, APS, and AAPM.

### d.  Endo International PLC

237.    On June 8, 2017 the FDA requested that Endo voluntarily remove from the market reformulated Opana ER—an opioid that was purportedly crush-resistant and thus supposedly

decreased the risk of addiction. The FDA informed Endo that the benefits of Opana ER may no longer outweigh the risks.

238.    Contrary to Endo's statements, reformulated Opana ER hardly reduced the risk of abuse.  Instead, abuse of reformulated Opana ER by injection resulted in a serious disease outbreak of HIV and hepatitis C, as well as cases of thrombotic microangiopathy (a serious blood disorder).

239.    Endo claimed to have reformulated Opana ER to be resistant for patients who crush and snort prescription opioid pills.  Instead, the route of abuse significant shifted from insufflation (crushing and snorting) to intravenous injection.

240.    The FDA released a statement confirming its decision was the first time that the FDA had taken steps to remove a currently marketed opioid pain medication from sale due to public health concerns of abuse.  The request, while voluntary, also stated that the FDA intended to take steps to formally require its removal by withdrawing approval if Endo chose not to remove Opana ER.

241.    Less than a month later, on July 6, 2017, Endo announced it would voluntarily remove Opana ER from the market after careful consideration and consultation with the FDA.

242.    Endo was one of the primary contributors to the APF's numerous published guides and brochures for patients, doctors, and policymakers. The guides minimized the risks of addiction and exaggerated the benefits associated with prescription opioids, including but not limited "Exit Wounds: A Survival Guide to Pain Management for Returning Veterans & Their Families," sponsored by Endo, which falsely claimed that it is unlikely that  people who are not predisposed to addiction will become addicted to opioid painkillers, and "Treatment Options: A Guide for People Living with Pain," which promoted opioids as essential for treating even "moderate" pain.

243.     A June 8, 2012 letter submitted by FSMB to the Senate Finance Committee disclosed that Endo paid $50,000 respectively to fund the production of the "Responsible Opioid Prescribing," a guide authored by Dr. Scott Fishman, former chairman and president of the now defunct American Pain Foundation in 2007. The guide was ultimately disseminated to 700,000 practicing doctors, with Michigan alone receiving 42,366 copies. Since that time, Endo has paid the FSMB at least $371,620.

### e.  Actavis

244.     On February 18, 2010, the FDA issued a warning letter to Actavis, the manufacturer of the opioid Kadian and one of the predecessor companies to Allergan, for distributing a false and misleading co-pay assistance brochure and comparison detailer.

245.     The FDA's findings were based on Actavis' omissions and its minimization of serious risks associated with Kadian in its brochure; Actavis' failure to present the limitations to Kadian's approved indication for use and its suggestions that it could be used for broader purposes than indicated; and its unsubstantiated claims of superiority and effectiveness.

246.     The brochure presented several effectiveness claims regarding Kadian, but failed to present any contraindications and, additionally, omitted several warnings, precautions, drug interactions, and adverse events.

247.     The brochure also failed to present risk information with a prominence and readability that is reasonably comparable to the presentation of benefit information.

248.     The brochure also minimized the serious and significant risks associated with the use of Kadian by describing the serious and potentially fatal risks in highly complex, medically technical language not likely to be understood by consumers.  The brochure simply included the

following language, "Please see accompanying complete Prescribing Information" in an effort to mitigate the misleading omission and/or minimization of risk information.

249.    In direct marketing to consumer marketing, Kadian's brochure included the following erroneous claims:

    a)  "Allow for less breakthrough pain and more consistent pain relief for patients";

    b)  "Better pain control …";

    c)  "Allow patients to live with less pain …";

    d)  "Allow individualization and customization of a patient's pain treatment";

    e)  "Prescribe KADIAN® - Less pain for your patients.  More options for you."; and

    f)  "Less pain.  More options."

250.    The FDA informed Actavis that its brochure and detailer were false and misleading because they omitted and minimized the serious risks associated with Kadian, broadened and fail to present the limitations to the approved indication of Kadian, and presented unsubstantiated claims of superiority and effectiveness.

251.    The FDA found Actavis' brochure and detailer for Kadian failed to include important and serious risk information including contraindications, adverse events, and warnings regarding potentially fatal abuse of opioids.

252.    The FDA also found Actavis' brochure and detailer presented broad claims about Kadian's use in treating pain, therefore implying that Kadian was appropriate for use in a broader range of patients than the patients for which FDA approval was granted.

253.    Finally, the FDA found Actavis' detailer included efficacy claims and presentations which were unsubstantiated, misleading and implied Kadian was superior to other opioid therapies. The FDA found Actavis' brochure and detailer misbranded the drug in violation of the Food, Drug,

and Cosmetic Act, 21 U.S.C. §§ 352(a) & 321(n). Cf. 21 C.F.R. §§ 202.1(e)(3)(i); (e)(5); (e)(6)(i), (ii) & (xviii); (e)(7)(i) and (viii).

### f. Mallinckrodt

254. On March 30, 2009, Mallinckrodt received a letter from the FDA stating that Mallinckrodt was found to have been marketing an unapproved new drug, morphine sulfate concentrate oral solution 20 mg/ml, in violation of 21 U.S.C. §§ 331(d) and 355(a).

255. The letter also stated that its unapproved morphine formulation was misbranded under 21 U.S.C. § 352(f)(1) because the conditions it was intended to treat were not amenable to self-diagnosis and treatment. Adequate directions for such use, therefore, could not be written. As a result, introduction or delivery for introduction into interstate commerce of its unapproved morphine formulation violated 21 U.S.C. §§ 331(a) and (d).

256. Mallinckrodt had been marketing its unapproved morphine formulation since 2005.

257. Mallinckrodt provided considerable funding to FSMB including at least $100,000.

258. Separately and together, Manufacturer Defendants thus engaged in a sustained misinformation campaign regarding both (1) the safety and efficacy of opioids generally; and (2) their products in particular. That misinformation campaign, propagated at times through industry-funded Front Groups, paid tremendous dividends. Across the country, including in the City of Traverse City, doctors began prescribing powerful opioids for a wide range of ailments. In turn, patients became addicted—setting into motion the raging opioid epidemic plaguing America today.

### C. Defendants' Failures to Maintain Effective Controls Against Diversion and Failures Report Suspicious Orders

259. The opioid epidemic was further fueled by all Defendants' failure to follow the specific mandates in the CSA requiring them to help ensure that highly addictive drugs are not diverted to

illegal use.  The brunt of the opioid epidemic could have been, and should have been, prevented by had Defendants fulfilled their duties set by statute and common law.  Defendants, who operate at every level of the opioid supply chain, had an obligation and duty to act.  They did not—and the country, including the City of Traverse City, paid the price.

260.    The opioid supply chain begins with manufacturers (including Manufacturer Defendants), who manufacture and package the pill.  Manufacturer Defendants then transfer the opioids to wholesale distributors (including Distributor Defendants).[7] Wholesale Distributors then dispense the opioids to hospitals and pharmacies.  Those entities (which include Retailer Defendants) who then dispense drugs to patients.

261.    Recognizing that highly addictive drugs like opioids can be easily abused and diverted to the black market, Congress, in the Controlled Substances Act ("CSA") set forth two relevant controls on such drugs.

262.    *First*, the DEA sets limits on the quantity of schedule II controlled substances—such as opioids—that may be produced in the United States in any given year. *See* 21 U.S.C. § 826(a); *see also* 28 C.F.R. § 0.100.  DEA determines these quotas based on a variety of data including sales, production, inventories, and exports. The DEA can and does lower quotas as a means of addressing abuse and diversion.

263.    *Second,* Congress anticipated that highly addictive prescription drugs like opioids could be abused and diverted to the black market.  The CSA thus sought to combat diversion of prescription narcotics by providing for a closed system of drug distribution in which every actor in the opioid supply chain—*i.e.,* manufacturers, wholesale distributors, and retailers—must register with the DEA.  Every registrant, in turn, is charged with being be vigilant in deciding

---

[7] Collectively, Distributor Defendants account for over 90% of all drugs distributed within the United States.

whether a customer, whether a pharmacy, wholesaler, or end customer, can be trusted to deliver or use controlled prescription narcotics only for lawful purposes. 21 U.S.C. § 823(e).  Specifically, every registrant—manufacturers, wholesale distributors, and retailers—is required to "maintain effective control against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels." 21 U.S.C. § 823(b)(1)

264.     In particular, the CSA and its implementing regulations require all registrants to (1) report suspicious orders of prescription opioids to the DEA, and (2) perform required due diligence prior to filling any suspicious orders. *See* 21 U.S.C. § 823(b)(1); 21 C.F.R. § 1301.74(b).   A "suspicious order" is defined as including "orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." 21 C.F.R. § 1301.74(b).

265.    In addition, the Code of Federal Regulations requires all registrants—manufacturers, wholesale distributors, and retailers—to "design and operate a system to disclose to the registrant suspicious orders of controlled substances." 21. C.F.R. § 1301.74(b).

266.    So, in addition to reporting suspicious orders, a registrant, whether a manufacturer, wholesaler or retailer, must exercise due diligence in confirming the legitimacy of all orders prior to filling.

267.    The requirements imposed on Defendants by the CSA—including the requirements to report suspicious orders, and to create a system to disclose suspicious orders—are crucial. As the United States Supreme Court has explained, the CSA was Congress's attempt "to conquer drug abuse and to control the legitimate and illegitimate traffic in controlled substances." *Gonzales v. Raich*, 545 U.S. 1, 12 (2005).

268.     "Congress," the Court has explained, "was particularly concerned with the diversion of drugs from legitimate channels.  It was aware that registrants, who have the greatest access to

controlled substances and therefore the greatest opportunity for diversion, were responsible for a large part of the illegal drug traffic." *United States v. Moore*, 423 U.S. 122, 135 (1975).

269.  Manufacturers and distributors must therefore be vigilant in deciding whether a prospective customer can be trusted to deliver controlled substances only for lawful purposes. This responsibility is critical, as Congress has expressly declared that the illegal distribution of controlled substances has a substantial and detrimental effect on the health and general welfare of the American people.

270.  Reflecting the importance of CSA compliance, the DEA has repeatedly provided guidance to registrants emphasizing their obligations under the CSA. A DEA letter dated September 27, 2006, sent to every commercial entity in the United States registered with the DEA, outlined specific circumstances that might be indicative of diversion:

    a)  Ordering excessive quantities of a limited variety of controlled substances while ordering few if any other drugs.

    b)  Ordering a Limited variety of controlled substances in quantities disproportionate to the quantity of non-controlled medications ordered.

    c)  Ordering excessive quantities of a limited variety of controlled substances in combination with excessive quantities of lifestyle drugs.

    d)  Ordering the same controlled substance from multiple distributors.

271.  Additionally, the letter implored Distributor Defendants to know their pharmacy customers, including Retailer Defendants, and to follow-up with said pharmacy customers, including Retailer Defendants, regarding:

    a)  What percentage of the pharmacy's business does dispensing controlled substances constitute?

b) Is the pharmacy complying with the laws of every state in which it is dispensing controlled substances?

c) Is the pharmacy soliciting buyers of controlled substances via the internet or is the pharmacy associated with an internet site that solicits orders for controlled substances?

d) Does the Pharmacy, or Internet site affiliated with the pharmacy, offer to facilitate the acquisition of a prescription for a controlled substance from a practitioner with whom the buyer has no pre-existing relationship?

e) Does the pharmacy fill prescriptions issued by practitioners based solely on an on-line questionnaire without a medical examination or bona-fide doctor-patient relationship?

f) Are the prescribing practitioners licensed to practice medicine in the jurisdictions to which the controlled substances are being shipped, if such a license is required by state law?

g) Are one or more practitioners writing a disproportionate share of the prescriptions for controlled substances being filled by the pharmacy?

h) Does the pharmacy offer to sell controlled substances without a prescription?

i) Does the pharmacy charge reasonable prices for controlled substances?

j) Does the pharmacy accept insurance payment for purchases of controlled substances made via the internet?

272.    In 2007, the DEA sent letters to every registered manufacturer or distributor of controlled substances, including Defendants.  As stated in the letter, "the purpose of [the] letter [wa]s to reiterate the responsibilities of controlled substance manufacturers and distributors to inform the DEA of suspicious orders in accordance with 21 C.F.R. § 1301.74(b)."

273.     In the letter, the DEA expressly warned that the regulation "requires that the registrant inform the local DEA Division Office of suspicious orders when discovered by the registrant." The DEA also warned that "[r]egistrants are reminded that their responsibility does not end merely with the filing of a suspicious order report.  Registrants must conduct an independent analysis of suspicious orders prior to completing a sale to determine whether the controlled substances are likely to be diverted from legitimate channels.  Reporting an order as suspicious will not absolve the registrant of responsibility if the registrant knew, or should have known, that the controlled substances were being diverted."

274.     In addition, the DEA warned that the "regulation specifically states that suspicious orders include orders of an unusual size, orders deviating substantially from a normal pattern, and orders of an unusual frequency.  These criteria are disjunctive and are not all inclusive.  For example, if an order deviates substantially from a normal pattern, the size of the order does not matter and the order should be reported as suspicious.  Likewise, a registrant need not wait for a 'normal pattern' to develop over time before determining whether a particular order is suspicious. The size of an order alone, whether or not it deviates from a normal pattern, is enough to trigger the registrant's responsibility to report the order as suspicious.  The determination of whether an order is suspicious depends not only on the order patterns of the particular customer, but also on the patterns of the registrant's customer base and the patterns throughout the relevant segment of the regulated industry."

275.     Federal law imposes a duty upon Defendants to maintain effective controls against diversion of prescription opiates into other than legitimate medical, scientific, and industrial channels. 21 U.S.C.A. § 823(b)(1).

276.     Federal law imposes a duty upon Defendants to comply with applicable State and local law. *See* 21 U.S.C.A. § 823(b)(2), incorporated into Michigan law by Mich. Admin. Code R. § 338.493c(i).

277.     On information and belief, Defendants knowingly, recklessly, and/or negligently supplied suspicious quantities of prescription opioids to obviously suspicious physicians and pharmacies in and around the City of Traverse City, Michigan, without disclosing suspicious orders as required by regulations and otherwise circumventing their statutory obligations under Federal and Michigan State law.

278.     Defendants' refusal to report and investigate suspicious orders had far-reaching effects. As mentioned above, the DEA is required to annually set production quotas for regulated drugs. In the context of opioids, however, DEA has cited the difficulty of determining an appropriate production level to ensuring that adequate quantities are available for legitimate medical use. That is because there are no direct measures available to establish legitimate medical need. DEA's difficulty in setting production quotas was compounded by the fact that the Manufacturer, Distributor, and Retailer Defendants failed to report suspicious orders of opioids—and failed to maintain effective controls against diversion. Defendants' deliberate failures thus prevented the DEA from realizing the full extent of opioid diversion for years

279.     Defendants could have (and should have) reported and stopped the flow of prescription opioids into the black market. But Defendants intentionally, recklessly, and/or negligently failed to investigate, report, and halt suspicious orders. Accordingly, as a direct result of Defendants' misconduct, substantial and dangerous quantities of prescription opioids were illegally diverted to and overprescribed in the City of Traverse City, Michigan.

### i. Failure of the Manufacturer Defendants

280. Manufacturers are the source of the prescription drugs in the pharmaceutical supply chain. The pharmaceutical manufacturing industry is composed of two distinct business models: manufacturers of brand-name drugs and manufacturers of generic drugs.

281. Manufacturers manage the actual distribution of drugs from manufacturing facilities to drug wholesalers, and in some cases, directly to retail pharmacy chains, mail-order and specialty pharmacies, hospital chains, and some health plans. Manufacturers may also distribute products directly to government purchasers, such as the Veterans Administration.

282. Upon information and belief, Manufacturer Defendants collected, tracked, and monitored extensive data concerning suspicious physicians and pharmacies through third-party organizations and through defendant distributors and defendant pharmacies in exchange for rebates or other consideration to better drive sales.

283. For example, IMS Health furnished Purdue and other Manufacturer Defendants with fine grained information about the prescribing habits of individual doctors and the ordering habits of individual pharmacies.

284. Manufacturer Defendants could have used this data to identify diversion as required under federal law, to satisfy its duty of ""effective control against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels." *See* 21 U.S.C. § 823(b)(1).

285. Instead, they utilized the data to understand which regions, and which doctors, to target through their sales force.

286.     With knowledge the knowledge that Retailer Defendants and prescribing doctors were facilitating diversion, Manufacturer Defendants failed to report each instance of diversion to the DEA while rolling out marketing campaigns to churn its prescription opioid sales.

287.     Indeed, upon information and belief, Manufacturer Defendants withheld from the DEA information about suspicious orders—and induced Distributor Defendants and Retailer Defendants to do the same—to obfuscate the extent of the opioid epidemic. Upon information and belief, Manufacturing Defendants knew that if they or the other defendants disclosed suspicious orders, the DEA would become aware that many opioids were being diverted to illegal channels, and would refuse to increase the production quotas for opioids.

288.     Upon information and belief, at least Purdue referred to overprescribing doctors or doctors engaged in diversion as "whales."

### ii.     Failure of the Distributor Defendants

289.     Distributor Defendants purchase prescription opioids from Manufacturer Defendants to distribute to a variety of customers, including Retailer Defendants (retail and mail-order), hospitals, long-term care, and other medical facilities (e.g., community clinics, physician offices and diagnostic laboratories).

290.     The top three wholesale distributors, McKesson, Cardinal Health, and AmerisourceBergen, account for almost 90 percent of the entire wholesale drug market.  This consolidation has forced the industry to change its revenue model, evolving its core distribution business into a low-margin enterprise that makes money by maximizing economies of scale, i.e. the more opioids they distribute the lower their margins.

291.     Distributor Defendants utilize "just-in-time" delivery methods.  In order to keep inventory and liability of pharmaceutical drugs as low as possible, most pharmacies receive drug

deliveries from distributors every day of the week. This allows the pharmacy to hold as little inventory of pharmaceutical drugs on site as possible. In making just-in-time deliveries, sometimes multiple times a day to a single pharmacy, distributors know precisely how many opioid prescriptions and individual pills they are delivering to a specific pharmacy.

292. On information and belief, Distributor Defendants supplied Manufacturer Defendants with distribution data in exchange for rebates or other consideration so Manufacturer Defendants could better drive sales.

293. Distributor Defendants report the sale of all prescription opioids, including those to Retailer Defendants in the City of Traverse City, Michigan, to the Automation of Reports and Consolidated Orders System ("ARCOS") database. The ARCOS database's purpose is to monitor the flow of DEA controlled substances from their point of manufacture through commercial distribution channels but does not include prescription or doctor data.

294. The ARCOS database does not alert the DEA to the suspicious nature of a particular order. The DEA investigators regard the database as unwieldy because it encompassed dozens of drugs sold by more than a thousand companies and is frequently six months out of date.

295. Distributors are a crucial link in the closed system envisioned by Congress in enacting the CSA. Wholesale distributors are the closest link to pharmacies in the pharmaceutical supply chain, as such, they are best situated to determine whether a pharmacy is facilitating the diversion of prescription opioid pills.

296. Industry compliance guidelines established by the Healthcare Distribution Management Association, the trade association of pharmaceutical distributors, explain that distributors, including Distributor Defendants, are "[a]t the center of a sophisticated supply chain"

and, therefore, "are uniquely situated to perform due diligence in order to help support the security of the controlled substances they deliver to their customers."

297.    Distributor Defendants are a key link in the pharmaceutical supply chain, as they that have the power to determine that an order is not being diverted before filling suspicious orders—thereby preventing diversion before it can even occur.

298.    Reporting an order as suspicious will not absolve a distributor, including Distributor Defendants, of responsibility if the registrant and distributor knew, or should have known, that the prescription opioids were being diverted.  Indeed, reporting a suspicious order, then filling said order with knowledge it may be suspicious constitutes a failure to maintain effective controls against diversion under 21 U.S.C. §§ 823 and 824.

299.    Once the DEA started to enforce suspensions of registrations to distribute controlled substances, rather than comply, manufacturers and defendants spent at least $102 million to undermine the DEA's ability to do so.

300.    On February 19, 2014, acting at the behest of industry lobbyists, Representative Tom Marino introduced the "Ensuring Patient Access and Effective Drug Enforcement Act" as a supposed effort to define "imminent danger" in the 1970 act. A DEA memo noted that this bill would essentially destroy the agency's power to file an immediate suspension order of any suspicious drug shipments.

301.    This bill required that the DEA show the company's actions had shown "substantial likelihood of an immediate threat," whether in death, serious bodily harm or drug abuse before a suspension order can be sought. It also gave drug companies the ability to submit "corrective action" plans before any penalties could be issued. The law essentially makes it impossible for the

DEA to halt any suspicious narcotic shipments before opioids are diverted to the illegal black market.

### a. The Distributor Defendants Failed to Track and Report Suspicious Sales as Required by Michigan and Federal Law

302.    The following fines reflect only a small portion of the hundreds of billions of dollars in revenue the Distributor Defendants receive each year.

#### 1)  McKesson

303.    McKesson is a significant distributor of opioids in the United States and is currently under investigation by Michigan Attorney General Bill Schuette ("Schuette").  The investigation is being handled by Schuette's Corporate Oversight Division.

304.    In or about 2007, the DEA accused McKesson of failing to report suspicious orders and launched an investigation.  In 2008, McKesson entered into a settlement agreement with the DOJ and a memorandum of agreement, agreeing to pay a $13.25 million fine for failure to report suspicious orders of pharmaceutical drugs and promising to set up a monitoring system.

305.    As a result, McKesson developed a Controlled Substance Monitoring Program ("CSMP") but nevertheless failed to design and implement an effective system to detect and report "suspicious orders" for controlled substances distributed to its independent and small chain pharmacy customers – *i.e.*, orders that are unusual in their frequency, size or other patterns. McKesson continued to fail to detect and disclose suspicious orders of controlled substances.  It failed to conduct adequate due diligence of its customers, failed to keep complete and accurate records in the CSMP files maintained for many of its customers and bypassed suspicious order reporting procedures set forth in the CSMP.

306.    Despite the CSMP, a DEA investigation revealed that between 2008 and 2013, McKesson continued to fail to inform the DEA about a plethora of suspicious orders of prescription

opioids.  In that time period, a single warehouse in Aurora, Co filled 1.6 million prescription orders and reported only 16 as suspicious.

307.     As recently as December 17, 2017 facts continue to emerge regarding McKesson's misdeeds. According to both the Washington Post Article and "60 Minutes," McKesson's failures from 2008 to 2013 were so egregious that members of the DEA believed that it warranted a criminal case against the drug distribution company. Apparently, members of the DEA thought prison sentences for McKesson executives would be warranted.

308.     The DEA's Denver field division, in conjunction with a local law enforcement investigation into Platte Valley Pharmacy in Brighton, Colo., ascertained that the vast majority of pills prescribed at the Platte Valley Pharmacy originated at McKesson's warehouse in Aurora, CO. According to local law enforcement, a single pharmacist, Jeffrey Clawson, was selling as many as 2,000 opioids a day.

309.     None of the 16 suspicious orders that McKesson actually reported from 2008 to 2013 were related to the Platte Valley Pharmacy, or to Jeffrey Clawson.

310.     This was in spite of the fact that, from 2008-2011, the percentage increase for oxycodone 30 mg orders supplied by McKesson to Platte Valley Pharmacy was approximately 1,469%.  Jeffrey Clawson was eventually indicted and convicted of drug trafficking charges and was given a 15 year prison sentence.

311.     McKesson eventually did report Jeffrey Clawson's suspicious orders, but only after he had already been convicted and the Platte Valley Pharmacy closed and was no longer a source of revenue.

312.     Upon information and belief, Distributor Defendants had a policy of not reporting suspicious orders until the DEA was already aware of wrongdoing. In this way the Distributor

Defendants believed they could protect themselves from liability, while obfuscating the true extent of opioid diversion to keep DEA quota on opioids high.

313.    Prior to Jeffrey Clawson's indictment, McKesson did not report, as suspicious, that a small pharmacy in rural Colorado needed the more prescription opioids than a medical center in the city of Denver. Nor did it report a more than fourteen-fold increase in prescription opioids deliveries to Platte Valley Pharmacy over only three years was out of place.

314.    The DEA's Denver field division rightly realized that if McKesson had been so bold in Colorado, it likely was ignoring suspicious orders elsewhere. What surprised the DEA most was that McKesson would be so reckless in spite of its violations in 2007 and the implementation of the CSMP program.

315.    Subsequently, nine field divisions of the DEA working with 12 U.S. attorney's offices across 11 states, including Michigan, began to collect information on McKesson's activity.

316.    What they found was striking. McKesson hadn't just been ignoring suspicious orders. Rather, McKesson was acutely aware of the situation at Platte Valley Pharmacy.  Worse, McKesson warehouses in Livonia, Michigan, and in Washington Court House, Ohio were supplying pharmacies that sold to criminal drug rings. In all, 12 McKesson distribution centers, including a Livonia, Michigan location, failed to report suspicious orders involving millions of opioids across the country. The DEA even pushed to completely revoke McKesson's Livonia location's registration to distribute controlled substances.

317.    The DEA investigative finding revealed that McKesson systematically :

    a)  Supplied controlled substances in support of criminal diversion activities;

    b)  Ignored blatant diversion;

c) Would arbitrarily increase the threshold amount of opioids pharmacies could purchase;

d) Failed to review orders for suspicious activity; and

e) Ignored own procedures designed to prevent diversion.

318.    David Schiller of the DEA's Denver field division, which first recognized McKesson's bad acts, asserted that "This is the best case we've ever had against a major distributor in the history of the Drug Enforcement Administration." Individuals at the DEA believed that a fine of more than $1 billion would be appropriate, and one unnamed source asserted that "[the DEA] could have fined them out of existence, or indicted the company and put [McKesson, the 5th largest Corporation in the United States] out of business.

319.    It was only after the DEA visited the Aurora, Colorado location on March 2013 that McKesson started to comply, enhancing its monitoring program that resulted in report of 2,447 suspicious orders between June and November of that year.

320.    On January 17, 2017, McKesson agreed to pay a record $150 million in fines and suspend sales of controlled substances from distribution centers in four states (Colorado, Ohio, Michigan and Florida) to settle allegations that the company violated federal law As part of the agreement, McKesson acknowledged that: "at various times during the Covered Time Period, it did not identify or report to DEA certain orders placed by certain pharmacies, which should have been detected by McKesson as suspicious, in a manner fully consistent with the requirements set forth in the 2008 MOA." The company promised to institute significant changes to its program designed to flag suspicious orders, the same promise it made and broke in 2008.

321.    McKesson was fined the equivalent of less than two year's salary of its board chairman and chief executive, John Hammergren.

322.   The DEA agents who were involved in the investigation believed that McKesson escaped criminal liability because McKesson had "intimidated" the lawyers of the chief counsel's office in the Division of Diversion Control.

### 2)  Cardinal Health

323.   Cardinal Health is a significant distributor of opioids in the United States and is currently under investigation by Michigan Attorney General Schuette.  The investigation is being handled by Schuette's Corporate Oversight Division.

324.   Cardinal fully acknowledged that from January 1, 2009 to May 14, 2012 it did fail to comply with regulations that required reports of any suspicious orders from pharmacies. Cardinal Health's chief legal and compliance officer, Craig Morford, also noted that going forward it would work "with all participants in addressing the epidemic of prescription drug abuse." In a press release from Cardinal Health on January 9, 2017, Cardinal Health notes that it is continuously improving a "sophisticated anti-diversion program that includes advanced analytics, technology, and the deployment of teams of anti-diversion specialists and investigators embedded within its supply chain," to address suspicious orders that are likely meant for illegitimate use.

325.   On December 23, 2016, Cardinal Health agreed to pay the United States $44 million to resolve allegations that it violated the Controlled Substances Act in Maryland, Florida and New York by failing to report suspicious orders of controlled substances, including oxycodone, to the DEA.

326.   In the settlement agreement, Cardinal Health admitted, accepted and acknowledged that it had violated the CSA between January 1, 2009 and May 14, 2012 by failing to:

   a) "timely identify suspicious orders of controlled substances and inform the DEA of those orders, as required by 21 C.F.R. § 1301.74(b)";

b) "maintain effective controls against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels, as required by 21 C.F.R. § 1301.74, including the failure to make records and reports required by the CSA or DEA's regulations for which a penalty may be imposed under 21 U.S.C. § 842(a)(5)"; and

c) "execute, fill, cancel, correct, file with the DEA, and otherwise handle DEA 'Form 222' order forms and their electronic equivalent for Schedule II controlled substances, as required by 21 U.S.C. § 828 and 21 C.F.R. Part 1305."

327.    In the press release announcing the settlement agreement, U.S Attorney for the District of Maryland, Rod Rosenstein, stated: "Pharmaceutical suppliers violate the law when they fill unusually large or frequent orders for controlled substances without notifying the DEA … Abuse of pharmaceutical drugs is one of the top federal law enforcement priorities.  Cases such as this one, as well as our $8 million settlement with CVS in February 2016, reflect the federal commitment to prevent the diversion of pharmaceutical drugs for illegal purposes."

328.    In the press release, DEA's Washington Division Special Agent-in-Charge, Karl Colder, clarified that the settlement specifically concerned oxycodone: "[The] DEA is responsible for ensuring that all controlled substance transactions take place within DEA's regulatory closed system.  All legitimate handlers of controlled substances must maintain strict accounting for all distributions and Cardinal failed to adhere to this policy … Oxycodone is a very addictive drug and failure to report suspicious orders of oxycodone is a serious matter.  The civil penalty levied against Cardinal should send a strong message that all handlers of controlled substances must perform due diligence to ensure the public safety …"

### 3) AmerisourceBergen

329.    AmerisourceBergen is a wholesale distributor of pharmaceuticals, including controlled

substances and non-controlled prescription medications.    It handles the distribution of

approximately 20% of all pharmaceuticals sold and distributed in the U.S. through a network of

26 pharmaceutical distribution centers, including one in Williamston, Michigan.

330.    AmerisourceBergen is a significant distributor of opioids in the United States and is

currently under investigation by Michigan Attorney General Schuette.  The investigation is being

handled by Schuette's Corporate Oversight Division.

331.    In 2012, West Virginia sued AmerisourceBergen and Cardinal Health, as well as

several smaller wholesalers, for numerous causes of action, including violations of the CSA,

consumer credit and protection, and antitrust laws and the creation of a public nuisance.  Unsealed

court records from that case demonstrate that AmerisourceBergen, along with McKesson and

Cardinal Health, together shipped 423 million pain pills to West Virginia between 2007 and 2012.

AmerisourceBergen itself shipped 80.3 million hydrocodone pills and 38.4 oxycodone pills during

that time period.  Moreover, public documents also demonstrate that that the average dose of each

tablet distributed grew substantially during that time period.    The Distributor Defendants,

including AmerisourceBergen, shipped large quantities of oxycodone and hydrocodone tablets to

the state.  In 2016, AmerisourceBergen agreed to settle the West Virginia lawsuit by paying $16

million to the state, with the funds set aside to fund drug treatment programs in order to respond

to the opioid addiction crisis.

### 4) Mallinckrodt PLC

332.    On July 11, 2017, Manufacturer Defendant Mallinckrodt PLC agreed to pay $35

million to the United States Department of Justice ("DOJ") to settle charges stemming from

violations of certain provisions of the Controlled Substances Act, such as (1) 21 C.F.R. 1301.74(b) for failing to design and operate a system to disclose to the registrant suspicious orders of controlled substances and to inform the DEA Field Division office of such suspicious orders when discovered, (2) 21 C.F.R. 1301.71(a) for failing to provide effective controls and procedures to guard against theft and diversion of controlled substance.

333.    The July 2017 agreement by Mallinckrodt PLC also settled charges by the DOJ stemming from Mallinckrodt PLC's failure to utilize chargeback data received from distributors to identify suspicious orders of customers further down in the supply chain, such as order from pharmacies or pain clinics from distributors, which Mallinckrodt required distributors provide it with in order to obtain chargeback discounts.

334.    Finally, the agreement settled charges stemming from allegations by the DOJ that Mallinckrodt PLC was guilty of record-keeping violations at its manufacturing facility in upstate New York, which created discrepancies between the actual number of oxycodone tablets manufactured in a batch and the number of tablets Mallinckrodt PLC reported on its records.

### 5) Omnicare

335.    As a result of a multi-jurisdictional investigation by the DOJ, CVS' subsidiary OmniCare, Inc., the nation's leading provider of pharmaceutical care for seniors, was fined $50 million for violations of the Controlled Substances Act.

336.    According to the investigation, from 2007 to 2012, OmniCare Inc., filled out prescriptions without requiring signed prescriptions by a prescribing doctor.  Rather, OmniCare Inc. would dispense prescription narcotics upon oral orders from long term care facility staff.  In other words, OmniCare Inc. regularly dispensed opioids without a prescription without knowing who they were dispensing opioids to.

### 6) Masters

337.    Masters has a long history of noncompliance with DEA standards. The DEA has, on two separate occasions, issued orders to show cause why Masters' DEA certificate of registration should not be revoked. On October 17, 2008 the DEA issued an order that alleged that throughout 2007 and 2008, Masters "failed to maintain effective controls against diversion" of hydrocodone. Masters agreed to settle charges brought by the DEA on April 1, 2009.

338.    Masters paid $500,000 and agreed to take steps to bring the company into compliance with DEA regulations for detecting suspicious orders and preventing diversion of controlled substances. However, on August 9, 2013 the DEA again issued an order to show cause why Masters' certificate of registration should not be revoked.

339.    The 2013 order alleged that Masters ignored and/or failed to implement its controlled substance policies and failed to report suspicious orders.

340.    Evidence raised during trial showed that Masters did not report orders held as potentially suspicious, even going so far as to, on numerous occasions, delete orders to they would no longer trigger the hold.  Even when customers provided information which confirmed that an order was indeed suspicious, Masters still failed to report the orders to the DEA.

341.    On September 8, 2015 Chuck Rosenberg, Acting Administrator of the DEA ordered Masters' DEA certificate of registration be revoked. On June 30, 2017 the United States Court of Appeals for the District of Columbia Circuit denied Masters' petition for review.

### iii.    Failure of the Retailer Defendants

342.    Pharmacies are the final step on the pharmaceutical supply chain before drugs reach the consumer/patient.  Pharmacies purchase drugs from wholesalers, and occasionally directly from manufacturers, and then take physical possession of the drug products.

343.     Since they are the final point of sale for pharmaceuticals and the interface between the supply chain and the consumer, pharmacies generate the data that manufacturers as well as wholesale distributors rely upon to measure consumer activity for sales purposes.

344.     Pharmacies have the most accurate data on individual doctors' prescribing habits.  On information and belief, Retailer Defendants provided Manufacturer Defendants with data regarding individual doctors in exchange for rebates, or other form of consideration.

345.     Most pharmacies purchase their drug supply from a wholesale distributor, although some retailers are large institutional and retail chain pharmacies that obtain drugs directly from a manufacturer.  These organizations can deal directly with manufacturers because they already possess the operational infrastructure necessary to bypass wholesalers – warehousing facilities, distribution vehicles, and inventory control systems.  Once a pharmacy takes possession of the drug products, it distributes the products to physicians or directly to consumers.

### a.  Duties of Pharmacies

346.  Pharmacists are the last line of defense in keeping drugs from entering the illicit market. They are meant to be the drug experts in the healthcare delivery system and as such have considerable duties and responsibility in the oversight of patient care.  They cannot blindly fill prescriptions written by a doctor, even one registered under the CSA to dispense opioids, if the prescription is not for a legitimate medical purpose.  Pharmacists are the gatekeepers of a closed system of prescription drug distribution designed to protect the health, safety and welfare of our citizens through limited access to drugs that can have serious and lethal adverse consequences.

347.  The CSA requires pharmacists to review each controlled substance prescription and, prior to dispensing medication, make a professional determination that the prescription is for a legitimate medical purpose.

348. Under the CSA, pharmacy registrants are required to "provide effective controls and procedures to guard against theft and diversion of controlled substances." 21 C.F.R. § 1301.71(a). In addition, 21 C.F.R. § 1306.04(a) states, "The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription." *See* 21 C.F.R. § 1306.04(a).

349. The DEA's 2010 "Practitioner's Manual" section on "Valid Prescription Requirements" instructs that "an order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is an invalid prescription."  Filling such a prescription is illegal.  The manual states: "The law does not require a pharmacist to dispense a prescription of doubtful, questionable, or suspicious origin.  To the contrary, the pharmacist who deliberately ignores a questionable prescription when there is reason to believe it was not issued for a legitimate medical purpose may be prosecuted."

Michigan requires that a controlled substance be prescribed or dispensed by a practitioner with a Michigan Controlled Substance License in good faith. MCLA § 333.7333.  With respect to pharmacists, good faith means "dispensing of a controlled substance pursuant to a prescriber's order which, in the professional judgment of the pharmacist, is lawful." *Id*.  The professional judgment should consider the totality of the circumstances including:

a)  Lack of consistency in the doctor-patient relationship;

b)  Frequency of prescriptions for the same drug by 1 prescriber for larger numbers of patients;

c)  Quantities beyond those normally prescribed for the same drug;

d)  Unusual dosages;

e)  Unusual geographic distances between patient, pharmacist, and prescriber that the prescription is authentic;

74

f) That the prescribed drug is appropriate and necessary for the treatment of an acute, chronic, or recurrent condition;

g) A pharmacist or prescriber shall dispense a prescription only if the prescription falls within the scope of practice of the prescriber; and

h) A pharmacist shall not knowingly dispense a prescription after the death of the prescriber or patient."

MCLA § 333.17751

350.    The Michigan Board of Pharmacy also provides the following guidelines:

"[Pharmacists] must exercise due diligence in verifying that a prescription for controlled substances must be issued for a legitimate medical purpose.  This verification should include (but not be limited to) a review of the prescription for evidence of:

a) Forgery;

b) Alteration;

c) Discussion with the patient regarding the signs and symptoms of the disorder or disease and the diagnosis;

d) Review of the patient's prescription records;

e) A discussion with the prescriber; and

f) A query to Michigan Automated Prescription System ("MAPS"), if fraud is suspected.

351.    In response to an increase of "doctor shopping" and prescription drug diversion, the Michigan Legislature established MAPS as a tool for law enforcement in rooting out drug diversion. *See* Mich. Comp. Laws ("MCL") § 333.7333a.

352.    In its policy statement, MAPS identifies the sole purpose of the MAPS program as identifying and preventing drug diversion of controlled substances.

353.    The MAPS system allows registered personnel (prescribers and pharmacists) to enter patient or prescriber information into an online clearinghouse.  That clearinghouse will let a doctor

or pharmacist know if a patient has gone to multiple doctors for the same prescription opiates, or if the prescribing doctor is overprescribing prescription opiates.

354.     Prescription monitoring programs, such as MAPS, are used to identify and prevent drug diversion at the prescriber, pharmacy and patient levels by collecting prescription data listed in Schedules 2-5 controlled substances dispensed by pharmacies and practitioners.  The goal of MAPS is to identify patients with a possible drug abuse problem and/or those patients who divert controlled substances for illegal use.

355.     Pharmacies are required report customer information pursuant to MCL § 333.7333a to meet this end, though doctors are notably not.  Additionally, pharmacists are not required to run a MAPS report before filling painkiller prescriptions.  So, much like the ARCOS database, MAPS can only be used to identify diversion after it has already occurred.

### b. Retailer Defendants' Policy of Speed over Accuracy Was Negligent

356.     Retail Defendants adopted a number of policies including performance metrics and quotas. CVS, for example, calls this policy The Metrics System.

357.     The performance metric system rates the Retailer Defendants' stores pharmacist employees based solely on productivity.  These requirements placed significant and unrealistic time pressures on pharmacists.

358.     Retailers measure how many and how quickly prescriptions are filled daily based on store volume.  Upon information and belief, many Retailer Defendants' locations require pharmacists to fill one prescription every three minutes.  The program also measures how many telephone calls are made to customers to refill and/or pick up prescriptions; how many flu shots are given; as well as other pharmacy tasks.  All measurements focus on productivity with the end goal of maximizing retail defendants' profits.

359.     Under CVS's Metrics system, for example, pharmacists are directed to meet unobtainable goals.  If they met those goals, they would violate the law regarding their professional responsibilities and governing practice rules.

360.     There is no measurement for pharmacy accuracy or customer safety.

361.     Due to the Metrics and other similar system, pharmacists cannot meet their directives and are forced to decide whether they violate the law and regulations pharmacists must comply with, or attempt to meet the company directives.

362.     Moreover, the bonuses for pharmacists are calculated, in part, on how many prescription that pharmacists is able to fill within a year.

363.     Upon information and belief, Retailer Defendants required their employee pharmacists to fill more than 600 prescriptions per work shift.

364.     The MAPS system debuted in 2003 and was not substantially upgraded until 2016.  Upon information and belief, a query to MAPS can take as long as fifteen minutes.

365.     At the same time that Retailer Defendants increased demands for productivity, they cut the hours for pharmacy technicians, leaving pharmacists severely understaffed and unable to provide all services required by the MAPS system.

366.     To satisfy the increased productivity demands with decreased staffing required pharmacists employed by Retailer Defendants to cut corners in their performance of due diligence obligations implemented through the MAPS system and, consequently, violate their legal obligations as it relates to their professional responsibilities and governing practice rules under Michigan and federal law.

367.    Retailer Defendants' high-volume-and-increased-profits business model also led to a greater number of errors in dispensing prescriptions, which can result in significant harm to pharmacy customers.

368.    A survey conducted by the Institute for Safe Medication Practices. ("ISMP") of 673 pharmacists revealed that 83% believed that distractions due to performance metrics or measured wait times contributed to dispensing errors, and that 49% felt specific time measurements were a significant contributing factor.

369.    Further, the National Association of Boards of Pharmacy found that performance metrics, which measure the speed and efficiency of prescription work flow—using such parameters as prescription wait times, percentage of prescriptions filled within a specified time period, number of prescriptions verified, and number of immunizations given per pharmacist shift—may distract pharmacists and impair professional judgment.

370.    The practice of applying performance metrics or quotas to pharmacists in the practice of pharmacy may cause distractions that could potentially decrease pharmacists' ability to perform drug utilization review, interact with patients, and maintain attention to detail, which could ultimately lead to unsafe conditions in a pharmacy.

371.    Multiple studies show that the more prescription drugs a pharmacist is required to dispense the more likely that pharmacists will make dispensing errors. Including the following:

   a) B.G. Guernsey, N.B. lngrim, J.A. Hokanson, W.H. Doutre, S.G.  Bryant, C.W. Blair & E. Galvan, *Pharmacists' dispensing accuracy in a high-volume outpatient pharmacy service: focus on risk management*, 17 Annals of Pharmacotherapy 742–46. (1983) ("There was a trend for the number of pharmacist-hours containing at least one potentially serious dispensing error to increase as the prescription-filling rate accelerated.  Outpatient pharmacies with high volumes should set a limit to the number of prescriptions filled by their

pharmacists and should experiment with quality assurance systems to reduce dispensing errors and subsequent legal liabilities.")

b) K.L. James, D. Barlow, R. McArtney, S. Hiom, D. Roberts & C. Whittlesea, C. *Incidence, type and causes of dispensing errors: a review of the literature*, 17 Int'l J. Pharm Practice 9-30 (2009) ("High workload, interruptions, distractions and inadequate lighting were objectively shown to increase the occurrence of dispensing errors.")

c) E. Schafheutle, *Factors influencing pharmacist performance: a review of the peer-reviewed literature*, 102 Health Policy 178–92 (2011) ("Factors relating to workload and work environment were associated with performance problems, particularly in relation to errors.")

372.    The Retailer Defendants' productivity policies are directly at odds with their performance of due diligence obligations required to be performed in conjunction with the MAPS system.   Indeed, their policies financially disincentive their pharmacists from exercising due diligence under Michigan and federal law, especially given the higher duty of care associated with the prescription of narcotic opioids, and create an untenable situation ripe for diversion.

373.    The Retailer Defendants failed to adequately train their pharmacists and pharmacy techs on how to properly and adequately handle prescriptions for opioid painkillers, including what constitutes a proper inquiry into whether a prescription is legitimate, whether a prescription is likely for a condition for which the FDA has approved treatments with opioids, and what measures and/or actions to take when a prescription is identified as phony, false, forged, or otherwise illegal.

374.    The Retailer Defendants failed to instruct their pharmacists and pharmacy techs on how to address situations in which they are forced to decline filling a prescription for a customer who submitted a prescription which a pharmacist has identified as suspicious.

375.    The Retailer Defendants have failed to train their pharmacists and pharmacy techs on how to properly exercise their judgment and intuition with respect to determinations about whether

a prescription is one that should be filled, or whether, under the law, the pharmacist should refuse to fill it.

376.     The Retailer Defendants failed to adequately use data available to them to identify doctors that were writing suspicious numbers of prescriptions and/or prescriptions of suspicious amounts of opioids.

377.     The Retailer Defendants failed to adequately use data available to them to do statistical analysis to prevent the filling of prescriptions that contributed to the opioid crisis. Upon information and belief, the Retailer Defendants failed to analyze:

a)  the number of opioid prescriptions filled by individual pharmacies relative to the population of the pharmacy's community;

b)  the increase in opioid sales relative to past years;

c)  the number opioid prescriptions filled relative to other drugs; and

d)  the increase in annual opioid sales relative to the increase in annual sales of other drugs.

378.     The Retailer Defendants failed to conduct internal or external audits of their opioid sales to identify patterns regarding prescriptions that should not have been filled and to create policies accordingly.

379.     The Retailer Defendants failed to have trained personnel monitoring media and journal publications regarding issues with all drugs being sold, including opioids.

380.     The Retailer Defendants failed to heed communications from government agencies, to the public and to Retailer Defendants specifically, and take action.

381.    The Retailer Defendants failed to effectively respond to concerns from raised by their own employees regarding inadequate policies and procedures regarding the filling of opioid prescriptions.

382.    The Retailer Defendants' own sales representatives, agents, employees, contractors, and other persons who rendered services in furtherance of selling more of the Retailer Defendants' drugs, upon information and belief, raised a significant number of complaints, statements of concern, and observations of regarding suspicious prescriptions, which the Retailer Defendants failed to investigate, act upon, and in some cases even acknowledge or create records of.

383.    Upon information and belief, the Retailer Defendants knew, reasonably should have known, or, if they did not know, intentionally remained willfully blind to the fact of the media and journal attention published about the opioid epidemic.  They intentionally remained willfully blind to the fact that pill diversion and pill mills were increasing at an alarming rate.  And, upon information and belief, the Retailer Defendants failed to act.

384.    The Retailer Defendants failed to track or observe increase in antidote sales, which would have triggered suspicion in a reasonable person or a reasonable sales representative that levels of prescription drug abuse were rampant.

385.    The Retailer Defendants failed to observe, take notice of, and take into account, government communications to the public and to those involved in the opioid supply chain, such as the Retailer Defendants, and take action.

386.    The Retailer Defendants failed to track profit changes for opioids, which skyrocketed once the epidemic was truly underway and would have signaled to any reasonable person, pharmacist, or executive that a crisis involving narcotic drugs was underway.

387.    The Retailer Defendants in fact knew of massive sales and negotiated purchase contracts more favorable to them, which in turn created further pressure on sales representatives.

388.    The Retailer Defendants knew that supply procedures had to change to address the ever increasing volume of drugs being sold—which was so patently obvious that it required an update to a larger physical storage space for the volume of pills being moved.

389.    The Retailer Defendants intentionally, maliciously, and repeatedly failed to investigate or act upon complaints, statements of concern and observations of employees.

390.    The Retailer Defendants clearly knew that an opioid epidemic existed as that they considered and/or implemented changes to their security procedures to address retail outlet concerns regarding customers who were, may have been, or had the potential to become addicts.

> **c.    Retailer Defendants and/or their Subsidiaries or Franchisees Failed to Track and Report Suspicious Sales as Required by Michigan and Federal Law**

391.    The Retailer Defendants were subject to multiple DEA investigations regarding their failure to meet their obligations under the CSA as DEA registrants.

> **1)  CVS**

392.    In 2013, CVS Pharmacy, Inc. paid $11,000,000 in fines for violations of the CSA. According to the DEA press release:

393.    "The United States has alleged that from October 6, 2005 to October 5, 2011, CVS pharmacy retail stores violated the CSA and the record-keeping regulations by";

  a) Creating, entering and maintaining invalid "dummy" DEA registration numbers or numbers other than the valid DEA registration number of the prescribing practitioner on dispensing records, which were at times provided to state prescription drug monitoring programs;

  b) Filling prescriptions for certain prescribers whose DEA registration numbers were not current or valid; and

82

c) Entering and maintaining CVS dispensing records, including prescription vial labels, in which the DEA registration numbers of non-prescribing practitioners were substituted for the DEA registration numbers of the prescribing practitioners."

394.    CVS has knowledge and/or notice of the opioid problem since at least 2002.

395.    At any time since CVS had knowledge and/or notice of the opioid problem it could have unilaterally taken steps to curtail and prevent expansion of the problem, but it failed to do so.

396.    Rather than act to curb the expansion of opioid use that CVS knew was occurring at a breathtaking pace, CVS chose not to undertake and/or failed to take action to induce internal consideration of any of the measures it was capable of taking.

397.    In addition to measures alleged above, CVS could and should have unilaterally taken action, and/or offered a program to third-party payers, which had the effect of:

a) Limiting to seven days the supply of opioids dispensed for certain acute prescriptions;

b) Reducing the dispensing of stronger and extended release opioids;

c) Enhancing pharmacist counseling for new opioid patients;

d) Limiting the daily dosage of opioids dispensed based on the strength of the opioid; and

e) Requiring the use of immediate-release formulations of opioids before extended-release opioids are dispensed.

398.    CVS could have and should have implemented these measures at any point in the last 15 years.

399.    CVS considered some of these measures prior to June 2017 but chose not to act on their implementation until September 2017.

400.     Having knowledge and/or notice of the damages that CVS conduct had caused to Plaintiff and others, CVS failed to take other steps to help curb the damages already incurred by Plaintiff.  Such step CVS could have included, among other things:

    a) Donating medication disposal units to community police departments across the country to ensure unused opioid painkillers are disposed of properly rather than taken by individuals to whom the prescription was not written or otherwise diverted or abused;

    b) Implementing a program that consists of providing counseling to patients who are receiving an opioid prescription for the first time, such as by discussing the risks of dependence and addiction associated with opioid use and discussing and answering any questions or concerns such patients may have; and

    c) Running a public education campaigns in which CVS Pharmacists' Teach Program share facts about opioid abuse with students and parents.

### 2)  Rite Aid

401.     In 2009, as a result of a multi-jurisdictional investigation by the DOJ including the Eastern District of Michigan, Rite Aid Corporation ("Rite Aid") and nine of its subsidiaries in eight states were fined $5 million in civil penalties for its violations of the Controlled Substances Act ("CSA").

402.     The investigation revealed that from 2004 onwards, Rite Aid pharmacies across the country, including in Michigan, had a pattern of non-compliance with the requirements of the CSA and federal regulations that lead to the diversion of prescription opioids in and around the communities of the Rite Aid pharmacies investigated.  Specifically in Michigan, Rite Aid failed to notify the DEA of losses of controlled substances in violation of 21 U.S.C. § 842(a)(5) and 21 C.F.R § 1301.76(b).

403.     In an effort to preserve good will, Rite Aid, in partnership with Albertsons announced in February 2017 that it was expanding access to naloxone, the opioid antagonist drug that is

extremely effective at reversing the effects of an opioid overdose and saving the lives of those affected.

404. In addition to measures alleged above, Rite Aid could and should have unilaterally taken action that and/or offered a program to third-party payers to accept that:

a) Limited to seven days the supply of opioids dispensed for certain acute prescriptions;

b) Reduced the dispensing of stronger and extended release opioids;

c) Enhanced pharmacist counseling for new opioid patients;

d) Limited the daily dosage of opioids dispensed based on the strength of the opioid; and

e) Required the use of immediate-release formulations of opioids before extended-release opioids are dispensed.

405. Having knowledge and/or notice of the damages that Rite Aid conduct had caused to Plaintiff and others, Rite Aid failed to take other steps to help curb the damages already incurred by Plaintiff due to Defendants, including Rite Aid, could have:

a) Donated medication disposal units to community police departments across the country to ensure unused opioid painkillers are disposed of properly rather than taken by individuals to whom the prescription was not written or otherwise diverted or abused;

b) Implemented a program that consists of providing counseling to patients who are receiving an opioid prescription for the first time, such as by discussing the risks of dependence and addiction associated with opioid use and discussing and answering any questions or concerns such patients may have; and

c) Run public education campaigns in which Rite Aids ran public education programs.

d) Limited to seven days the supply of opioids dispensed for certain acute prescriptions;

e) Reduced the dispensing of stronger and extended release opioids;

f) Enhanced pharmacist counseling for new opioid patients;

g) Limited the daily dosage of opioids dispensed based on the strength of the opioid; and

h) Required the use of immediate-release formulations of opioids before extended-release opioids are dispensed.

406. Rite Aid could have and should have implemented these measures at any point in the last 15 years.

407. And the failure to take such steps that Rite Aid should have taken was negligent and did result in significant damages to Plaintiff.

### 3) Costco

408. In 2017, Costco Wholesale was fined $11.75 million as a result of a multi-jurisdictional investigation by the DOJ including the Eastern District of Michigan.

409. According to the investigation, Costco pharmacies filled prescriptions that were incomplete, lacked valid DEA registration numbers or were for substances beyond various doctors' scope of practice.  Additionally, the settlement resolves allegations that Costco failed to keep and maintain accurate records for controlled substances at its pharmacies.

410. Between January 1, 2012, and December 31, 2015, certain Costco pharmacies dispensed controlled substances inconsistent with their compliance obligations under the CSA and its implementing regulations.  The violations include: filling prescriptions from practitioners who did not have a valid DEA number, incorrectly recording the practitioner's DEA number, filling prescriptions outside the scope of a practitioner's DEA registration, filling prescriptions that did not contain all the required information, failing to maintain accurate dispensing records, and failing to maintain records for their central fill locations in Sacramento, California and Everett, Washington.

411.     According to US Attorney Eileen M. Decker: "These are not just administrative or paperwork violations – Costco's failure to have proper controls in place in its pharmacies played a role in prescription drugs reaching the black market…"

412.     Furthermore, Costco could and should have unilaterally taken action that and/or offered a program to third-party payers to accept that:

a) Limited to seven days the supply of opioids dispensed for certain acute prescriptions;

b) Reduced the dispensing of stronger and extended release opioids;

c) Enhanced pharmacist counseling for new opioid patients;

d) Limited the daily dosage of opioids dispensed based on the strength of the opioid; and

e) Required the use of immediate-release formulations of opioids before extended-release opioids are dispensed.

413.     Having knowledge and/or notice of the damages that Costco conduct had caused to Plaintiff and others, Costco failed to take other steps to help curb the damages already incurred by Plaintiff due to Defendants, including Costco, could have:

a) Donated medication disposal units to community police departments across the country to ensure unused opioid painkillers are disposed of properly rather than taken by individuals to whom the prescription was not written or otherwise diverted or abused;

b) Implemented a program that consists of providing counseling to patients who are receiving an opioid prescription for the first time, such as by discussing the risks of dependence and addiction associated with opioid use and discussing and answering any questions or concerns such patients may have; and

c) Run public education campaigns in which Costco ran public education programs.

d) Limited to seven days the supply of opioids dispensed for certain acute prescriptions;

e)  Reduced the dispensing of stronger and extended release opioids;

f)  Enhanced pharmacist counseling for new opioid patients;

g)  Limited the daily dosage of opioids dispensed based on the strength of the opioid; and

h)  Required the use of immediate-release formulations of opioids before extended-release opioids are dispensed.

414.     Costco could have and should have implemented these measures at any point in the last 15 years.

415.     And the failure to take such steps that Costco should have taken was negligent and did result in significant damages to Plaintiff.

### 4)  Walgreens

416.     In 2013, as a result of a multi-jurisdictional investigation by the DOJ including the Eastern District of Michigan, Walgreen Corporation was fined $80 million for its violations of the CSA.

417.     According to the investigation Walgreens committed an unprecedented number of record-keeping and dispensing violations under the CSA.  According to documents filed in the underlying administrative actions, Walgreens negligently allowed controlled substances listed in Schedules II – V of the Act, such as oxycodone and other prescription pain killers, to be diverted for abuse and illegal black market sales.

418.     On September 20, 2017, Walgreens announce that the pharmacy was launching its #ItEndsWithUs campaign to educate teens about the opioid epidemic.  As part of that initiative, the company created a website that serves as an online "#ItEndsWithUs" hub and resource center aimed at disseminating the risks of opioid abuse, guides on how to properly dispose of unused opioids, and even testimonials from individuals who personally overcame opioid addictions.

419.   Additionally, the #ItEndsWithUs" hub provides the locations of free-to-use medication-disposal kiosks where individuals can deposit their unused medication into a safe-box, the contents of which will be later disposed of in a safe and proper manner.

420.   In the wake of a recent $500,000 fine, Walgreens adopted a "good faith dispensing" policy that allows a pharmacist to refuse to dispense pain relievers if the pharmacist feels that the prescriber failed to write a prescription for a legitimate medical purpose.

421.   In a letter issued to prescribing physicians, Walgreens stated: "According to 21 C.F.R. 1306.04, pharmacists are required to ensure that prescriptions for controlled substances are issued for a legitimate medical purpose."  The precise text of the regulation to which Walgreens' letter referred, in pertinent part, is as follows:

> The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription.  An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of section 309 of the Act (21 U.S.C. 829) and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances.

422.   Walgreens also took additional steps to combat the opioid crisis, although such efforts were admittedly late in the game including launching a safe medication disposal program in which the company installed drug disposal kiosks in more than 500 Walgreens drugstores in 39 states and Washington D.C., as well as eliminating the requirement persons present a prescription before being permitted to obtain the life-saving medication, Naloxone (in 35 states including Washington, D.C.).  When a patient receives naloxone, Walgreens provides mandatory counseling on the risks of opioids, risk factors for and how to avoid overdose, how to identify and respond to an overdose, and how to use and administer Naloxone.

423.    In addition to measures alleged above, Walgreens could and should have unilaterally taken action that and/or offered a program to third-party payers to accept that:

a) Limited to seven days the supply of opioids dispensed for certain acute prescriptions;

b) Reduced the dispensing of stronger and extended release opioids;

c) Enhanced pharmacist counseling for new opioid patients;

d) Limited the daily dosage of opioids dispensed based on the strength of the opioid; and

e) Required the use of immediate-release formulations of opioids before extended-release opioids are dispensed.

424.    Having knowledge and/or notice of the damages that Walgreens conduct had caused to Plaintiff and others, Walgreens failed to take other steps to help curb the damages already incurred by Plaintiff due to Defendants, including Walgreens, could have:

a) Donated medication disposal units to community police departments across the country to ensure unused opioid painkillers are disposed of properly rather than taken by individuals to whom the prescription was not written or otherwise diverted or abused;

b) Implemented a program that consists of providing counseling to patients who are receiving an opioid prescription for the first time, such as by discussing the risks of dependence and addiction associated with opioid use and discussing and answering any questions or concerns such patients may have;

c) Run public education campaigns in which Walgreens ran public education programs;

d) Limited to seven days the supply of opioids dispensed for certain acute prescriptions;

e) Reduced the dispensing of stronger and extended release opioids;

f) Enhanced pharmacist counseling for new opioid patients;

g) Limited the daily dosage of opioids dispensed based on the strength of the opioid; and

h) Required the use of immediate-release formulations of opioids before extended-release opioids are dispensed.

425.     Walgreens could have and should have implemented these measures at any point in the last 15 years.

426.     And the failure to take such steps that Walgreens should have taken was negligent and did result in significant damages to Plaintiff.

427.     Each of the Retailer Defendants had knowledge and/or notice of the damages caused and continuing to be caused by their conduct and could and should have taken measures, including but not limited to those set forth herein, to curb opioid expansion of opioid use and to prevent or minimize the cascading damages caused by their wrongful conduct.

**D.  Examples of Unreported Suspicious Prescribing Habits in Michigan**

428.     Defendants' gross inadequacies in the performance of their due diligence obligations is underscored by the following examples of illegal prescribing and diversion activities.  Upon information and belief, none of the following doctors, who were apprehended and convicted as a result of a DEA investigation, were prosecuted at the initial prompting by reports of an opioid manufacturer, wholesale distributor, or retail distributor.

429.     Mukunda Dev Mukherjee, M.D. ("Mukherjee"), was sentenced to 328 years in prison after he was found guilty of 44 counts of illegal distribution of controlled substances in the United States District Court for the Eastern District of Michigan.  Records indicate that between January 1, 2003 and April 30, 2004, Mukherjee issued prescriptions for 56,414 dosage units of OxyContin, 166,516 dosage units of hydrocodone pain killers, and 6,200 codeine cough suppressant prescriptions.  These numbers far exceeded any other medical practice in the area and are far higher than are expected from a legitimate medical practice of this size.  In fact, Mukherjee issued more 80 mg OxyContin prescriptions than any other physician or hospital in the state of Michigan during

91

the period of January 1, 2003, through June 30, 2004.  The trial judge described Mukherjee's office as "effectively a prescription mill."

430.    Salahuddin S. Ahmad, M.D. ("Ahmad"), of Ferndale, Michigan, pleaded guilty in the United States District Court for the Eastern District of Michigan to one count of Conspiracy to Possess with Intent to Distribute Oxycodone.  According to court documents, on May 13, 2008, Ahmad, outside the scope of his legitimate practice of medicine, planned to sell (and possessed with the intent to sell) over 2,400 OxyContin tablets.  At one point the defendant claimed he could get 1,500 80mg OxyContin tablets in a "few weeks."

431.    Stuart W. Bilyeu, D.O. ("Bilyeu"), of Southfield, Michigan, pleaded guilty in the United States District Court for the Eastern District of Michigan to the unlawful distribution of hydrocodone, a Schedule III controlled substance.  According to court documents, Bilyeu admitted that he prescribed without medical necessity or justification quantities of controlled substances to patients.  For example, in October, 2004, Bilyeu wrote a prescription for 120 Vicodin to an individual, without any good faith attempt to determine the legitimate medical needs of the patient.  From January 2003 until May 10, 2005, Bilyeu prescribed without medical necessity or justification 100 dosage units of oxycodone 80mg; 100 dosage units of Dilaudid, 20,000 Schedule III drugs, and 40,000 Schedule IV drugs.

432.    Philip Lafata, M.D. ("Lafata), of Pigeon, Michigan, pleaded guilty in the U.S. District Court for the Eastern District of Michigan to one count of Use of a Communication Facility to Facilitate Distribution of Hydromorphone.  According to court documents, between July 2007 and June 2008, Lafata intentionally wrote a person prescriptions for 2050 vials of Hydromorphone— a Schedule II pharmaceutical—without performing any examination of that person.  During the time Lafata wrote these prescriptions, Lafata knew this person was addicted to hydromorphone

92

and that the person was not suffering from any disease, accident, or illness that would justify those prescriptions.

433.    Fanny Dela Cruz, M.D. ("Dela Cruz"), of Livonia, Michigan, was sentenced to 96 months in federal prison for participating in a conspiracy to illegally distribute prescription pills, and to defraud Medicare. During her plea, she admitted she would write pre-signed prescriptions for controlled substances and non-controlled maintenance medication. When pre-signing the prescriptions for controlled substances, Dela Cruz would write the name, milligram and quantity of the controlled substance on the prescription and affix her signature. Dela Cruz would not write in the patient name. The patient name was affixed to the prescription later, by other individuals. These patients were not examined by Dela Cruz prior to her issuing the controlled substance prescriptions. Dela Cruz was compensated in cash by other individuals for issuing these prescriptions. In a 13-month period, Dela Cruz issued the following controlled substances: approximately 577,707 dosage units Oxycodone HCl, 333,394 dosage units of Oxymorphone, 35,185 dosage units of Alprazolam and 663,778 milliliters of Promethazine with Codeine. Dela Cruz was the number one prescriber of Oxycodone and Oxymorphone in the State of Michigan in 2015. Law enforcement officials were never notified of Dela Cruz's malfeasance by the opioid manufacturers, wholesale distributors, or retail distributors. Rather, the investigation was predicated on information provided by a former employee of Dela Cruz.

434.    Chiropractor Boris Zigmond, D.C. ("Zigmond"), of Oak Park, Michigan—as well as a number of his co-conspirators—pleaded guilty in the United States District Court for the Eastern District of Michigan to writing prescriptions for oxycodone without medical justification. From January 2013 through May 2015, Zigmond was the leader of a large-scale prescription drug trafficking organization whose purpose was to secure written prescriptions from medical doctors

for controlled substances (primarily Roxicodone and its generic equivalent Oxycodone) which could be filled at various pharmacies. According to a superseding indictment filed in the United States District Court for the Eastern District of Michigan, Zigmond's organization distributed approximately 1.1 million pills or more than 30 kilograms of Roxicodone. Every week, Zigmond prescribed a staggering 12,000 dosages of brand name and generic 30 mg Roxicodone. Zigmond's last charged coconspirator, Dr. Jennifer Franklin, pleaded guilty before Judge George Caram Steeh of the Eastern District of Michigan in August of 2017.

435.    Dr. Oscar Linares, M.D. ("Linares"), of Monroe, Michigan, was sentenced by the United States District Court for the Eastern District of Michigan to 57 months in prison for unlawful distribution of prescription drugs. According to court records, between April 1, 2008 and March of 2011, Linares unlawfully prescribed millions of dosage units of Schedule II, III and IV narcotics, including opioids such as OxyContin and Opana. Court records further showed that Linares prescribed controlled substances for as many as 250 patients per day.

436.    Doctors. Hussein Awada, M.D. ("Awada"), of Royal Oak, Michigan, and Luis Collazo, M.D. ("Collazo"), of Farmington Hill, Michigan, pleaded guilty in the United States District Court for the Eastern District of Michigan to charges of drug conspiracy and health-care fraud. From December 2010 through 2012, Awada and Collazo distributed controlled substances, including the highly addictive drugs Oxycodone, Roxicodone, and Opana ER, outside the course of usual medical practice and for no legitimate purpose. According to court documents, Awada for sixteen months ran a "pill mill." Awada prescribed a total of more than 400,000 oxycodone pills during the relevant time period. Awada was sentenced to seven years in prison for his crimes, whereas Collazo, as a result of his plea, received a non-jail sentence.

### E.  Examples of Unreported Suspicious Orders from Pharmacies in Michigan

437.    Upon information and belief, none of the following pill mill conspiracies were uncovered as a result of a DEA investigation prompted by reports from an opioid manufacturer, wholesale distributor, or retail distributor.

438.    Sohrab Shafinia, D.O. ("Shafinia"), of Farmington Hills, Michigan, pleaded guilty in U.S. District Court, Eastern District of Michigan, to one count of Conspiracy to Possess with Intent to Distribute Controlled Substances.  According to court documents, beginning in or about October, 2005 and continuing up to and including May, 2007, Shafinia maintained medical practices at various locations in West Bloomfield, Michigan, Southfield, Michigan, and Farmington Hills, Michigan.  During that period of time, Shafinia conspired with several other persons to write prescriptions for individuals who were not patients and on whom he did not conduct any physical examinations.  Shafinia was paid between $100 and $300 for each prescription that he wrote.  Shafinia typically provided in his prescriptions the same combination of Oxycodone, Hydrocodone, and Xanax.  Shafinia referred the individuals who received his prescriptions to SafeScript Pharmacy in Farmington Hills, where one of his co-conspirators worked as the pharmacist.  After receiving the drugs Shafinia prescribed, these individuals turned the pills over to other members of the conspiracy for subsequent distribution.  SafeScript Pharmacy, which prior to the conspiracy had not been among the top 100 pharmacies in Michigan for Oxycodone prescriptions filled, shot to the number one spot for Oxycodone prescriptions in 2006 with over 368,000 dosage units filled.  During the conspiracy, Shafinia prescribed approximately 300,000 dosage units of Oxycodone, 340,000 dosage units of Hydrocodone, and 231,000 dosage units of Xanax.  This trio of drugs prescribed by Shafinia became known at SafeScript Pharmacy as the "Shafinia Cocktail."

95

439.     In *United States of America v. Mason et al* (No. 2:11-cr-20551) (E.D. Mich.) 44 individuals, including doctors and pharmacists, were charged, in the United States District Court for the Eastern District of Michigan, with conspiracy to distribute controlled substances. According to the indictment, Sardar Ashrafkhan, Deepak Kumar, John Check, and David Vezzossi—owners of home health agencies—would provide kickbacks, bribes, and other illegal benefits to physicians to induce them to write opioid prescriptions for patients with Medicare, Medicaid, and private insurance.  Patients were recruited into the scheme by patient recruiters or "marketers," who would pay kickbacks and bribes to patients in exchange for the patients' permitting the pharmacies and physicians to bill their insurance for medications and services that were medically unnecessary and/or never provided.  During this conspiracy, prescriptions were presented to the Sav-Max (pharmacist Ahab Elmadhoun), Sav-Mart (pharmacist Waleed Yaghmour), Atrium (pharmacist Krina Patel and manager Sanjay Patel), or Caremax (pharmacist Jayshriben Gandhi and manager Guarang Gandhi) pharmacies for filling.  The five doctors named in the indictment prescribed a combined total of more than 500,000 dosage units of OxyContin 80 mg and 2 million dosage units of Vicodin.  A cooperating pharmacy, Sav-Max, ordered over 700,000 dosage units of OxyContin 80 mg in a 21 month period.  The devastation of the broader community is well documented in this case—as unleashing $10 million to $20 million of opioids onto the street market had predictably disastrous effects.

440.     According to an FBI press release dated March 19, 2013, Babubhai Patel, a pharmacist, was the owner and controller of some 26 pharmacies in Michigan from approximately 2006 through 2011.  The indictment alleges that Babubhai Patel would (1) offer and pay kickbacks, bribes, and other inducements to physicians in order to induce physicians to write opioid prescriptions for patients with Medicare, Medicaid, and private insurance, and (2) direct that those

prescriptions be presented to one of his pharmacies for billing.  In exchange for their kickbacks and inducements, the medical professionals wrote prescriptions for the patients, and billed the relevant insurers for services supposedly provided to the patients, without regard to the medical necessity of those prescriptions and services.  Patients were recruited into the scheme by patient recruiters, who would pay kickbacks and bribes to patients in exchange for the patients' permitting the Patel Pharmacies (and the physicians associated with Patel) to bill their insurance for medications and services that were medically unnecessary and/or never provided.  The indictment further alleges that since January of 2009, the Patel Pharmacies have dispensed not less than 250,000 doses of OxyContin, not less than 4.6 million doses of Vicodin, not less than 1.5 million doses of Xanax, and not less than 6,100 pint bottles of codeine cough syrup.  Notably, the Patel conspiracy was not uncovered by federal authorities.  Rather, the impetus for the investigation came from observations by the Dearborn Police Department at one of the Patel Pharmacy locations.

441.    The DEA was never alerted by either opioid manufacturers or wholesale distributors of any of the foregoing "pill mill" conspiracies.  Instead—and despite their awareness of the suspicious nature of the foregoing enterprises—manufacturers and wholesale distributors continued to supply them with prescription opioids.

### F. The Opioid Epidemic's Devastating Effects

442.    As a result of: (1) Manufacturer Defendants' misinformation campaigns, and (2) Defendants' failure to abide by their obligations under the CSA, opioid addiction in the United States has skyrocketed.  Defendants' actions created an opioid ecosystem in which prescriptions for highly addictive drugs could be easily obtained, and easily filled.  Overprescribing, in turn,

97

drove opioid-related addiction, overdose, and infections, and it sustained nonmedical use of prescription opioids.[89]

443.    All Defendants were aware of bad-faith prescribing practices.  Yet, far from doing anything to stop the practice of overprescribing, Defendants took action to fuel it.  Defendants are thus responsible for the opioid epidemic that, as set forth below, has devastated America and imposed severe burdens on the City of Traverse City.

### G.  Deaths from Prescription Opioid Overdoses

444.    Weighted National Survey on Drug Use and Health ("NSDUH") estimates suggested that, in 2016, 91.8 million people—more than one-third the population of civilian, noninstitutionalized U.S. adults—used prescription opioids.  For many of those people, opioid use will prove fatal.

445.    Since 1999, two hundred thousand Americans have died as a result of overdoses from OxyContin and other prescription opioids.

446.    To date, prescription opioids have accounted for more American deaths than World War I, the Korean War, and the Vietnam War combined.

447.    Over the next decade, the number of prescription opioid-related deaths is expected to exceed 650,000, outpacing the estimated number of deaths caused by breast and prostate cancers combined during the same period.  To put this figure in context, that figure exceeds the approximately 620,000 Americans who lost their lives in the line of duty during the entire American Civil War.

---

[8] L. Manchikanti et al., *Opioid Epidemic in the United States*. 15 PAIN PHYSICIAN ES9–38 (supplemental material) (2012).
[9] AM Arria & WM Compton, *Complexities In Understanding and Addressing the Serious Public Health Issues Related to the Nonmedical Use of Prescription Drugs*, 65 ADDICT BEHAV. 215–17 (2017).

448.    Opioids could kill nearly as many Americans in a decade as HIV/AIDS has killed since that epidemic began in the early 1980s.

449.    Nationwide, from 1997 to 2002, there was a 73%, 226%, and 402% increase in morphine, fentanyl, and oxycodone prescribing, respectively (in grams per 100,000 populations).

450.    During that same period, hospital emergency department mentions for morphine, fentanyl, and oxycodone increased 113%, 641%, and 346%, respectively.

451.    Mortality rates from opioid overdose have climbed dramatically.  Since 1999, overdose deaths due to prescription opioids have continued to rise.  And in 2002, unintentional overdose deaths from prescription opioids surpassed those from heroin and cocaine nationwide.

452.    The crisis in opioid overdose deaths has reached epidemic proportions in the United States (33,091 in 2015), and currently exceeds all other drug-related deaths or traffic fatalities.

453.    Thus far in 2017, 175 Americans have died every day as a result of the opioid epidemic.

454.    The incredible increase in overdoses from 1999 to today is illustrated by the following graph:



https://www.theguardian.com/society/ng-interactive/2016/may/25/opioid-epidemic-overdose-deaths-map

### H.  Social, Economic, and Health Consequences of Prescription Opioid Abuse

455.    The victims of the opioid epidemic, however, are not just those who die from overdoses.  Prescription opioid abuse also imposes severe harm on those who live with addiction, their families, and their communities.

456.    People suffering from opioid addiction often suffer from a variety of interlocking psychological ailments, including depression, lack of motivation, anxiety, and drug-seeking behavior.  Addiction can thus wreak havoc on an individual's ability to complete daily tasks, to hold down a job, and to care for a family.

457.    A recent Brookings Institution study examining the implications of the opioid crisis on the labor force suggests that the increase in opioid prescriptions could account for much of the decline in the labor force participation of "prime age men" (ages 25-54).[10]

458.    On any given day, 31% of prime age men not in the labor force report taking prescription pain medication, most likely opioid based.  In fact, the true percentage is likely far higher than this self-reported number, due to the stigma and legal risk associated with narcotics.[11]

459.    Opioid abuse also devastates families.  When a family member is addicted to opioids, each family member is affected differently.  The most vulnerable, however, are children.

460.    Indeed, a child's vulnerability to opioids begins even before a child is born. Developing fetuses are vulnerable to substance use by the pregnant mother, as drugs such as opioids can easily cross the placenta and enter fetal blood circulation.

---

[10] Alan B. Krueger, Princeton University, Where *Have All the Workers Gone? An Inquiry into the Decline of the U.S. Labor Force Participation Rate*. BROOKINGS PAPERS ON ECONOMIC ACTIVITY:  BPEA CONFERENCE DRAFTS (2017), https://www.brookings.edu/wp-content/uploads/2017/09/1_krueger.pdf.
[11] *Id.*

461.    The number of children experiencing neonatal abstinence syndrome ("NAS"), a group of problems that occur in newborns exposed to opioids in utero, increased 383% during the period 2000-2012 (1.2 cases per 1000 hospital births in 2000 to 5.8 cases per hospital births in 2012).[12]

462.     In addition, children whose parents have an opioid addiction may be neglected or require removal to foster care.

463.    In the City of Traverse City, as in communities across the country, the number of children who have entered foster care due to parental drug use has increased in recent years.  As a result, child welfare agencies have seen a dramatic increase in their caseloads.  Such welfare agencies, however, are often severely underfunded.  Child welfare agencies thus frequently lack sufficient resources to support drug treatment or parenting classes, or to fund community-based support for children of addicted parents.

464.    The adverse effects of the opioid epidemic are not confined to addicted individuals or their families.

465.    To the contrary, the costs of the opioid epidemic radiate outward, and are borne by society at large.

466.    The monetary costs of prescription opioid overdose, abuse, and dependence are staggering.  The White House Council of Economic Advisers recently reported that, in 2015, "the economic cost of the opioid crisis was $504.0 billion, or 2.8 percent of the GDP that year."[13]

467.    The total cost of the opioid crisis is so high, the White House Council of Economic Advisers emphasized, because of the multifaceted harms caused by prescription opioids.  Among

---

[12] Ctr. for Disease Control & Prevention, *Morbidity and Mortality Weekly Report – Incidence of Neonatal Abstinence Syndrome – 28 States, 1999–2013*, CDC.GOV (Aug. 12, 2016), https://www.cdc.gov/mmwr/volumes/65/wr/mm6531a2.htm.
[13] COUNCIL ECON. ADVISERS, THE UNDERESTIMATED COST OF THE OPIOID CRISIS 1 (2017), https://www.whitehouse.gov/sites/whitehouse.gov/files/images/The%20Underestimated %20Cost%20of%20the%20Opioid%20Crisis.pdf.

other things, the opioid epidemic has imposed significant costs on the healthcare system, and on the criminal justice system. It has also significantly reduced worker productivity, both as a result of addiction and incarceration.[14]

468.     As staggering as a $504 billion annual cost might be, however, the actual current economic cost of the opioid epidemic is probably even higher. As one commentator noted, the White House's 2015 "estimate is probably low for 2016, given that drug and opioid overdose deaths spiked last year compared to 2015."[15]

### I.   The Rising Tide of the Heroin Epidemic

469.     In addition to the costs directly imposed be prescription opioid abuse, the prevalence of prescription opioids in the United States has led to an unprecedented increase in heroin use. According to the Center for Behavioral Health Statistics and Quality, 914,000 people in 2014 reported prior heroin use, a 145% increase from 2007. As a direct result of increased heroin use, heroin-related overdoses are spiking. In 2002, the rate of heroin-related overdose deaths in the United States was 0.7 per 100,000 people. By 2013, that rate had climbed to 2.7 per 100,000 people—a 286% increase.

470.     Heroin use in the United States increased dramatically the period in which the country witnessed a rise in prescription opioid misuse. Data from the 2001-2002 and 2012-2013 National Epidemiologic Survey on Alcohol and Related Conditions-I and–III ("NESARC") showed prevalence of heroin use increased five-fold in the United States during the period between the two surveys.[16]

---

[14] *Id.*

[15] German Lopez, *White House: One Year of the Opioid Epidemic Cost the US Economy More Than $500 Billion*, VOX.COM (Nov. 20, 2017), https://www.vox.com/science-and-health/2017/11/20/16679688/white-house-opioid-epidemic-cost.

[16] SS Martins et al., *Changes In Lifetime Heroin Use And Heroin Use Disorder: Prevalence From The 2001–2002 to 2012-2013 National Epidemiologic Survey on Alcohol and Related Conditions.* 74 JAMA PSYCHIATRY 445–55 (2017).

471.    The parallel explosion in rates of prescription opioid abuse and rates of heroin abuse is no coincidence.  The pathway from prescription opioids to heroin is well-documented, and well understood.  People who are prescribed a prescription opioid, either by a well-meaning physician or through a pill mill, can find that their tolerance and dependence on opioids increases over time.  At that point, the allure of heroin, which is chemically highly similar to prescription opioids—yet often cheaper and more readily available—can prompt an individual to begin heroin use.

472.    Scientific studies indicate that the prescription opioid epidemic is, far and away, the key driver of new heroin users.  People who report previous nonmedical prescription pain-reliever use are 19 times more likely to begin using heroin than the general population.[17]  What is more, prescription opioid abuse, not heroin, is now the main pathway into opioid addiction.  Fifty years ago, 80% of people who abused opioids initiated that abuse through heroin.  By the 2000s, however, that number had flipped on its head: 75% of people who began abusing opioids in the 2000s started through prescription opioids.[18]

473.    Highlighting the link between prescription opioid use and heroin use, Washington University St. Louis Professor Theodore Cicero and his colleagues reported—in a letter to the *New England Journal of Medicine*—that after Purdue introduced a reformulated, purportedly "abuse resistant" strand of OxyContin, heroin use nearly doubled among previous opioid users.  The authors noted that there was no evidence that OxyContin-addicted individuals ceased their drug use as a result of the abuse deterrent formulation.  Rather, addicted individuals simply shifted to a new opioid: in many instances, heroin.[19]

---

[17] Pradip K. Muhuri et al., *Associations of Nonmedical Pain Reliever Use and Initiation of Heroin Use in the United States*, SAMHSA CTR. FOR BEHAVIORAL STATS. & QUALITY (August 2013), https://www.samhsa.gov/data/sites/default/files/DR006/DR006/nonmedical-pain-reliever-use-2013.htm.

[18] TJ Cicero et al., *The Changing Face of Heroin Use in the United States: A Retrospective Analysis of the Past 50 Years*, 71 JAMA PSYCHIATRY 81 (2014).

[19] TJ Cicero et al., *Effect of Abuse-Deterrent Formulation of OxyContin*, 367 N. ENG. J. MED. 187–89 (2012).

474.    That shift from prescription opioids to heroin is often a deadly one.  As indicated in the chart below, heroin deaths escalated 4-fold in the five-year period comprising 2010-2015 alone:



475.    The City of Traverse City is at the epicenter of the heroin epidemic.  Of all United States Census regions, heroin use in the Midwest—the region that includes Michigan—increased

the most drastically from 2000 to 2013.  The Midwest experienced 2,791 heroin-related deaths in 2013, compared to 285 heroin-related deaths in 2002, a near ten-fold increase.[20]

476.     The heroin epidemic in Michigan is, like the heroin epidemic nationwide, being driven by the prescription opioid epidemic.  As early as 2009, law enforcement officials working with the Drug Market Analysis of the Michigan High Intensity Drug Trafficking Areas ("HIDTA"), regions through which trafficked drugs make their way throughout the State of Michigan, including to the City of Traverse City, reported that OxyContin abusers were switching to heroin because it is less expensive.

477.     Opioids users' shift to heroin in Michigan did more than just exacerbate a public health crisis—it also exacerbated a law-enforcement crisis.  By 2010, law enforcement officers concluded that heroin trafficking in HIDTA counties was being fueled, at least in part, by oxycodone users substituting heroin for prescription opioids.[21]  Heroin trafficked through HIDTA regions, in turn, supplies cities throughout Michigan, including the City of Traverse City.

478.     According to a 2009 Drug Market Analysis of the HIDTA, law enforcement officials report that some OxyContin abusers eventually switch to heroin because it is less expensive.  This is indicative of a trend throughout Michigan, including the City of Traverse City.

479.     The number of publicly funded treatment admissions in the region in which heroin was indicated as the primary substance of abuse was higher than for any other drug and increased more than 20 percent from fiscal year ("FY") 2005 (8,439) to FY2009 (10,358).

---

[20] Holly Hedegaard, M.D., Ctrs. for Disease Control & Prevention, *Drug-Poisoning Involving Heroin: United States, 2000–2013*, CDC.GOV (March 2015), https://www.cdc.gov/nchs/data/databriefs/db190_table.pdf#5.
[21] MSP Headquarters, Michigan Intelligence Operations Center, interview by NDIC IA, January 26, 2011; BAYANET, interview by NDIC IA, January 26, 2011; Kalamazoo Public Safety, KVET, response to NDIC RFI, February 8, 2011; DEA, Detroit Division, Strategic Intelligence Group, interview by NDIC IA, January 25, 2011.

480. By 2010, the high level of heroin trafficking in HIDTA counties was been fueled, at least in part, by oxycodone users substituting heroin for prescription opioids.[22]

## VI. SPECIFIC FACTUAL ALLEGATIONS

481. Diverted opioids in the City of Traverse City are often trafficked through the Michigan High Intensity Drug Trafficking Area, encompassing eastern and western Michigan.

482. Publicly funded treatment admissions show that the abuse of opioids increased from 2003 to 2007 including those for opiates/synthetics by 98 percent.

483. By 2009, the HIDTA Drug Market Analysis for the Michigan region reported that Diverted opioids are commonly available and abused in Michigan.

484. By 2011, the ability of users to acquire controlled prescription drugs ("CPDs") in the HIDTA region has driven CPD addiction to its highest level in 5 years.

485. The HIDTA region is one of the primary avenues by which diverted opioids travel through and into Michigan, including into cities such as the City of Traverse City.

486. According to the National Drug Threat Survey ("NDTS") data, 38 of the 49 respondents in the Michigan region reported high controlled prescription drug availability in their areas.

487. Opioid prescriptions in Michigan increased 41% between 2009 and 2015. In 2016, there were 11 million prescriptions written for opioids, about 1.1 prescriptions for every Michigan residents, about the same as 2015, according to the state's drug monitoring system.

488. Michigan health-care providers wrote 11 million prescriptions for opioid drugs in 2015 and another 11 million in 2016 -- enough to provide every Michigan resident with his or her own bottle of narcotics, according to state data.

---

[22] *Id.*

489.    The 2016 prescriptions accounted for 835 units of opioids -- enough to give every Michigan resident about 84 opioid pills, patches or other types of doses of opioid drugs.

490.    The number of Michigan deaths from an overdose of opioids, including heroin, exceeded deaths from traffic crashes or gun fatalities in 2015, according to data from the Michigan Department of Health and Human Services.

491.    In total, 1,275 people in Michigan died from opioid overdoses in 2015, compared to 1,164 gun deaths and 840 traffic fatalities.

492.    Deaths from other drugs have stayed about the same over the past decade while opioid deaths have spiked.

493.    In 1999, opioids accounted for 22% of Michigan's overdose deaths.  By 2015, it was 67%.

494.    Prescription opioids account for more than twice as many overdose deaths as heroin, although many addicts get their prescription painkillers illegally.

495.    Michigan saw an increase in inpatient hospital stays related to opioid use between 2009 and 2014, according to a federal survey.

496.    In 2015, Michigan had an age-adjusted drug overdose death rate of 20.4 per 100,000 people, the 15th highest rate in the country.

497.    According to data collected by the Centers for Medicare & Medicaid Services (CMS), in 2015, City of Traverse City opioid prescriptions accounted for 36,344 claims covered by Medicare Part D, equating to 765,591 days' worth of opioids, costing $2,283,154.68.

## VII.  TOLLING OF STATUTE OF LIMITATIONS AS TO THE CLAIMS AGAINST THE MANUFACTURER DEFENDANTS AND THE DISTRIBUTOR DEFENDANTS

498.  In Michigan, if a person who is or may be liable for any claim fraudulently conceals the existence of the claim or the identity of any person who is liable for the claim from the knowledge of the person entitled to sue on the claim, the action may be commenced at any time within two years after the person who is entitled to bring the action discovers, or should have discovered, the existence of the claim or the identity of the person who is liable for the claim, although the action would otherwise be barred by the period of limitations. MCL § 600.5855.

499.  The running of any statute of limitation has been tolled because the Manufacturer Defendants fraudulently concealed from Plaintiff the existence of Plaintiff's claims by manipulating and distorting public information, knowledge, and facts; negligently and recklessly failing to make public or otherwise produce nonpublic information, over which the Manufacturer Defendants had exclusive possession, dominion, and control, that would have revealed the truth; and by deliberately and fraudulently concealing the truth.

500.  Specifically, the Manufacturer Defendants concealed from Plaintiff the existence of Plaintiff's claims by manipulating and distorting public information, knowledge, and facts when the Manufacturer Defendants engaged in a public disinformation campaign which knowingly and maliciously misrepresented that opioids, when used correctly, as directed, and for approved indications, were, *inter alia*, non-addictive, abuse proof or deterrent, safe, and effective for daily, long-term treatment of pain.

501.  Specifically, the Manufacturer Defendants concealed from Plaintiff the existence of Plaintiff's claims by recklessly and negligently failing to make public or otherwise produce information that would have revealed the truth over which the Manufacturer Defendants had

exclusive possession, dominion, and control, such as reports that those treated with opioids in clinical trials exhibited behaviors indicating that the Manufacturer Defendants' opioids were addictive; data suggesting or proving that large amounts of opioids were being diverted from legitimate, legal channels and used for medical treatment; and information that specific doctors and pharmacies were engaged in an illegal pattern of conduct that was designed to provide, in exchange for monies, opioids to persons who did not suffer from FDA approved indications.

502.    Specifically, the Manufacturer Defendants concealed from Plaintiff the existence of Plaintiff's claims by deliberately concealing the truth when, for example, certain Manufacturer Defendants did not report information about conduct they knew to be illegal by other members of the opioid supply chain; when one Manufacturer Defendant deployed a team of representatives to push prescribers to recommend dosing no more frequently than every 12 hours, despite affirmative knowledge that such prescribing practices were ineffective and increased patients' propensity to become addicted; and when the Manufacturer Defendants sponsored or were otherwise directly involved with organizations that falsely represented themselves as pain patient advocates while simultaneously disseminating the Manufacturer Defendants' desired opioid narrative.

503.    The Distributor Defendants fraudulently concealed from Plaintiff the existence of Plaintiff's claims by misrepresenting their compliance with their legal duties under state and federal law and by wrongfully and repeatedly disavowing those duties in an effort to mislead regulators and the public regarding the Distributor Defendants' compliance with their legal duties.

504.    Specifically, the Distributor Defendants fraudulently concealed the existence of Plaintiff's claims by affirmatively seeking to convince the public that their legal duties had been satisfied through public assurances that they were working to curb the opioid epidemic.  For example, Cardinal Health, through an executive, claimed that it used "advanced analytics" to

monitor the supply chain and falsely represented that it was being "as effective and efficient as possible in constantly monitoring, identifying, and eliminating any outside criminal activity." McKesson stated that it has a "best-in-class controlled substance monitoring program to help identify suspicious orders" and claims that it is "deeply passionate about curbing the opioid epidemic in our country."  Given each Distributor Defendants' sales volumes and history of violations, these false statements were made intentionally and fraudulently or recklessly without regard to the truth and as a positive assertion.

505.    Specifically, the Distributor Defendants fraudulently concealed the existence of Plaintiff's claims through wrongful and repeated disavowal of their duties under state and federal law by individually and collectively through trade groups in the industry pressuring the U.S. Department of Justice to "halt" prosecutions and lobbying Congress to strip the DEA of its ability to immediately suspend distributor registrations.  As a result of their efforts, the Distributor Defendants caused a sharp drop in enforcement actions and secured the passage of legislation raising the legal hurdle the DEA must clear before revoking a registrant's license, an act which was, perhaps not ironically, entitled "Ensuring Patient Access and Effective Drug Enforcement Act."

506.    Furthermore, each Manufacturer Defendant is equitably estopped from relying on a statute of limitations as a defense to any of Plaintiff's claims because each such Defendant took affirmative action to prevent Plaintiff from discovering the existence of and filing its claims any earlier.  Each Manufacturer Defendant was under a duty to disclose the true character, quality, and nature of their opioids, which was nonpublic information over which the Manufacturer Defendants had and continue to exclusive possession, dominion, and control, but the Manufacturer Defendants

110

breached that duty by failing to disclose such information and by intentionally and fraudulently concealing these facts.

507.   As set forth in the foregoing paragraphs of this Complaint, the Manufacturer Defendants made material misrepresentations about opioids, such as that they are non-addictive; the Manufacturer Defendants were aware that they were false because they had possession, dominion, and control over information indicating that opioids were far more addictive that the Manufacturer Defendants misled the public to believe; the Manufacturer Defendants intended that consumers, including Plaintiff, would act upon those misrepresentations (or Plaintiff reasonably believed that the Manufacturer Defendants so intended) as demonstrated by the existence of extensive marketing campaigns that asserted these misrepresentations; Plaintiff recommended that its employees' insurance carriers cover, and that its workers' compensation system reimburse, treatment with opioids because Plaintiff was unaware of the underlying truth about the Manufacturer Defendants' opioids; and Plaintiff reasonably or justifiably relied on those misrepresentations to its detriment because Plaintiff's reliance on the Manufacturer Defendants was reasonable considering that the Manufacturer Defendants possessed and controlled more information about their opioids than any other party and such reliance was harmful to Plaintiff as set forth in the damages section of this Complaint.

508.   Additionally, the Distributor Defendants are estopped from relying on a statute of limitations as a defense to any of Plaintiff's claims because each such Defendant took affirmative action to prevent Plaintiff from discovering the existence of and filing its claims any earlier.

509.   As set forth in the foregoing paragraphs of this Complaint, the Distributor Defendants made material misrepresentations about the existence of, and their compliance with, their duties with respect to distributing controlled substances under state and federal law; these statements

111

were false, and the Distributor Defendants were aware of their falsity, because Distributor Defendants were aware of their own history of conduct which included repeated breaches of such duties; Plaintiff did not know such statements were false; the Distributor Defendants intended that members of the public, including Plaintiff, would rely upon such representations, and Plaintiff did rely on such representations to its detriment, as demonstrated by the damages suffered by Plaintiff as set forth herein.

510.    Plaintiff had no knowledge that the Manufacturer Defendants or the Distributor Defendants were engaged in any of the wrongdoing alleged herein.  Because of the fraudulent acts of concealment of wrongdoing by the Manufacturer and Distributor Defendants, Plaintiff could not have reasonably discovered the wrongdoing at any time prior.

511.    Also, the economics of this fraud should be considered.  During the relevant time period, the Defendants all derived record profits as a result of their sales and distribution of prescription opioids.  The Defendants had the ability to and did spend enormous amounts of money in furtherance of their purpose of marketing and promoting a profitable drug, notwithstanding the known or reasonably known risks.  Plaintiff could not have afforded, and due to a lack of the requisite expertise could not have possibly conducted, studies to determine the nature, extent and identity of related health risks.  As a result, the public and members thereof, including Plaintiff, were forced to rely on Defendant's untrue and fraudulent representations.

512.    Much of the reckless distribution of opioids that were distributed through retail pharmacies in Michigan came from McKesson's Livonia distribution center.  McKesson minimized and misrepresented the extent of the violations at the Livonia distribution center, which were hidden by McKesson and Retailer Defendants and recently disclosed in a 60 Minutes episode that aired on December 17, 2017.

513.     David Schiller, the Assistant Special Agent in Charge of the Denver Field Division of

the Drug Enforcement Agency, spoke in the 60 Minutes episode regarding McKesson's

distribution practices to Michigan pharmacies that were recklessly distributing opioids in

Michigan, stating:

> The issue with McKesson was, they were providing millions and millions and
> millions of pills to countless pharmacies throughout the United States, and they did
> not maintain any sort of due diligence. This wasn't just happening in Denver,
> Colorado. This was happening in Los Angeles, California. It was happening in
> Detroit, Michigan. It was happening in New York City. It was a national problem,
> and nobody wanted to deal with it.

## VIII.   CAUSES OF ACTION

## COUNT I

### Public Nuisance
### As Against All Defendants

514.     The City of Traverse City incorporates by reference, as if fully set forth herein, each

and every preceding paragraph.

515.     Defendants' conduct has unreasonably interfered with the health, safety, peace,

comfort, and convenience of the general public in the City of Traverse City.

516.     Defendants, individually and acting through their employees and agents, have

unreasonably interfered with a right common to the general public of the City of Traverse City,

including by: (a) interfering significantly with the public health, safety, peace, comfort and

convenience of the general community; (b) engaging in conduct proscribed by statute, ordinance

or administrative regulation; and (c) engaging in conduct of a continuing nature that Defendants

knew or should have known produced and continues to produce permanent and long-lasting

significant effect of these rights common to the general public.

517.     Each of the Manufacturer Defendants unreasonably interfered with rights common to the general public of the City of Traverse City -including by interfering with the public health, safety, peace and comfort-by, among other things, misleading federal regulators as to the addictive nature of their drugs, promoting and marketing the use of opioids for uses not federally approved, circulating false and misleading information concerning opioids' safety and efficacy, and downplaying or failing to disclose the risk of addiction arising from their use.  In so doing, the Manufacturer Defendants acted unreasonably, reckless and with actual malice.

518.     Each of the Defendants unreasonably interfered with rights common to the general public of the City of Traverse City —including by interfering with the public health, safety, peace and comfort—by failing to design and operate a system that would disclose the existence of suspicious orders of controlled substances and/or by failing to report suspicious orders of opioids as required by the CSA, 21 C.F.R. § 1301.74(b), and by Mich. Admin. Code R. § 338.493c (i).  In so doing, Defendants acted unreasonably, reckless and with actual malice.

519.     Defendants' conduct contributing to the opioid epidemic has impinged the rights of the general public to use the streets and public ways without fear, apprehension and injury.

520.     In light of Defendants' failures to disclose suspicious orders of opioids, and in light of Manufacturer Defendants' aggressive misinformation campaign regarding opioids, the City of Traverse City was unaware of, and could not reasonably know or have learned through reasonable diligence, that it had been exposed to the risks alleged herein.  Information pertaining to the suspicious orders of opioids Defendants were required to disclose—but did not—was nonpublic information over which the Defendants had and continue to have exclusive control, and which Defendants knew was unavailable to the City of Traverse City.

114

521.    At all times relevant to this Complaint, Defendants were in complete control over the instrumentalities constituting the public nuisance.

522.    The City of Traverse City had neither knowledge nor reason to suspect that the Defendants were engaged in the wrongdoing alleged herein.  Because of the fraudulent acts of concealment of wrongdoing by the Defendants, the City of Traverse City could not have reasonably discovered the wrongdoing in time to stem the opioid epidemic in the City of Traverse City.

523.    As detailed herein, Defendants' conduct has interfered with and continues to interfere with rights common to the general public of the City of Traverse City, and has caused the City of Traverse City to sustain damages special and particular in kind, including, without limitation, increased law enforcement and overtime pay for law enforcement patrols, judicial expenditures, increased prison and public works expenditures, increased substance abuse treatment and diversion plan expenditures, increased emergency and medical care services, and lost economic opportunity.

WHEREFORE, Plaintiff demands judgment against the Defendants for actual and compensatory damages; for restitution; for punitive or exemplary damages; for costs incurred herein; the cost of abating the public nuisance and such other and further relief as this Court deems just and proper.

## COUNT II

### Negligence Per Se
### As Against All Defendants

524.    The City of Traverse City incorporates by reference, as if fully set forth herein, each and every preceding paragraph.

525.    Each of the Defendants owed the City of Traverse City statutory duties, including the duty to report suspicious orders of opioids (and the appurtenant duty to investigate any such orders

before filling them), the duty to abide by any government agreements entered regarding the same, and the duty to comply with the federal CSA, 21 C.F.R. § 1301.74(b), as incorporated by Mich. Admin. Code R. § 338.493c(i), which required the design and operation of a system to detect and disclose suspicious orders of controlled substances.

526.     Each of the Defendants breached these duties by failing to report such suspicious orders to the appropriate regulators as required by state and federal law, by failing adequately to investigate suspicious orders before filling them, and/or by failing to design and operate a system that would disclose the existence of suspicious orders of controlled substances.  In so doing, Defendants acted unreasonably, reckless and with actual malice.

527.     Each of the Manufacturer Defendants owed the City of Traverse City statutory duties, including the duty to be forthright and honest with the FDA and federal authorities regarding their products; the duty to promote and market opioids truthfully and pursuant to their federally approved indications for use; and the duty to disclose the true risk of addiction associated with the use of opioids.

528.     Each of the Manufacturer Defendants breached those duties by, among other things, promoting and marketing opioids for uses not federally approved, circulating false and misleading information concerning their safety and efficacy, and downplaying or failing to disclose the risk of addiction arising from their use.  In so doing, Defendants acted unreasonably, reckless and with actual malice.

529.     Each of the Retailer Defendants owed the City of Traverse City statutory duties, including   the duty to "provide effective controls and procedures to guard against theft and diversion of controlled substances." *See* 21 C.F.R. § 1301.71(a).

530. Each of the Retailer Defendants owed the City of Traverse City a duty to adequately train or supervise their employees at the point of sale to investigate or report suspicious or invalid prescriptions, or protect against corruption or theft by its employees or agents.

531. The Retailer Defendants' policies directly contributed to the filling and dispensing of prescriptions without a legitimate purpose as required under 21 C.F.R. § 1306.04. *See* e.g., MCLA §§ 333.7311, 7401 and 17766.

532. The Retailer Defendants' policies directly contributed to the filling opioid prescriptions that would have been deemed questionable or suspicious by a reasonably prudent pharmacy.

533. Each of the Retailer Defendants breached those duties by, among other things, putting procedures into place that encouraged employees to turn a blind eye to suspicious orders of opioids, failing to train and/or supervise their employees at the point of sale to investigate or report suspicious or invalid prescriptions, and failing to take steps to protect against corruption or theft by its employees and/or agents. In so doing, Defendants acted unreasonably, reckless and with actual malice.

534. The City of Traverse City suffered both injuries and pecuniary losses proximately caused by Defendants' breaches of their duties set forth in this Count. Among other things, the City of Traverse City's residents are suffering through an unprecedented epidemic of opioid addiction and overdose. This epidemic has forced the City of Traverse City to shoulder tremendous costs relating, among other things, to health services, emergency services, social services, and law enforcement. The City of Traverse City has also suffered a loss of productivity in its City of Traverse City workforce, as well as lost tax revenue stemming from the cascading effects of the opioid epidemic.

535.     Defendants' breaches of the statutory duties they owed to the City of Traverse City are the proximate cause of this crisis and its resulting harm to City of Traverse City.

WHEREFORE, Plaintiff demands judgment against the Defendants for actual and compensatory damages; for restitution; for punitive or exemplary damages; for costs incurred herein; the cost of abating the public nuisance and such other and further relief as this Court deems just and proper.

## COUNT III

### Negligence
### As Against All Defendants

536.     The City of Traverse City incorporates by reference, as if fully set forth herein, each and every preceding paragraph.

537.     Separate and apart from the Defendants' statutory duties, each of the Defendants owed the City of Traverse City common-law duties, including the duty to report to investigate and report plainly suspicious orders of highly addictive opioids.  Each of the Defendants breached these duties by failing to report such suspicious orders to the appropriate regulators, by failing adequately to investigate suspicious orders before filling them, and/or by failing to design and operate a system that would disclose the existence of suspicious orders of controlled substances.  In so doing, Defendants acted unreasonably, reckless and with actual malice.

538.     Separate and apart from the Manufacturer Defendants' statutory duties, each of the Manufacturer Defendants owed the City of Traverse City common-law duties, including the duty to be forthright and honest with the FDA and federal authorities regarding their products; the duty to promote and market opioids truthfully and pursuant to their federally approved indications for use; and the duty to disclose the true risk of addiction associated with the use of opioids. Each of the Manufacturer Defendants breached those duties by, among other things, promoting and

marketing opioids for uses not federally approved, circulating false and misleading information concerning their safety and efficacy, and downplaying or failing to disclose the risk of addiction arising from their use.  In so doing, Defendants acted unreasonably, reckless and with actual malice.

539.     Separate and apart from the Retailer Defendants' statutory duties, each of the Retailer Defendants owed the City of Traverse City common-law duties, including the duty to enact policies that would prevent the filling of opioid prescriptions that would be deemed questionable or suspicious by a reasonably prudent pharmacist; the duty to train and supervise their employees at the point of sale to investigate or report suspicious or invalid prescriptions; and the duty to protect against corruption or theft by its employees or agents.

540.     On information and belief, the Retailer Defendants failed to enact policies that would prevent pharmacists from filling questionable or suspicious opioid prescriptions; failed to train and supervise their employees at the point of sale .to investigate and report suspicious or invalid prescriptions; and failed to protect  against corruption or theft by its employees or agents.

541.     In failing to take adequate measures to prevent substantial opioid-related injury to the City of Traverse City, the Retailer Defendants have breached their duties imposed by common law, industry standards, and Michigan's Board of Pharmacy.

542.     Retailer Defendants' conduct fell below the reasonable standard of care in the following ways:

a) Using unsafe dispensing practices;
b) Disregarding the CSA, the Michigan Board of Pharmacy, and the DEA's suggestions for safe dispensing;
c) Failing to properly review prescription orders for suspicious orders;
d) Failing to report suspicious orders, and failing to investigate such orders before filling them;

119

e) Failing to provide effective controls and procedures to guard against diversion of controlled substances; and

f) Promoting unsafe dispensing in the interest of speed.

543. It was reasonably foreseeable that Defendants' breaches of the duties set forth in this Count would cause harm to the City of Traverse City.

544. It is reasonably foreseeable that Retailer Defendants breached their duties under the common law, industry standards, the CSA, and regulations under the Michigan Board of Pharmacy that tragic and preventable injuries would result, including significant loss of life.

545. Retailer Defendants engaged in improper dispensing practices with the knowledge that the City of Traverse City, in its role of providing protection and care for its citizens, would bear the expense for additional medical services, emergency services, law enforcement, and other necessary services, as well as the loss of substantial economic productivity and opportunity costs that contribute to the health and well-being of the City of Traverse City.

546. The City of Traverse City suffered both injuries and pecuniary losses proximately caused by Defendants' breaches of their duties set forth in this Count. Among other things, the City of Traverse City's residents are suffering through an unprecedented epidemic of opioid addiction and overdose. This epidemic has forced the City of Traverse City to shoulder tremendous costs relating, among other things, to health services, emergency services, social services, and law enforcement. The City of Traverse City has also suffered a loss of productivity in its City of Traverse City workforce, as well as lost tax revenue stemming from the cascading effects of the opioid epidemic.

547. Defendants' breaches of the common-law duties they owed to the City of Traverse City are the proximate cause of this crisis and its resulting harm to the City of Traverse City.

WHEREFORE, Plaintiff demands judgment against the Defendants for actual and compensatory damages; for restitution; for punitive or exemplary damages; for costs incurred herein; the cost of abating the public nuisance and such other and further relief as this Court deems just and proper.

## COUNT IV

### Violations of Racketeer Influenced And Corrupt Organizations Act 18 U.S.C. 1961, *et seq.* As Against Manufacturer Defendants and Distributor Defendants

548.    The City of Traverse City incorporates by reference, as if fully set forth herein, each and every preceding paragraph.

549.    The City of Traverse City brings this count on behalf of itself against the following Defendants, as defined above:  the Manufacturer Defendants, the Distributor Defendants, and the Retailer Defendants (collectively, for purposes of this Count, the "RICO Defendants").

550.    Pursuant to 18 U.S.C. § 1961(2) of the RICO Act, the term person includes "any individual or entity capable of holding a legal or beneficiary interest in property."

551.    Plaintiff, the City of Traverse City, is a person under the RICO Act because it is a legal entity capable of holding a legal or beneficial interest in property.  Plaintiff is a political subdivision within the State of Michigan, and it is capable of holding a legal or beneficial interest in property as demonstrated by its ownership of substantial real estate and other personal property.

552.    Plaintiff, the City of Traverse City, sustained a concrete injury to a proprietary interest in its business or property.  Under Michigan law, money constitutes property in which the owner has a proprietary interest.  Therefore, purely economic losses are considered "damage to property," and the economic loss rule does not apply in Michigan to prevent recovery of solely pecuniary damages when a plaintiff had neither the bargaining power, nor the opportunity to otherwise bargain to protect its interests.

553.     The RICO Defendants' violations of law and their pattern of racketeering activity directly and proximately caused the City of Traverse City's injury.  As a result of the opioid epidemic resulting from the RICO Defendants' violations of the law, the City of Traverse City suffered losses and incurred expenses.

554.     Plaintiff directly and foreseeably sustained economic damages alleged herein as a direct and proximate cause of the reckless, intentional, and unlawful conduct (which, at times, was fraudulent) of the Manufacturer, Distributor, and Retailer Defendants.  Such conduct has imposed an exorbitant financial burden on Plaintiff, for which Plaintiff seeks relief.

555.     The damages Plaintiff has suffered are not derivative of third party's injury or injuries.

a)  Plaintiff, the City of Traverse City, has suffered damages as a result of the Defendants' conduct including, but not limited to, increased emergency response costs, law enforcement and incarceration costs, addiction treatment costs, and medical costs caused by Defendants' conduct in creating and exacerbating the opioid epidemic. High levels of sustained opioid drug abuse, also created, or accelerated economic blight in some portions of the City, resulting in diminished property values and a loss in tax revenue. The opioid epidemic has caused Plaintiff to suffer past, present, and  future damages in the form of the increased expenses of providing public services that so far exceeds the normal, expected costs that they constitute a "distinct well-defined category unrelated to the normal provision" of public services.

556.     The Defendants' conduct was extraordinary, unexpected, and rare, and is a repeated course of conduct that did, does, and will continue to result in recurring costs to the Plaintiff.  The magnitude of the acts of the Defendants were neither discrete nor of a sort that a municipality, including Plaintiff, could reasonably expect to have to respond to at any time during its existence as such.  It  would be unreasonable, wrong, and inequitable not to allocate these additional

governmental expenses, and any other costs associated with the harms Defendants' wrongful conduct has caused, to the very parties responsible for creating the need for such resources to be expended in the manner they were here.

557.    The RICO Defendants' racketeering activities were the factual cause of the City of Traverse City's damages because, but for the RICO Defendants' racketeering activities and operation of their enterprise, the City of Traverse City would not have incurred the expenditures and losses associated with the opioid epidemic.  Nor would the City of Traverse City have incurred any of the other costs associated with the plague of addiction caused by the RICO Defendants' drugs.

558.    The City of Traverse City's injuries were directly and proximately caused by the RICO Defendants' violations of law and their pattern of racketeering activity.

559.    The City of Traverse City therefore has standing in this civil RICO action.

560.    The City of Traverse City seeks all legal and equitable relief available under the law, in the maximum amount and to the furthest extent permitted by law.

561.    The RICO Defendants did and do conduct their business using both legitimate and illegitimate means.  Each RICO Defendant belongs to a subgroup of defendants, of which each subgroup forms an association-in-fact enterprise or a legal enterprise (each, a "Dealing Enterprise").

562.    The RICO Defendants conducted and continue to conduct their business through legitimate and illegitimate means in the form of an association-in-fact enterprise and/or a legal entity enterprise.  At all relevant times, the RICO Defendants were "persons" under 18 U.S.C. § 1961(3) because they are entities capable of holding, and do hold, "a legal or beneficial interest in property."

123

563.    Section 1962(c) of RICO makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c); *United States v. Turkette*, 452 U.S. 576, 580 (1981).

564.    The term "enterprise" is defined as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4); *Turkette*, 452 U.S. at 580; *Boyle v. U.S.*, 556 U.S. 938, 944 (2009).   In other words, an enterprise is any company (regardless of form or legal organization), person, or group of persons (regardless of how the members are associated, regardless of whether any member is aware of his membership, regardless of whether they intend to comprise a union or group, and regardless of whether wish or do not wish to be part of such group or union, provided that, in fact, that they are somehow associated).

565.    The definition of "enterprise" in Section 1961(4) includes legitimate and illegitimate enterprises within its scope.   Specifically, the section "describes two separate categories of associations that come within the purview of an 'enterprise' -- the first encompassing organizations such as corporations, partnerships, and other 'legal entities,' and the second covering 'any union or group of individuals associated in fact although not a legal entity.'" *Turkette*, 452 U.S. at 577. The second category is not a more generalized description of the first.  *Id*.

### **DIVERSION ENTERPRISE**

566.    Manufacturer Defendants, Distributor Defendants, and Retailer Defendants engaged in a conspiracy to expand the market for opioid drugs—thus inflating their own profits—without

regard to legal requirements that Defendants take action to prevent the diversion of drugs to illegal channels.

567.    These legal associations and/or associations in fact include, at a minimum, a Manufacturer Defendant, a Distributor Defendant, and a Retailer Defendant (or a smaller and/or local pharmacy not named as a defendant in the instant case).  These legal associations and/or associations in fact are, for purposes of the RICO Act, an enterprise (hereinafter, for purpose of this count, an "Enterprise," a "Diversion Enterprise," or collectively, the "Enterprises").

568.    Under the present facts, each co-conspirator either (a) agreed to operate or manage the enterprise that did and does feloniously deal in controlled substances, an offense punishable under the laws of the United States, or (b) if a co-conspirator did not agree to operate or manage the enterprise, each co-conspirator knowingly agreed to facilitate others who did and do operate or manage the enterprise of felonious dealing in controlled substances, an offense punishable under the laws of the United States.

569.    To illustrate of the concept of an Enterprise, consider the following example.  A Manufacturer Defendant manufactures opioids.  The Manufacturer Defendant then sells the same opioids to a Distributor Defendant.  The Distributor Defendant then distributes, or sells, the same opioids to a Retailer Defendant.  Finally, the Retailer Defendant sells the same opioids to the Retailer Defendant's customers who have been provided a prescription for the opioids.

570.    To the Manufacturer Defendants, Distributor Defendants, and Retailer Defendants, what the customer does with the opioids once the final sale has been made is irrelevant.  He may ingest the opioids for legitimate medical purposes, such as to treat severe acute or chronic pain; he may abuse the opioids personally by ingesting them for recreational purposes or to support a drug

habit; or he may give or sell them to a third party abuser who ingests them recreationally or out of habit to support an addiction.

571.    Each Diversion Enterprise (which may later include as yet unnamed persons implicated by facts uncovered in the future, including  doctors who illegal prescriptions in exchange for cash payments from patients or increase their prescribing practices in exchange for kick-backs from Manufacturer Defendants), and each vertical supply chain therefore constitutes an individual Dealing Enterprise.  And any given actor in the Enterprise, whether a Manufacturer Defendant, Distributor Defendant, or Retailer Defendants may belong to one or more Diversion Enterprises.

572.    The purpose the Diversion Enterprises, which are schemes organized to maximize the members' profits at all costs, is to manufacture, encourage excessive prescriptions, distribute, and sell as many highly addictive—and often deadly—pills as legally possible.  The Enterprises accomplish this by transferring pills down through the supply chain, entity-by-entity, from the manufacturer to the end user (who can be anyone with a prescription that at least appears to be real). And they do so without regard for federal law requiring them to take affirmative steps to prevent the diversion of drugs onto the illegal marketplace.

573.    For over a decade, the RICO Defendants aggressively sought to bolster their revenue, increase profit, and grow their share of the prescription painkiller market by unlawfully and surreptitiously increasing the volume of opioids they produced and sold.  The RICO Defendants, however, are not permitted to engage in a limitless expansion through unlawful sales of regulated painkillers.  As "registrants," the RICO Defendants operated and continue to operate within the "closed system" created under the Controlled Substances Act, 21 U.S.C. § 821, et seq. (the "CSA").  The CSA restricts the RICO Defendants' ability to manufacture or distribute Schedule II substances like opioids by requiring them to:

a) Register to manufacture or distribute opioids;

b) Maintain effective controls against "diversion" of the controlled substances that they manufacturer or distribute (i.e., the transfer of the drug away from the person for whom it was intended);

c) Design and operate a system to identify suspicious orders of controlled substances, halt such unlawful sales, and report them to the DEA; and

d) Make sales within a limited quota set by the DEA for the overall production of Schedule II substances like opioids.

574.    The closed system created by the CSA, including the establishment of quotas, was specifically intended to reduce or eliminate the diversion of Schedule II substances like opioids from "legitimate channels of trade" to the illicit market.

575.    In addition, the CSA imposes strict checks on the size of the market for Schedule II substances such as opioids.  The CSA requires the Attorney General to annually establish a "production quota" for Schedule II controlled substance—setting the total quantity of "each basic class of controlled substance" that is legally permitted to be produced in the United States.  21 U.S.C. § 826(a).  In turn, each manufacturer of Schedule II drugs must apply for an "individual production quota" allowing that specific manufacturer to produce a certain quantity of drugs.  *Id.* at § 826(b).  When setting the aggregate quota for the United States, the Attorney General must consider, among other things, the estimated legitimate demand for such drugs during the coming year. *Id.* § 826(a).  When setting the "individual production quota" for manufacturers, the Attorney General must consider, among other things, the manufacturer's current rate of drug disposal and the "trend of the national disposal rate during the preceding calendar year." *Id.* at § 826(c).

576.    The Attorney General has delegated the responsibility of setting production quotas to the DEA. 28 C.F.R. § 0.100.

577.     Members of the Enterprises systematically violated their statutory duty to maintain effective controls against diversion of their drugs, to design and operate a system to identify suspicious orders of their drugs, to halt unlawful sales of suspicious orders, and to notify the DEA of suspicious orders.  Consequently, the RICO Defendants allowed hundreds of millions of pills to enter the illicit market, which allowed the RICO Defendants to derive and be unjustly enriched by obscene profits.

578.     Defendants' illegal scheme was hatched by an association-in-fact enterprise between the Manufacturer Defendants and the Distributor Defendants.  In particular, each of the RICO Defendants were associated with, and conducted or participated in, the affairs of the RICO enterprise, whose purpose was to engage in the unlawful sales of opioids and deceive the public and federal and state regulators into believing that the RICO Defendants were faithfully fulfilling their statutory obligations.

579.     The RICO Defendants' scheme allowed them to make billions in unlawful sales of opioids and, in turn, increase and/or maintain high production quotas with the purpose of ensuring unlawfully increasing revenues, profits, and market share.

580.     The RICO Defendants conducted and participated in the conduct of the Diversion Enterprise through a pattern of racketeering activity as defined in 18 U.S.C. § 1961(A) by the felonious dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substance Act), chargeable under State law. The Enterprises are engaged in or affect interstate commerce.  The Enterprises are engaged in interstate commerce, or their activities affect interstate commerce, because many of the Enterprise's transactions that occur before opioids arrive in the retail purchaser's possession (a) involve sales between and/or among residents of different states, and/or (b) physical transportation of opioids across state lines.

128

581.    CSA § 102 defines "controlled substance" as a drug or other substance or immediate precursor included in schedule I, II, III, IV, or I of part B of Title II of the Controlled Substances Act.

582.    Schedule II controlled substances have a high potential for abuse and have a high potential to lead to physical and/or psychological dependence, despite that such drugs have currently accepted medical uses.

583.    Each of the opioids manufactured or sold by the Manufacturer Defendants, Distributor Defendants, and Retailer Defendants is a semi-synthetic opiate or a synthetic opiate, including the branded versions of the Manufacturer Defendants' drugs that include morphine, codeine, oxycodone, hydrocodone, oxymorphone, hydromorphone, methadone, buprenorphine, fentanyl, and other similar drugs that are Schedule II controlled substances or listed chemicals as defined in section 102 of part B of Title II of the CSA.

584.    The RICO Defendants committed crimes that are punishable as felonies under the laws of Michigan. Specifically, MCL § 333.7407 makes it unlawful for any person to knowingly or intentionally furnish false information in, or omit any material information from, any application, report, record or other document required to be made, kept or filed under Article 7 of the Public Health Code of Michigan. A violation of MCL § 333.7407 is punishable by up to four years in jail, making it a felony. MCL § 333.7407(1)(d).  In turn, Article 7 of the Public Health Code provides that a person licensed to manufacture, distribute, prescribe, or dispense controlled substances shall keep records in conformance with the record-keeping and inventory requirements of federal law including the statutory requirements of the CSA. MCL § 333.7321.

585.    The regulations promulgated under the CSA include a requirement that a person licensed to manufacture, distribute, prescribe, or dispense controlled substances design and operate

129

a system to detect and report "suspicious orders" for controlled substances, as that term is defined in the regulation. *See* 21 C.F.R. § 1301.74(b). The provision requiring the reporting of suspicious orders in the federal CSA has been incorporated, via regulation, into Michigan law. Mich. Admin. Code R. § 338.493c(i). Much like Michigan's Public Health Code, a violation of reporting requirements under the CSA is punishable up to 4 years in jail, making it a felony. 21 U.S.C. §§ 842(a)(4)(A) and (d)(1).

586.    Each of the RICO Defendants qualifies as registrants under the CSA and Michigan's Public Health Code. Their status as registrants under the CSA and Michigan law requires that they maintain effective controls against diversion of controlled substances in schedule I or II, design and operate a system to disclose to the registrant suspicious orders of controlled substances, and inform the DEA of suspicious orders when discovered by the registrant. 21 U.S.C. § 823; 21 C.F.R. § 1301.74(b); Mich. Admin. Code R. § 338.493c(i).  Failure to abide by those requirements is a felony.

587.    The multiple acts of racketeering activity that the RICO Defendants committed, or aided and abetted in the commission of, were related to each other, had a similar purpose, involved the same or similar participants and methods of commission, and have similar results affecting similar victims, including Plaintiff, the City of Traverse City. These acts pose a threat of continued racketeering activity and constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

588.    Members of each Enterprise participate in the Enterprise's affairs:

a)    without regard to their obligations under the CSA, such as the obligation to report suspicious orders;

b)  without regard to what effect the Enterprise's operations may have on individuals or the larger community, such as mass overdoses, crime, addiction, and death;

c)  without regard to whether the prescriptions presented by purchasers are for legitimate purposes;

d)  without regard to whether the size of individual doses or collective volume of doses in individual prescriptions is appropriate, or extremely inappropriate, given the conditions for the opioids prescription;

e)  without regard to whether the purchasers did in the past or continue to exhibit drug seeking behavior;

f)  without regard to whether the purchasers have a known history of criminal activity inside the Retailer Defendants' store, or on or near their property;

g)  without regard to whether an individual customer presents multiple prescriptions from different doctors, who are unaware of each other, during a single month; and

h)  without regard to whether prescriptions were written by doctors who have a known history of, or presently continue, engaging in suspicious or downright fraudulent over-prescribing.

589.  The Predicate Offenses of the Enterprise are related because they:

a)  have the same purpose, results, participants, victims, and/or methods of commission; and/or

b)  are otherwise interrelated by distinguishing characteristics, which include, without limitation:

i.  commission in the same manner using the same means, such as:

1.  intentionally failing to comply with CSA obligations to flag and report orders of controlled substances as suspicious when they meet certain criteria;

2.  using aggressive marketing campaigns that encourage overprescribing medications for unapproved uses;

3.    claiming that the drugs were far safer, less addictive, and more effective than alternatives, each of which claim is false and misleading; and

4.    providing such strong incentives for prescribing that such practices would be better described as bribery or coercion, (and which, in fact, in some cases, resulted in criminal convictions for violations of federal anti-kickback laws).

c)  were conducted pursuant to an understanding and agreement, whether explicit or implicit, that each member would participate to facilitate and further the Enterprise's purpose, which was to maximize profits by manufacturing, distributing, and selling as many opioid pills as possible.

590. From at least as early as 1995, and continuing until the time of filing of this complaint, in the City of Traverse City and elsewhere, Defendants and others known and unknown did knowingly and intentionally devise and intend to devise an illegal scheme and artifice to increase and maintain profits from unlawful sales of opioids.

591. It was further part of said scheme and artifice that, in order to conceal the inundation of opioids in the steam of commerce, Defendants and their co-conspirators:

a)  would and did make representations and statements in national publications;

b)  would and did represent that Defendants would comply with their duty to (1) design and operate a system to disclose to the registrant suspicious orders of controlled substances, and (2) disclose the results of such a program to resolve concerns about over-prescription and diversion of opioids; and

c)  would and did suppress and destroy records of suspicious orders to hide evidence of over-prescription and diversion.

592. It was further part of said scheme and artifice that Defendants and their co-conspirators would seek to impair, impede, and defeat government authorities' ability to regulate diversion and to impair, impede, and defeat governmental efforts to regulate and control the manufacture and

distribution of opioids, and would and did attempt to prevent to the public, Congress, courts and government officials from uncovering those activities

593. It was further part of said scheme and artifice that Defendants' communications directed toward government officials and courts would be and were designed to preserve and increase the market for prescription opioids while concealing Defendants' role in supporting an illegal market for opioids.

594. Throughout the existence of the Enterprise, the RICO Defendants purposefully failed to comply with all state and federal regulations regarding the identification and reporting of suspicious orders of prescription opioids—all the while espousing to the general public, to Congress, and to federal and state agencies their commitment to preventing diversion of prescription opioids.

595.  The felonious dealing described herein were made in furtherance of RICO Defendants' unified scheme to increase and maintain profits from unlawful sales of opioids while thwarting the ability of federal and state regulators to prevent diversion.  This unified scheme was furthered by (1) habitual noncompliance with federal and state law; (2) intensive lobbying of federal and state official to evade further regulation; and (3) increasing and/or maintaining high production quotas for their prescription opioids from which Defendants could profit for as long as possible.

596. The RICO Defendants unlawfully, knowingly and intentionally combined, conspired, confederated, and agreed together with each other, and with others whose names are both known and unknown, to conduct and participate, directly and indirectly, in the overall objective of their unified scheme, and participated in the common course of conduct to fail to prevent the overprescribing and diversion of prescription opioids.

597. Upon information and belief, each of the Defendants had to agree to implement similar tactics regarding marketing prescription opioids and refusing to report suspicious orders. If any RICO defendant had disclosed and/or withheld suspicious orders, the conspiracy would be endangered.

598. The RICO Defendants engaged in a pattern of related and continuous predicate acts for years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant monies and revenues while benefitting from, encouraging, indirectly creating, contributing to, and maintaining an illegal secondary market for highly addictive and dangerous drugs. The predicate acts involved the same or similar purposes participants, victims, criminal acts that have the same or similar purposes, results, participants, victims, methods of commission, and are not isolated events.

599. Many of the precise dates of the RICO Defendants' criminal actions are not known and cannot be alleged without access to Defendants' books and records. Indeed, an essential part of the successful operation of the unified scheme alleged herein depended upon secrecy—and, towards that end, RICO Defendants took deliberate steps to conceal their wrongdoing. However, given the massive scope of the illegal and scheme, RICO Defendants likely committed thousands, if not millions, of predicate acts of racketeering activity.

600. By intentionally refusing to report and halt suspicious orders of their prescription opioids, Defendants engaged in a unified scheme and unlawful course of conduct constituting a pattern of racketeering activity.

601. It was foreseeable to Defendants that refusing to report and halt suspicious orders, as required by the CSA, the Code of Federal Regulations, and Michigan's Public Health Code would

harm the City of Traverse City by allowing the flow of prescriptions opioids from appropriate medical channels into the illicit drug market.

602. The RICO Defendants knowingly and intentionally furnished false information in their reports to the DEA about suspicious orders, and/or omitted material information from reports, records and other document required to be filed with the DEA—including the Manufacturer Defendants' applications for production quotas. Specifically, the RICO Defendants were aware of suspicious orders of prescription opioids and the diversion of their prescription opioids into the illicit market, and failed to report this information to the DEA in their mandatory reports and their applications for production quotas.

603. The following DEA communications reflect the RICO Defendants' pattern and practice of willfully and intentionally omitting information from their mandatory reports to the DEA as required by 21 C.F.R. § 1301.74:

a) On April 24, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against AmerisourceBergen's distribution center in Orlando, Florida ("Orlando Facility"), alleging failure to maintain effective controls against diversion of controlled substances. On June 22, 2007, AmerisourceBergen entered into a settlement that resulted in the suspension of its DEA registration.

b) On November 28, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against Cardinal Health's distribution center in Auburn, Washington ("Auburn Facility"), for failure to maintain effective controls against diversion of hydrocodone.

c) On December 5, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against Cardinal Health's distribution center in Lakeland, Florida ("Lakeland Facility"), for failure to maintain effective controls against diversion of hydrocodone.

d)  On December 7, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against Cardinal Health's distribution center in Swedesboro, New Jersey ("Swedesboro Facility"), for failure to maintain effective controls against diversion of hydrocodone.

e)  On January 30, 2008, the DEA issued an Order to Show Cause and Immediate Suspension Order against the Cardinal Health's distribution center in Stafford, Texas ("Stafford Facility"), for failure to maintain effective controls against diversion of hydrocodone.

f)  On May 2, 2008, McKesson Corporation entered into an Administrative Memorandum of Agreement ("2008 MOA") with the DEA which provided that McKesson would "maintain a compliance program designed to detect and prevent the diversion of controlled substances, inform DEA of suspicious orders required by 21 C.F.R. § 1301.74(b), and follow the procedures established by its Controlled Substance Monitoring Program."

g)  On September 30, 2008, Cardinal Health entered into a Settlement and Release Agreement and Administrative Memorandum of Agreement with the DEA related to its Auburn Facility, Lakeland Facility, Swedesboro Facility and Stafford Facility. The document also referenced allegations by the DEA that Cardinal failed to maintain effective controls against the diversion of controlled substances at its distribution facilities located in McDonough, Georgia ("McDonough Facility"), Valencia, California ("Valencia Facility") and Denver, Colorado ("Denver Facility").

h)  On February 2, 2012, the DEA issued an Order to Show Cause and Immediate Suspension Order against the Cardinal Health's Lakeland Facility for failure to maintain effective controls against diversion of oxycodone.

i)  On December 23, 2016, Cardinal Health agreed to pay a $44 million fine to the DEA to resolve the civil penalty portion of the administrative action taken against its Lakeland Facility.

j)  On January 5, 2017, McKesson Corporation entered into an Administrative Memorandum Agreement with the DEA wherein it agreed to pay a $150,000,000 civil penalty for violation of the 2008 MOA as well as failure to

identify and report suspicious orders at its facilities in Aurora, Colorado; Aurora, Illinois; Delran, New Jersey; LaCrosse, Wisconsin; Lakeland, Florida; Landover, Maryland; La Vista, Nebraska; Livonia, Michigan; Methuen, Massachusetts; Santa Fe Springs, California; Washington Courthouse, Ohio; and West Sacramento, California.

604. These actions against the Distributor Defendants confirm that the Distributors knew they had a duty to maintain effective controls against diversion, design and operate a system to disclose suspicious orders, and to report suspicious orders to the DEA. These actions also demonstrate, on information and belief, that the Manufacturer Defendants were aware of the enforcement against their Distributors and the diversion of the prescription opioids.  Manufacturer Defendants had a corresponding duty to report these suspicious orders.

605.    Given the continuous nature of these offenses—as demonstrated by the number of co-conspirators convicted, the number of predicate offenses committed by the co-conspirators, and the length of time over which they were committed—the pattern of conduct by the co-conspirators presents a significant risk of continued criminal activity and serious, resulting harm.

## MARKETING ENTERPRISE

606.    In addition to their participation in the Diversion Enterprises, Manufacturer Defendants and their co-conspirators engaged in a coordinated conspiracy to deceive the American public and the medical profession about the efficacy and safety of opioids, including by minimizing the addictive qualities of opioids.  That conspiracy is referred to the "Marketing Enterprise," or, for purposes of this subsection, the "Enterprise."

607.    The formation, existence, and actions of the Marketing Enterprise were essential to the success of Manufacturer Defendants' campaign to increase and maintain profits from unlawful sales of opioids. The constituent members of the Marketing Enterprise were aware that, unless they agreed to act and acted as an enterprise, their sales of prescription opioids would substantially

decrease, and accordingly, the profits of the Manufacturer Defendants would substantially diminish.

608.    At all relevant times, the Marketing Enterprise has existed separate and apart from defendants' racketeering acts and their conspiracy to commit such acts. The Marketing Enterprise has an ascertainable structure and purpose beyond the scope and commission of defendants' predicate acts. It has a consensual decision making structure that is used to coordinate strategy, manipulate scientific data, suppress the truth about the addictive qualities of opioids, and otherwise further the Manufacturer Defendants' fraudulent unified scheme.

609.    The Manufacturer Defendants' conduct, and that of their co-conspirators, has been directed in a uniform manner—using the same misleading and deceptive drug labels and same misleading and deceptive promotional practices.

610.    Manufacturer Defendants' deceptive and misleading marketing scheme increased the number of prescriptions of opioids written and filled over the last two decades. Because Defendants withheld material information about the true safety and efficacy of opioids, prescribing physicians did not have the knowledge necessary to make informed decisions regarding opioid prescriptions. Physicians thus wrote prescriptions they would not have otherwise, and the City of Traverse City, unaware of Manufacturer Defendants' scheme, was left to pay for the resulting opioid epidemic.

611.    Effective, safe, and less expensive alternatives to opioids are available.  Yet Manufacturer Defendants were able to dominate the market for pain-relief by funding and carrying out an aggressive misinformation campaign about opioid safety and effectiveness.  As a result of that campaign—which sparked the opioid epidemic and its widespread devastation—

Manufacturer Defendants raked in billions of dollars in profits.  Those are ill-gotten gains to which they are not entitled.

612.    Patients relied on Manufacturer Defendants' misrepresentations regarding opioids safety and efficacy when making purchases of the drugs. Physicians relied on Manufacturer Defendants' misrepresentations regarding opioids safety and efficacy when prescribing the drugs for their patients. From both groups, Manufacturer Defendants withheld material information about the drugs' safety and efficacy that was not otherwise available and undercut the entire rationale for their use.

613.    The Marketing Enterprise functioned as an ongoing organization and continuing unit. The Marketing Enterprise was created and/or used as tools to effectuate a pattern of racketeering activity. Each of the Marketing Enterprise participants, including Defendants, is a "person" distinct from the Marketing Enterprise.

614.    Each of the Defendants, in concert with the other Enterprise participants, created and maintained systematic links for a common purpose, i.e., to aid in marketing opioids as effective and safe for use by patients in moderate pain, while suppressing evidence to the contrary. Each of the participants in the Marketing Enterprise received revenue, directly or indirectly, and/or otherwise benefitted from the scheme to promote opioids as safe and non-addictive. Such revenue was exponentially greater than it would have been had opioids been marketed appropriately and the true efficacy and safety risks of prescription opioids disclosed. All participants of the Marketing Enterprise were aware of Defendants' control over the activities of the Enterprise in promoting opioids for use in every situation in which a patient is in pain. Furthermore, each portion of the Enterprise benefited from the existence of the other parts.

615.    Defendants established the Marketing Enterprise to accomplish goals that were instrumental to its scheme designed to market and sell opioids in every situation in which a patient is in pain.

616.    In order to further the conspiracy, and as part of an Enterprise that was engaged in a pattern of racketeering activity, Defendants formed multiple front groups or infiltrated existing third party organizations to avoid regulation from the FDA.

a)  The American Pain Foundation ("APF"), founded in 1997, described itself as the nation's largest advocacy group for pain patients. At the heart of its messaging was that the risk of opioid addiction was overblown and opioids were underused as a treatment for pain.   In December 2011, a ProPublica investigation found that in 2010, nearly 90% of APF's funding came from the drug and medical device community, including Manufacturer Defendants. On May 8, 2012, the U.S. Senate Finance Committee sent a letter APF inquiring about its ties to drug manufactures. That very same day, APF announced it was ceasing operations, effective immediately. APF, upon information and belief, received more than $10 million in funding from opioid manufacturers from 2007 through 2012. The primary opioid manufacturer contributors were Purdue and Endo. Manufacturer Defendants Purdue, Endo, Janssen and Cephalon all contributed to funding APF;

b)  The American Academy of Pain Management ("AAPM") is a medical specialty society which has received funding from Manufacturer Defendants for years. Upon information and belief, Endo, Janssens and Purdue have contributed funding to AAPM. AAPM issued a statement in 1997 that endorsed opioids, and claimed that the risk of opioid addiction in people taking prescription opioids was low. The chairman of AAPM at that time was Dr. David Haddox. Dr. Haddox was, at the time of the statement, a paid speaker for Purdue. He later went on to become Purdue's vice president for health policy and is most known for inventing the pseudoscience of pseudoaddiction (the idea that

140

opioid-seeking patients are not actually addicted to opioids but are "undertreated"—requiring higher doses of opioids.);

c) In 2009, the American Pain Society ("APS") and AAPM jointly issued guidelines ("APS/AAPM Guidelines") recommending the use of opioids to treat chronic pain. The APS/AAPM guidelines promoted the use of opioids for the treatment of chronic pain and concluded that the risk of opioid addiction was manageable in patients regardless of previous histories of abuse.  At least fourteen of the twenty-one panel members who drafted the APS/AAPM Guidelines received funding from manufacturer defendants Purdue, Endo, Cephalon or Janssen;

d) FSMB printed and distributed "Responsible Opioid Prescribing," a guide authored by Dr. Scott Fishman in 2007 on behalf of the Manufacturer Defendants. FSMB received funding from organizations that manufacture opioid-based drugs from 1997 through 2012. Included in the list of payments are Manufacturer Defendants Purdue, Endo, Cephalon and Mallinckrodt. Total disclosed payments include $822,400.06 from Purdue, $371,620.00 from Endo, $180,000.00 from Cephalon and $100,000.00 from Mallinckrodt;

e) The Pain Care Forum ("PCF") is a coalition comprised of Manufacturer Defendants, trade groups, and various front groups supported by the pharmaceutical industry. Purdue, Endo, Cephalon and Janssen are each represented in PCF. Upon information and belief, Distributor Defendants participated directly in PCF as well. PCF projects included making sure that a FDA mandated education project on opioids did not require mandatory participation by prescribers, since manufacturer defendants determined this would reduce opioid prescribing habits; and

f) Healthcare Distribution Alliance ("HDA") is an association of pharmaceutical manufacturers and distributors. Upon information and belief, members of the HDA included Manufacturer Defendants Purdue, Endo, Johnson & Johnson (Janssen's parent company), Actavis, and Teva (Cephalon's parent company), and distributor defendants McKesson, Cardinal Health, and AmerisourceBergen.

141

617.     The Marketing Enterprise used three principle stratagems to facilitate their goal of misleading doctors and the public about the dangers opioids. *First*, using the shadow groups discussed above, the Marketing Enterprise created a marketing structure that appeared independent from Manufacturer Defendants.  In so doing, Manufacturer Defendants sought to avoid federal regulations concerning off-label promotion. *Second*, Manufacturer Defendants generated and published favorable articles that appeared to emanate from independent physicians. *Third*, in order to widely disseminate the message that opioids were practically non-addictive, Defendants' marketing enterprise developed misleading labeling.  That labeling was widely disseminated across the country to physicians and prescribers. These three stratagems were complementary and mutually reinforcing. The production of favorable publications and the peer-to-peer marketing and promotion allowed aggressive sales pitches to continue with the appearance of legitimacy.

618.     There was a common strategy employed by these Enterprise participants whereby the Enterprise participants would recruit and use physicians, both for marketing and publication, to promise the ubiquitous use of opioids.  That created the perception that independent physicians were achieving favorable results with opioids with little to no incidence of addiction.

619.     The various participants of the Enterprise performed work that Manufacturer Defendants could not lawfully do, including funneling payments to physicians, misleading the public into believing the message was coming from a neutral source, covering up Manufacturer Defendants' control over the Enterprises, and actively concealing any negative information.

620.     These systematic linkages between physicians, marketing participants, physician participants, Manufacturer Defendants and all the Enterprise participants were established for a common purpose: to aid in marketing and selling opioids for ubiquitous use to treat all levels of pain. Many of the Enterprise participants received substantial revenue from the scheme to promote

opioids. Such revenue was exponentially greater than it would have been if opioids been marketed appropriately.

621.    All participants of the Enterprise were fully aware of Manufacturer Defendants' control over the Enterprise. Furthermore, each portion of the Enterprise benefited from the existence of other parts. For example, medical "experts" and "thought leaders" on the Enterprise's payroll produced literature promoting opioids—which, in turn, provided medical legitimacy to the Enterprise's direct-to-prescriber promotional materials.

622.    The Marketing Enterprise are engaged in interstate commerce, or their activities affect interstate commerce, because many of the Enterprise's activities (a) involved promotion of opioid sales between and/or among residents of different states, and/or (b) physical transportation of promotional materials across state lines.

623.    The named Manufacturer Defendants exerted control over the Enterprise, and Defendants have participated in the operation or management of the affairs of the Enterprise.

624.    The Manufacturer Defendants' predicate acts of racketeering, 18 U.S.C. § 1961(1) include, but are not limited to:

a)  Mail Fraud: The Manufacturer Defendants violated 18 U.S.C. § 1341 by sending and receiving, and by causing to be sent and/or received, materials via U.S. Mail or commercial interstate carriers for the purpose of executing the unlawful scheme to deceptively market, and sell the opioids by means of false pretenses, misrepresentations, promises and omissions; and

b)  Wire Fraud: The Manufacturer Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, and by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to defraud and obtain money on false pretenses, misrepresentations, promises and omissions.

625. The Manufacturer Defendants' use of the mails and wires include, but are not limited to, the transmission, delivery and shipment of deceptive marketing materials by the Manufacturer Defendants and other members of the opioid marketing fraud enterprise. These materials would not have been delivered but for the Manufacturer Defendants' illegal scheme, including, but not limited to:

a) false or misleading communications to the public and to regulators;

b) sales and marketing materials, including slide decks, presentation materials, purported guidelines, advertising, web sites, product packaging, brochures, labeling and other writings which misrepresented, falsely promoted and concealed the true nature of opioids;

c) Numerous guides and brochures for patients, doctors, and policymakers produced by the American Pain Foundation that minimizing the risks of addiction and exaggerated the benefits associated with prescription opioids, including but not limited to the "Policymaker's Guide," sponsored by Purdue, which sought to dispel the "myth" that opioid pain medication leads to addition, "Exit Wounds: A Survival Guide to Pain Management for Returning Veterans & Their Families," sponsored by Endo, which falsely claimed that it is unlikely that people who are not predisposed to addiction will become addicted to opioid painkillers, and "Treatment Options: A Guide for People Living with Pain," which promoted opioids as essential for treating even "moderate" pain.

d) Statements by the American Academy of Pain Management that endorsed opioids and claimed that the risk of opioid addiction in people taking prescription opioids was low.

e) Guidelines issued in 2009 by the American Pain Society ("APS") and American Academy of Pain Management ("AAPM") recommending the use of opioids to treat chronic pain. The APS/AAPM guidelines promoted the use of opioids for the treatment of chronic pain and concluded that the risk of opioid addiction was manageable in patients regardless of previous histories of abuse.

f)  Distribution of "Responsible Opioid Prescribing," a guide authored by Dr. Scott Fishman in 2007. The guide was ultimately disseminated to 700,000 practicing doctors, with doctors in Michigan alone receiving 42,366 copies. The "Responsible Opioid Prescribing" guide promoted the use of opioid pain relievers for both acute and chronic pain and severely minimized the risk of addiction—even claiming that opioids could be used safely in patient assessed to have a risk of substance abuse. The guide promoted the widespread use of opioids, stating that "[p]atients should not be denied opioid medications except in light of clear evidence that such medications are harmful to the patient."

626.   The conduct of the Enterprise described above constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(1). Manufacturer Defendants' decision for the Enterprise to routinely conduct its transactions in such a manner constitutes a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

627.   The above described racketeering activities amounted to a common course of conduct intended to deceive and harm the general public and the City of Traverse City. Manufacturer Defendants' racketeering activity was related, had similar purposes, involved similar or the same participants, and methods of commission, and had similar results affecting the same or similar victims, including the City of Traverse City.  Defendant's racketeering activities were part of their ongoing business and constitute a continuing threat to the property of the City of Traverse City.

628.   Manufacturer Defendants' motive in creating and operating the fraudulent scheme and the Enterprises was to obtain additional revenues from the marketing and sale of opioids for treating every conceivable level of patient pain.

629.   The City of Traverse City has been injured in their property by reason of these violations in that the City of Traverse City has paid and will pay significant government entity dollars to abate the public nuisance that is the opioid epidemic in the City of Traverse City, Michigan.

145

630.    Defendants' racketeering activity was a substantial factor in bringing about injuries to the City of Traverse City. In the absence of the Manufacturer Defendants' unlawful conduct, the American public and the American medical community would not have been misled as to the addictive qualities of opioids.

631.    The Enterprise, and the members thereof, acted and participated to further the purpose of the Enterprise willfully and/or with actual knowledge of the illegal acts of the enterprise, as evidenced by their aggressive marketing campaigns and even recent activities abroad, which includes companies owned and controlled by Purdue running training seminars where doctors are urged to overcome "opiophobia" and prescribe painkillers.  Harriet Ryan, Lisa Girion & Scott Glober, *OxyContin goes Global – ""We're only just getting started"*, LOS ANGELES TIMES (Dec. 18, 2016), http://www.latimes.com/projects/la-me-oxycontin-part3/.

632.    The RICO Defendants did not undertake the practices described herein in isolation, but as part of a common scheme. These actions violate 18 U.S.C. § 1962(c). Various other persons, firms, and corporations, including third-party entities and individuals not named as defendants in this Complaint, may have contributed to and/or participated in the scheme with the RICO Defendants and have performed acts in furtherance of the scheme to increase revenues, increase market share, and/or minimize the losses for the RICO Defendants.

633.    The RICO Defendants, with knowledge and intent, agreed to the overall objective of their fraudulent scheme, and participated in the common course of conduct to commit acts of fraud and indecency in manufacturing and distributing prescription opioids.

634.    Indeed, for the Defendants' fraudulent scheme to work, each of the Defendants had to agree to implement similar tactics regarding marketing prescription opioids and refusing to report suspicious orders.

146

635.    As described herein, the RICO Defendants engaged in a pattern of related and continuous predicate acts for years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant monies and revenues from the sale of their highly addictive and dangerous drugs. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

636.    The predicate acts all had the purpose of generating significant revenue and profits for the RICO Defendants.  At the same time, the City of Traverse City was forced to shoulder costs related to the damage that the prescription opioid epidemic caused.

637.    The pattern of racketeering activity alleged herein, and the Enterprises alleged herein (including both the Diversion Enterprise and the Marketing Enterprise) are separate and distinct from each other. Likewise, Defendants are distinct from the Enterprises.

638.    The pattern of racketeering activity alleged herein is continuing as of the date of this Complaint and, upon information and belief, will continue into the future unless enjoined by this Court.

639.    All the RICO Defendants conducted and participated in the conduct of the affairs of the Marketing Enterprise or the Diversion Enterprise through a pattern of racketeering activity as defined in 18 U.S.C. § 1961(D) by the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substance Act), punishable under any law of the United States. Furthermore, in so doing the acts alleged herein, the members of the Enterprises (the "Co-Conspirators") conspired to violate § 1962(c) of the RICO Act, and they thereby violated § 1962(d) of the RICO Act.

640.     The Co-Conspirators so conspired because there was a meeting of the minds evidencing the alleged conspiracy of which the intent was to violate § 1962(c).

641.     The Diversion Enterprise and Marketing Enterprise did encourage, and indirectly create, contribute to, and maintain an illegal secondary market for opioids.

642.     The pattern of racketeering activity alleged herein is continuing as of the date of this Complaint and, upon information and belief, will continue into the future unless enjoined by this Court.

643.     But for the conduct of the Enterprises' affairs, the City of Traverse City would not have sustained damages.

644.     The City of Traverse City's damages are not remote.  Nor are the City of Traverse City's damages derivative of harm visited upon third party persons or entities not named in this action.

645.     By virtue of the foregoing violations of the RICO Act, including 18 U.S.C. § 1962(c), Manufacturer Defendant is liable to the City of Traverse City for three times the damages sustained, plus the costs of this suit, including reasonable attorney's fees.

## **EXEMPLARY DAMAGES**

646.     Plaintiff re-alleges all paragraphs of this Complaint as if set forth fully herein.

647.     By engaging in the above-described intentional and/or unlawful acts or practices, Defendants acted willfully with actual malice, wantonly, and oppressively.  Defendants acted with conscious disregard to the rights of others and/or in a reckless, wanton, willful, or grossly negligent manner.  Defendants acted with a prolonged indifference to the adverse consequences of their actions and/or omissions.  Defendants acted with a conscious disregard for the rights and safety of others in a manner that had a great probability of causing substantial harm.  Defendants acted

148

toward the Plaintiff with fraud, oppression, and/or malice, and/or were grossly negligent in failing to perform the duties and obligations imposed upon them under applicable federal and state statutes, and common law.

648.    Defendants were selling and/or manufacturing dangerous drugs statutorily categorized as posing a high potential for abuse and severe dependence.  Thus, Defendants knowingly traded in drugs that presented a high degree of danger if prescribed incorrectly or diverted to other than legitimate medical, scientific, or industrial channels.  Because of the severe level of danger posed by, and indeed visited upon the City of Traverse City by, these dangerous drugs, Defendants owed a high duty of care to ensure that these drugs were only used for proper medical purposes. Defendants chose profit over prudence, and the safety of the community, and an award of punitive damages is appropriate, as punishment and deterrence.

649.    By engaging in the above-described wrongful conduct, Defendants also engaged in willful misconduct and gross negligence, and exhibited an entire want of care that would raise the presumption of a conscious indifference to consequences.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, acting on behalf of themselves and on behalf of their inhabitants, prays that the Court grant the following relief:

A.  Enjoin the Distributing Defendants from failing to report suspicious orders as required by the federal CSA, as incorporated by Mich. Admin. Code R. § 338.493c(i);

B.   Award the Plaintiff the damages caused by the opioid epidemic, including the increased costs of providing governmental servicers attributable to the crisis;

C.  Order that Defendants compensate the Plaintiffs for past and future costs to abate the ongoing public nuisance caused by the opioid epidemic;

D.  Order Defendants to fund an "abatement fund" for the purposes of abating the opioid nuisance;

E.  Award actual damages, treble damages, injunctive and equitable relief, forfeiture as deemed proper by the Court, and attorney fees and all costs and expenses of suit pursuant to Plaintiffs' RICO claims;

F.  Award judgment against the Defendants requiring Defendants to pay exemplary damages;

G.  The cost of investigation, reasonable attorneys' fees, and all costs and expenses;

H.  Pre-judgment and post-judgment interest; and

I.  Grant any such further monetary, injunctive and equitable relief as this Court deems appropriate.


Dated: July 31, 2018                    Respectfully submitted,


                                        /s/*Paul J. Pennock*

                                        Paul J. Pennock
                                        Ellen Relkin
                                        **WEITZ & LUXENBERG, P.C.**
                                        700 Broadway
                                        New York, NY 10003
                                        Tel: (212) 558-5500
                                        Email: ppennock@weitzlux.com
                                        Email: erelkin@weitzlux.com

                                        Paul F. Novak (P39524)
                                        **WEITZ & LUXENBERG, P.C.**
                                        3011 West Grand Boulevard, Suite 2150
                                        Detroit, MI 48202
                                        Tel: (313) 800-4170
                                        Email: pnovak@weitzlux.com

Mark Bernstein (P56528)
**THE SAM BERNSTEIN LAW FIRM, PLLC**
31731 Northwestern Hwy, Suite 333
Farmington Hills, MI 48334
Tel: (888) 225-5726
Email: mbernstein@sambernstein.com

Timothy P. Smith (P48259)
**SMITH & JOHNSON, ATTORNEYS, P.C.**
603 Bay Street, P.O. Box No. 705
Traverse City, MI 49685-0705
Tel: (231) 946-0700
Email: tsmith@smith-johnson.com

*Attorneys for Plaintiff, City of Traverse City*